**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| THE NEW GEORGIA PROJECT, *et al.*, <br><br>      *Plaintiffs*, <br><br> v. <br><br> BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State, *et al.*, <br><br>      *Defendants*. | CIVIL ACTION <br><br> FILE NO. 1:21-CV-01229-JPB |

**<u>BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>**

## INTRODUCTION

Plaintiffs' rhetoric does not match the reality of what is in the legislation that they challenge. Plaintiffs assail SB 202 as "burdensome," "discriminatory," and "unjustified," [Doc. 1, ¶¶ 3, 7], but as discussed below, the changes it makes are well within the mainstream of other state laws related to elections. Plaintiffs cannot point to a single provision of SB 202 that is not law in other states already—and, in fact, Georgia remains in the top tier of voter access according to a recent non-partisan report.[1]

In this case, New Georgia Project (NGP) asks this Court to give it the policy outcome it seeks[2] despite the clear direction from the Eleventh Circuit that the judicial "sphere does not extend to second-guessing and interfering with a State's reasonable, nondiscriminatory election rules." *New Ga. Project*, 976 F.3d at 1284. Regardless of any lingering effects of a costly pandemic,

---

[1] *See* Center for Election Innovation and Research, *How Easy Is It to Vote Early in Your State?*, https://electioninnovation.org/research/early-voting-availability-2022/ (April 12, 2021).

[2] While Plaintiffs apparently now agree that Georgia's election system is "*already* safe and secure," [Doc. 1, ¶ 6] (emphasis in original), they did not seem to reach that conclusion until after they saw the 2020 results. NGP—with the same counsel—unsuccessfully sued the Secretary *before* the 2020 elections, seeking major changes to Georgia election laws they said would "unconstitutionally burden and disenfranchise thousands of voters." *New Ga. Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1279 (N.D. Ga. 2020), stayed by *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1284 (11th Cir. 2020).

"COVID-19 has not put any gloss on the Constitution's demand that States—
not federal courts—are in charge of setting those rules." *Id*. As discussed
below, NGP and the other Organizational Plaintiffs do not have Article III
standing to invoke this Court's limited jurisdiction over state election laws.

But even if this Court reaches the merits, there is no case here. SB 202
is designed "to address the lack of elector confidence in the election system on
all sides of the political spectrum, to reduce the burden on election officials,
and to streamline the process of conducting elections in Georgia by promoting
uniformity in voting." Ex. A[3] at 4:79-82; 4:70-72. It does that by updating
Georgia's reasonable, nondiscriminatory election rules in response to lessons
learned from voting during a pandemic.

Because of the COVID-19 pandemic, the 2020 election cycle saw
marked and sudden changes in how Georgians cast their ballots, as well as
numerous emergency rules passed to deal with the pandemic. Ex. A at 4:76-
78. It is logical that the legislature would weigh in on these extraordinary
circumstances, and it did so in a way that expands the required minimum
time for early voting, expressly allows Sunday voting for the first time in
Georgia law, expressly requires absentee ballot drop boxes for the first time

---

[3] A copy of the enacted version of SB 202 is attached as Ex. A. Citations are to
the page and line number.

2

in Georgia law, allows for the early scanning of absentee ballots, and attempts to ensure that voters do not face long lines or electioneering at polling places. Ex. A at 4:84-90, 5:113-118, 6:123-138; 29:721-734. This Court should "follow the law as written and leave the policy decisions for others," *Ga. Ass'n of Latino Elected Officials, Inc. v. Gwinnett Cty. Bd. of Reg. & Elections*, No. 1:20-CV-01587-WMR, 2020 U.S. Dist. LEXIS 211736, at *4 (N.D. Ga. Oct. 5, 2020) ("*GALEO*"), and dismiss this case in its entirety.

## ARGUMENT AND CITATION OF AUTHORITY

Plaintiffs ask this Court to enjoin nine components of SB 202 because they claim those changes place an undue burden on the right to vote and that they violate Section 2 of the Voting Rights Act. *See generally* [Doc. 1].

Where a motion to dismiss is brought pursuant to Fed. R. Civ. P. 12(b)(1), the Court is not limited to the four corners of the Complaint to adequately satisfy itself of jurisdiction over the matter. *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 732 n.9 (11th Cir. 1982). In evaluating a 12(b)(1) motion, "no presumptive truthfulness attaches to plaintiff's allegations." *Id.*

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully."

3

*Ashcroft v. Iqbal,* 556 U.S. 662, 677 (2009). While this Court must assume the veracity of well-pleaded factual allegations, it is not required to accept legal conclusions when they are "couched as [] factual allegation[s]." *Id.* at 678-79. This Court may consider any matters appropriate for judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## I.   Plaintiffs do not have standing.

Article III of the United States Constitution limits federal-court authority to "Cases" and "Controversies." U.S. CONST. Art. III § 2. As the Eleventh Circuit explained recently, "Federal courts are not 'constituted as free-wheeling enforcers of the Constitution and laws.'" *Wood v. Raffensperger*, 981 F.3d 1307, 1313 (11th Cir. 2020) quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006).

To demonstrate standing at this stage of the litigation, Plaintiffs must allege "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). The party invoking federal jurisdiction bears the burden of establishing standing at the start of the lawsuit and at each phase of the litigation. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 570 n.5 (1992); *see also Johnson v. Bd. of Regents*, 263 F.3d 1234, 1267 (11th Cir. 2001).

Within the "injury-in-fact" requirement are several elements, including "an invasion of a legally protected interest that is both concrete and particularized and actual or imminent, not conjectural or hypothetical." *Wood*, 981 F.3d at 1314 (citing *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020)). And the imminence prong requires that there be either a substantial risk of an alleged future injury or that such injury is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Organizations can establish an injury by (1) showing they diverted resources in response to the purportedly illegal acts of Defendants, or (2) "stepping in the shoes" of its members. Utilizing either of these paths requires Plaintiffs to otherwise satisfy the remaining elements of standing.

## A.   Organizational standing.

### 1.   *Diversion of resources.*

For a plaintiff to have standing under a diversion-of-resources theory, it must demonstrate that "a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Arcia v. Sec'y of Fla.*, 772 F.3d 1335, 1341 (11th Cir. 2014). And as the Seventh Circuit recently explained, organizations cannot support a claim of standing "based solely on the baseline work they are

already doing." *Common Cause Ind. v. Lawson*, 937 F.3d 944, 955 (7th Cir. 2019). Further, organizations "cannot convert ordinary program costs into an injury in fact. The question is what additional or new burdens are created by the law the organization is challenging. It must show that the disruption is real and its response is warranted." *Id.* (cleaned up). Put differently, organizations must demonstrate that the challenged law's effect "goes far beyond 'business as usual'" through "concrete evidence showing that [the law] is already disrupting their operations, and . . . will likely require them to significantly change or expand their activities." *Id.*

In contrast, Plaintiffs in this case allege that they can show a diversion of resources through a much-more-lenient standard of "spending more money" or "expending additional effort." NGP, for example, alleges it "will [] be forced to divert resources from its day-to-day activities in order to combat the suppressive effects of [SB 202], which also threatens to undermine its mission." [Doc. 1, ¶ 16].  Similarly, BVMF alleges that SB 202 "threatens to undermine the organization's mission," and that they "must divert scarce resources away from its traditional voter education and turnout programs toward efforts to ensure that voters, and communities of color in particular, can navigate the [purported] restrictions to their voting options imposed by [SB 202]." [Doc. 1, ¶ 17]. Rise claims that SB 202 harms their organization

6

"by making it more difficult for Georgia students who have joined the Rise movement to vote." [Doc. 1, ¶ 19]. Further, Rise claims the law "forces the organization to divert resources, as well as shift the focus of its day-to-day activities." *Id*. Rise also guesses that it will have to divert resources from its "free college advocacy programs in Georgia and elsewhere to implement effective voter education and mobilization efforts." *Id*.

The Eleventh Circuit's standards on injury for organizations diverting resources is similar to the Seventh Circuit. And it is far from clear that the alleged actions to be taken by the Plaintiffs here will constitute a "diversion" of anything under Eleventh-Circuit precedent.

While the Seventh Circuit has more clearly stated that an organization "cannot convert ordinary program costs into an injury in fact," this is really just a restatement of the Eleventh Circuit's holding in *Jacobson*. There, the Eleventh Circuit required not only that organizational plaintiffs explain what they are purportedly diverting resources *to* as a result of the challenged law, but also what they are diverting resources *from*. *Jacobson*, 974 F.3d at 1250. Taken together, this two-part requirement of resource diversion signals the importance of the concept that an organization must be forced to go *beyond* merely executing its existing mission in a more deliberate way. Otherwise, simply alleging what resources are diverted *to* would be more than sufficient,

7

and all that would be required for organizations to invoke federal-court jurisdiction is to move money within the organization in some deliberate way.

After the Eleventh Circuit's holding in *Jacobson*, at least one district court agreed with this approach. In *GALEO*, plaintiffs claimed that failing to send Spanish-language election materials violated federal law. 2020 U.S. Dist. LEXIS 211736 (N.D. Ga. October 5, 2020).[4] The plaintiff organization, GALEO, alleged in its complaint that it had Article III standing because it was forced to divert resources "from getting out the vote and voter education to 'reach out to and educate [limited English proficiency voters] about how to navigate the mail voting process… as well as other aspects of the electoral process." *Id*. at *17. But GALEO also noted in its complaint that its mission as an organization was, among other things, "organizing voter education, civic engagement, [and] voter empowerment." *Id*.

In spite of these allegations, the district court dismissed the case and found "there is no indication that GALEO would in fact be diverting any resources *away from* the core activities it already engages in by continuing to educate and inform Latino voters." *Id*. (emphasis added). Allegations contained in the complaint of ostensibly new or additional efforts were

---

[4] Plaintiffs appealed the dismissal and that appeal is currently being briefed at the Eleventh Circuit.

"precisely of the same nature as those that GALEO engaged in before…" *Id*.

This holding supports the reading that *Jacobson* requires more than a formulaic recitation of an accounting maneuver—like moving money from one activity to another—because there is an additional step in the analysis. That step calls on the courts to determine whether the alleged diversion is one that actually is *inconsistent* with the organizational mission. In *GALEO*, the court found the plaintiffs fell short of this second step of the analysis.

The reasoning that compelled the district court in *GALEO* to deny standing is equally applicable here. None of the organizational plaintiffs are alleging they have to divert resources in a way that hinders or is inconsistent with their respective missions. NGP, for example, makes only the vague claim that SB 202 will *eventually* cause them to "divert resources from its day-to-day activities in order to combat [its] suppressive effects…" [Doc. 1, ¶ 16]. But NGP also alleges that its mission is to "register all eligible, unregistered citizens of color in Georgia." [Doc. 1, ¶ 14]. Plaintiffs' Complaint does not articulate how SB 202 is in any way inconsistent with this mission. NGP's rote recitation of diversion of resources would seemingly give it standing to challenge any change to election administration that does not match its own policy agenda. But the requirements of Article III surely could not countenance such a result.

Similarly, BVMF claims its goal is to "increase power in communities of color." [Doc. 1, ¶ 17]. And it accomplishes this by "increasing voter registration and turnout, as well as by advocating for policies to expand voting rights and access." *Id*. But nothing in SB 202 causes BVMF to depart from these goals.

Finally, Rise claims to have diverted resources because passage of SB 202 will force it to divert attention from their "free college advocacy programs in Georgia…" [Doc. 1, ¶ 19]. But Rise acknowledges that, in addition to advocating for free college, its mission also includes "increas[ing] voting access to college students." *Id*., ¶ 18. Rise does not explain how SB 202 will hinder that mission, or how diverting resources from generic voting-access initiatives to other, more-specific, SB-202-related voting-access initiatives they might ultimately create is inconsistent with that mission.

In short, the purported plight of the Plaintiffs here mirrors that faced by the organization in *GALEO*. This Circuit requires more before Article III standing can be established to invoke the jurisdiction of federal courts.

Significantly, accepting the contention that standing is established solely by alleging that an organization will expend resources on their existing efforts in a slightly different way creates an exception that swallows the resource-diversion rule. Organizations would *always* have standing to

challenge any government action—including in situations where *no* individual would have standing—because they could simply allege the organization will alter its message or spend its money slightly differently.[5]

For these reasons, the organizational plaintiffs in this case have failed to establish Article III standing under a diversion-of-resources theory. But even if this Court disagrees on that point, the purported injury faced by Plaintiffs is far too speculative to amount to injury-in-fact sufficient to accord standing, and we turn to that question next.

2.  *The alleged injuries are too speculative to establish Article III standing.*

Where, as here, an alleged injury is based on some future harm, that alleged injury must be "imminent" or "certainly impending." *Clapper*, 568 U.S. at 398. *Clapper* remains the primary case analyzing the imminence prong of standing, and the Court made clear that allegations of mere "*possible* future injury are not sufficient." *Id.* at 409 (emphasis in original).

---

[5] For example, Plaintiffs' theory of diversion would have allowed individual plaintiffs suing in the aftermath of the 2020 election to avoid dismissal on standing merely by incorporating—one can easily imagine a new organization called "Kraken Action, Inc."—and then claiming plans to spend some time or effort differently. *See Wood*, 981 F.3d at 1314 (no concrete injury to individual voter); *Bognet v. Sec'y Pa.*, 980 F.3d 336, 356 (3d Cir. 2020) (same); *Bowyer v. Ducey*, No. CV-20-02321-PHX-DJH, 2020 U.S. Dist. LEXIS 231093, at *15 (D. Ariz. Dec. 9, 2020) (same); *Gohmert v. Pence*, No. 6:20-cv-660-JDK, 2021 U.S. Dist. LEXIS 3, at *11 (E.D. Tex. Jan. 1, 2021) (same).

The Eleventh Circuit recently "discussed *Clapper's* 'high standard for the risk-of-harm analysis' in the context of speculative allegations…" *Tsao v. Captiva MVP Rest. Partners, LLC*., 986 F.3d 1332, 1339 (11th Cir. 2021) quoting *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 931 (11th Cir. 2020) (en banc). The *Muransky* plaintiffs alleged they faced an "elevated risk of identity theft" because the defendants printed too many digits of their customers' credit cards on receipts. This, plaintiffs argued, made them more susceptible to identity theft because bad actors could observe these extra digits and would be better positioned to commit identity theft. But the Eleventh Circuit was not persuaded that this risk of future harm constituted an injury under Article III, reasoning that the plaintiff's "naked allegations that he and the [proposed] class were exposed to an 'elevated risk' of identity theft – but not that he and the class were ever *actually* the victims of identity theft – were not enough to confer standing." *Tsao*, 986 F.3d at 1339 citing *Muransky*, 979 F.3d at 933 (emphasis added).

In essence, *Tsao* and *Muransky* stand for the proposition that some triggering event beyond just a subjective fear of some abstract vulnerability is necessary to support standing. And other courts in this District found similar fears did not support jurisdiction in the elections context where plaintiffs sued because they believed, for example, that long lines would occur

12

at the polls. *Anderson v. Raffensperger*, No. 1:20-cv-03263, 2020 U.S. Dist. LEXIS 188677, at *11 n.3 (N.D. Ga. Oct. 13, 2020) ("To the extent Organizational Plaintiffs are diverting resources because they *believe* long lines are inevitable, that is insufficient to establish standing — they must show the lines are *actually* likely to occur."). Like these cases, Plaintiffs' claims of "voter suppression" with respect to SB 202 are entirely based on a political narrative divorced from the realities of the legislation and of imagined harms rather than concrete demonstrations of harm affecting the organizations themselves or any of their individual unnamed members.

To appreciate the speculative nature of Plaintiffs' claims, no individual members of their organizations have come forward with any allegations of the supposedly negative consequences of SB 202. This is the case for at least two reasons: (1) SB 202 has not been law for any statewide election; and (2) claims made regarding possible future harm to members seem to be based on a preferred narrative rather than on actual effects of the bill.

NGP claims that, as a result of SB 202, they "will also be forced to divert resources," indicating that any diversion of resources will occur at some point in the future.[6] [Doc. 1, ¶ 16]. Similarly, BVMF claims SB 202

---

[6] Any diversion must necessarily take place in the future because Plaintiffs filed this case *the same day* the Governor signed SB 202. [Doc. 1]. Despite the

"threatens to undermine the organization's mission," and that BVMF "must divert scarce resources." [Doc. 1, ¶ 17]. But they make no allegation that they actually have diverted any resources. Finally, Rise states that it "and its student organizers will be forced to divert resources" as a result of SB 202, which must be at some future date. [Doc. 1, ¶ 19].

In short, even if this Court were to determine Plaintiffs' alleged resource diversions constitute an injury, that diversion is based *solely* on a speculative future injury and one that it is dependent on the occurrence of a "highly attenuated chain of possibilities." *Clapper*, 568 U.S. at 410. This does not satisfy the requirements of organizational standing.

## B.   Associational standing.

Only NGP and Rise alleged associational standing in any meaningful sense. *See* [Doc. 1 ¶¶ 16, 19]. But for the same reasons the purported injuries are too speculative for the organizations, any alleged injuries are also too speculative of any injury to any of their members, and Plaintiffs have failed

---

lack of immediate diversion, Plaintiffs have wasted no time fundraising off their efforts related to this lawsuit. *See* https://twitter.com/marceelias/status/1377118411411529728 (Mar. 31, 2021).; https://twitter.com/NewGAProject/status/1379443734367109124 (Apr. 6, 2021); https://twitter.com/BlackVotersMtr/status/1387092953492082692 (Apr. 27, 2021); https://twitter.com/RiseFreeOrg (bio includes "Support our lawsuit challenging #SB202" with an arrow to a link).

to establish standing on an associational basis.

## II.    Plaintiffs fail to state a claim on which relief can be granted.

### A.    Fundamental right to vote claim (Count I).

#### 1.    *Legal standard.*

Plaintiffs first challenge nine provisions of SB 202 as undue burdens on the right to vote. [Doc. 1, ¶¶ 76-86]. And these challenges are apparently facial—which "must fail where the statute has a plainly legitimate sweep." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008). Challenges to election practices weigh the alleged burden on the right to vote against the interests of government. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). "Regulations imposing severe burdens on the plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a state's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Significantly, lesser burdens impose no burden of proof or evidentiary showing on states. *Common Cause*, 554 F.3d at 1353. To establish the requisite severe burden in voting cases under *Anderson/Burdick*, one must show that the burden imposed was a direct result of a state's laws and

15

policies, not burdens "arising from life's vagaries." *Crawford*, 553 U.S. at 197.

*See also Duncan v. Poythress*, 657 F.2d 691, 699 (5th Cir. Unit B 1981).

> 2.   *The challenged practices.*

First, Plaintiffs take issue with the use of an identification number for absentee-ballot applications and ballots. [Doc. 1, ¶¶ 42, 80]. The General Assembly explained that the prior signature-matching process was subjective and challenged by Democratic[7] and Republican groups. Ex. A at 4:73-75. The reformed process in SB 202 is objective and includes safeguards for voters who lack identification. Ex. A at 38:949-39:956; 51:1297-52:1305. Plaintiffs allege that there is a disproportionate impact on minority voters, [Doc. 1, ¶ 42] but the Eleventh Circuit and Supreme Court have already determined there is no unconstitutional burden on the right to vote by requiring photo identification.[8] *Crawford*, 553 U.S. at 181; *Greater Birmingham Ministries v. Sec'y of Ala.*, 2021 U.S. App. LEXIS 10218, *41, __ F.3d __, 2021 WL 1323510 (11th Cir. April 9, 2021). Thus, even if there is a slight burden, it is more

---

[7] The plaintiffs in *Dem. Party of Georgia v. Raffensperger*, Case No. 1:19-cv-05028-WMR (N.D. Ga.), which attacked the signature-matching process as "standardless," were represented by the same counsel as Plaintiffs here.

[8] Also, at least six other states utilize identification with absentee-ballot applications or ballots. *See* Code of Ala. § 17-9-30(b); A.C.A. § 7-5-412(a)(2)(B) (Arkansas); K.S.A. § 25-1122(c) (Kansas); Minn. Stat. Ann. § 203B.07(3); Ohio Rev. Code Ann. § 3509.03(B), .04(B); Wis. Stat. § 6.87(1).

than justified by the state's regulatory interests. Plaintiffs also fail to mention that the verification requirement in SB 202 closely matches the voter-identification requirements of federal law when registering to vote by mail. *See* 52 U.S.C.S. § 21083(b)(2). Tellingly, Plaintiffs do not challenge the constitutionality of that law.

Second, Plaintiffs challenge alleged "restrictions" on outdoor drop boxes, [Doc. 1, ¶¶ 44, 80]—something that did not exist in Georgia law prior to SB 202 and was only optional in 2020 under an emergency rule that was intended as a temporary measure due to the health risks posed by COVID-19. Ex. A at 5:113-118; Ga. Comp. R. & Regs. r. 183-1-14-0.8-.14; 183-1-14-0.10-.16; 183-1-14-.08-.14; *see also* O.C.G.A. § 50-13-4(b) (emergency rules "shall be effective for the duration of the emergency or disaster and for a period of *not more than 120 days* thereafter" (emphasis added)). SB 202 *requires*[9] every county to have at least one drop box and allows them to be moved outside during emergencies. Ex. A at 47:1172-1174, 1188-1191. Plaintiffs' sole claim is that, because Black adults "are more likely to work multiple jobs," there is a disproportionate burden on their right to vote. [Doc. 1, ¶ 44]. But there is no right to vote in any particular manner, *Burdick*, 504 U.S. at 433, and the

[9] The emergency rules adopted by the State Election Board merely *permitted* a county to establish drop boxes but did not *require* that they have one.

elimination[10] of some pieces of voting access, while retaining others, is a minimal burden at best, *Ohio Democratic Party v. Husted*, 834 F.3d 620, 630 (6th Cir. 2016). And where there are multiple options a voter can select from, the right to vote may not be implicated at all. *See, e.g., New Ga. Project*, 976 F.3d at 1281 ("Indeed, a look at the evidence shows that Georgia's Election Day deadline does not implicate the right to vote at all. *Georgia has provided numerous avenues to mitigate chances that voters will be unable to cast their ballots*." (emphasis added)). In SB 202, Georgia expanded the number of mandatory early-voting days, maintained no-excuse absentee balloting, and required drop boxes in every county. Plaintiffs fail to show that the State's first-ever statutory authorization of drop boxes places any burden whatsoever on the right to vote—the fact that SB 202 arguably may not be as expansive as a temporary emergency rule (which had to expire *before* the 2022 election cycle commences) is more than justified by the state's regulatory interests. *Common Cause*, 554 F.3d at 1354; *Gwinnett Cty. NAACP v. Gwinnett Cty. Bd. of Registration & Elections*, 446 F. Supp. 3d 1111, 1124 (N.D. Ga. 2020).

Third, Plaintiffs challenge changes made to absentee-ballot

---

[10] Given the large number of locations to drop off mail, which is the primary option for returning absentee ballots, O.C.G.A. § 21-2-385(a) ("personally mail or personally deliver"), there is no elimination of any access in SB 202.

applications and ballots, including limitations on sending out applications and assisting voters in returning them. [Doc. 1, ¶¶ 45-46, 80]. The General Assembly updated the process after significant voter confusion in 2020 surrounding absentee ballots, including applications sent by third-party groups. Ex. A at 5:102-112. The only allegations of a burden is that Black voters used absentee voting at a higher rate and therefore are burdened—not that anyone is prohibited from voting absentee entirely. But when voters "must simply take reasonable steps and exert some effort to ensure that their ballots are submitted on time . . . no one is 'disenfranchised.'" *New Ga. Project*, 976 F.3d at 1282. Given the extremely light burden imposed by the limitations on absentee-ballot applications, the state's strong interest in protecting the confidential information of its voters, and the importance of mitigating risk of potential voter intimidation, the state's regulatory interests more than justify any burden. *Common Cause*, 554 F.3d at 1354.

Fourth, Plaintiffs attack the limitations placed on mobile-voting units, which were utilized by one county for the first time in the 2020 elections to mitigate the effects of the COVID-19 pandemic. [Doc. 1, ¶¶ 29, 43, 81]. SB 202 specifically allows mobile voting units when needed in emergency situations, Ex. A at 31:774-778, but the limitations are consistent with other provisions of the bill that require specific notice of the location of a precinct,

not a bus traveling to different locations around the county. Ex. A at 30:741-757 (posted notice of precinct change), 60:1525-1535 (notice of early-voting location). Other than a conclusory allegation that limiting a county's option to use mobile units will "harm voters especially in minority communities," [Doc. 1, ¶ 43], Plaintiffs do not identify *any* burden imposed by limiting an *optional* system used in an unusual election by one county. Without such a burden, even the State's regulatory interests do not have to be shown. *Common Cause*, 554 F.3d at 1354; *Gwinnett Cty. NAACP*, 446 F. Supp. 3d at 1124.

Fifth, Plaintiffs challenge the limitations placed on out-of-precinct ballots. [Doc. 1, ¶¶ 48, 81]. Almost half of the states do not count a provisional ballot cast out of precinct at all.[11] Georgia legislators explained that voters who vote out of precinct "add to the burden on election officials and lines for other electors because of the length of time it takes to process a provisional ballot in a precinct" and that not voting in the proper precinct prevents voters from voting "in all elections for which they are eligible," Ex. A at 6:135-138. The statutory provision also explicitly permits the counting of out-of-precinct ballots for voters who cannot get to their home precinct before

---

[11] *Provisional Ballots*, National Conference of State Legislatures (September 17, 2020) *available at* https://www.ncsl.org/research/elections-and-campaigns/provisional-ballots.aspx#partial

7:00 P.M. *Id.* at 75:1914-1919. The sole allegation from Plaintiffs is that moving within the county is more likely to lead to appearing at the wrong precinct [Doc. 1, ¶ 48]—but SB 202 expressly requires the voter to be *directed* to his or her correct precinct if it is before 5:00 P.M. *Id.* at 74:1902-75:1907. Given opportunities to vote before Election Day and after 5:00 P.M. out of precinct on Election Day, any burden is minimal at best and is justified by the State's interests. *Ohio Democratic Party*, 834 F.3d at 630.

Sixth, Plaintiffs challenge the prohibition on third parties giving anything of value to voters in line. [Doc. 1, ¶¶ 47, 82]. The General Assembly explained that "many groups" approached voters in line during the 2020 elections and clarified the rules around electioneering within 150 feet of a polling place because of the importance of "[p]rotecting electors from improper interference, political pressure, or intimidation while waiting in line to vote." Ex. A at 6:126-129. This is not unusual among states—New York has a similar prohibition on providing food or drink to voters, NY CLS Elec § 17-140, and the Supreme Court has recognized that campaign speech can be restricted near polling locations and precincts.[12] *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1879, 1886 (2018); *Burson v. Freeman,* 504

---

[12] Plaintiffs do not raise a First Amendment challenge to this provision.

U.S. 191, 193-94 (1992). Most states have "buffer zones" around polling places.[13] The important regulatory interests of the state are more than enough to justify the minimal burden of a voter not being approached in line with an offer of food from a third party.[14] *Common Cause*, 554 F.3d at 1354; *Gwinnett Cty. NAACP*, 446 F. Supp. 3d at 1124.

Seventh, Plaintiffs contest minor clarifications to Georgia's existing voter-challenge law. [Doc. 1, ¶¶ 49, 83]. Existing Georgia law allowed challenges to voter registrations and required hearings before the board of registrars. O.C.G.A. §§ 21-2-229(b), 21-2-230(b). In SB 202, the General Assembly simply clarified that (1) there was no limit on challenges, which was a reasonable reading of existing law; and (2) that challenges must be resolved quickly. Ex. A at 23:575-24:581, 25:622-623. Neither of these requirements are facially unconstitutional—even Plaintiffs admit that these kinds of challenges only "may" be filed, [Doc. 1, ¶ 49]. And any burden on the

---

[13] *Electioneering Prohibitions*, National Conference of State Legislatures https://www.ncsl.org/research/elections-and-campaigns/electioneering.aspx (April 1, 2021)**.**

[14] Aside from whether there is a constitutional right to food and water while waiting in line, voters can still receive water from a cooler stationed within the 150-feet buffer and SB 202 requires election officials to make changes to avoid long lines. Ex. A at 74:1887-1889; 29:721-734. To the extent Plaintiffs challenge line length as part of this claim, long lines are not an injury traceable to Defendants. *Anderson*, 2020 U.S. Dist. LEXIS 188677 at *64.

right to vote is minimal at best, given the discretion for local officials to weed out the "indiscriminate challenges" Plaintiffs fear, *id*., especially when compared to the State's clear regulatory interest in up-to-date voter rolls.

Finally, Plaintiffs apparently seek to challenge the shortening of time for runoff elections, but only refer to this in passing in Count I of their Complaint. *Compare* [Doc. 1, ¶ 50 and ¶ 84]. Again, there is nothing unusual about a four-week runoff—this was already the timeline used for all runoffs in Georgia prior to a change in 2014 as a result of a federal court decision and state offices still adhere to a four-week runoff.[15] O.C.G.A. § 21-2-501(a)(3) and (4) (2020). SB 202 adopted a system similar to that used in Alabama, which uses ranked-choice voting to hold runoffs on the same four-week timeline. *See* Code of Ala. §§ 17-13-8.1 (instant runoff voting ballots); 17-13-18 (runoff on fourth Tuesday after election). Plaintiffs' only complaint about this change is that it shortens the early-voting period, [Doc. 1, ¶ 50], but SB 202 leaves the current early-voting period for four-week runoffs in place—it just provides for *all* runoffs to be held during that time. Additionally, there is no right to early voting and any changes are only minimally burdensome. *Ohio Democratic*

---

[15] Extended runoffs were required for federal offices due to federal-law requirements for overseas and military voters. *See U.S. v. Georgia*, 892 F. Supp. 2d 1367, 1375 (N.D. Ga. 2012).

*Party*, 834 F.3d at 631. As a result, the State's interests in "easing the burden on election officials and on electors," Ex. A at 5:119-6:122, more than justifies the changes made to runoff elections.

Taken as a whole, Plaintiffs challenge a handful of—at best—minimally burdensome changes.[16] No evidence is required from Defendants to justify those changes because the important regulatory interests are enough to justify them, *Common Cause*, 554 F.3d at 1354, and, as a result, Plaintiffs have failed to state a claim on any of the challenged provisions as violations of their fundamental right to vote.

## B.   Section 2 claim.

Section 2 of the Voting Rights Act prohibits jurisdictions from "impos[ing] or appl[ying]" any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" 52 U.S.C. § 10301(a). "This analysis turns on whether, based on the totality of the circumstances, the challenged law violates Section 2(a) because it deprives minority voters of an equal opportunity to participate in the electoral process *and* to elect representatives of their choice." *Greater*

---

[16] Despite explaining what they believe are the motives behind SB 202, [Doc. 1, ¶¶ 23-40], Plaintiffs do not allege any intentional discrimination.

*Birmingham Min.*, 2021 U.S. App. LEXIS 10218 at*61 (emphasis in original). To make out a valid vote-denial[17] claim, the Eleventh Circuit requires (1) proof of disparate impact (a denial or abridgement) and (2) that the disparate impact is *caused* by racial bias. *Id.* at *63-64; see also *Northeast Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 626-27 (6th Cir. 2016); *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1012 (9th Cir. 2020).

Plaintiffs' Complaint never alleges any causal link between race and any of the specific practices they challenge as a burden on the right to vote under Section 2, instead making—at best—generalized statements about disparate impacts. *Compare* [Doc. 1, ¶ 92] (only referencing entirety of legislation) with *Greater Birmingham Min.*, 2021 U.S. App. LEXIS 10218 at *65-66. This lack of specific allegations is fatal to their Section 2 claim and, as a result, they have failed to state a claim for any violations of Section 2. *Id.*

## CONCLUSION

This Court should allow Georgia to do what the Constitution specifically allows it to do—regulate its own elections—and this Court should dismiss this case.

---

[17] While vote-dilution claims challenge district maps, vote-denial claims challenge specific practices. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 239 (4th Cir. 2014); *Veasey v. Abbott*, 830 F.3d 216, 244 (5th Cir. 2016).

Respectfully submitted this 3rd day of May, 2021.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene McGowan
Assistant Attorney General
Georgia Bar No. 697316
**Office of the Georgia Attorney General**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

*Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing Brief in Support of Defendants' Motion to Dismiss has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

/s/ Bryan P. Tyson
Bryan P. Tyson