# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

THE NEW GEORGIA PROJECT,
BLACK VOTERS MATTER FUND,
RISE, INC., ELBERT SOLOMON,
FANNIE MARIE JACKSON GIBBS, and
JAUAN DURBIN,

           Plaintiffs,

   v.

BRAD RAFFENSPERGER, in his official
capacity as the Georgia Secretary of State;
REBECCA SULLIVAN, in her official
capacity as the Vice Chair of the Georgia
State Election Board; DAVID WORLEY,
in his official capacity as a member of the
Georgia State Election Board; MATTHEW
MASHBURN, in his official capacity as a
member of the Georgia State Election
Board; ANH LE, in her official capacity as
a member of the Georgia State Election
Board; MARGARET BENTLEY, in her
official capacity as Chairman of the
SPALDING County Board of Elections
and Voter Registration; GLENDA
HENLEY, in her official capacity as
Secretary of the SPALDING County Board
of Elections and Voter Registration;
BETTY BRYANT, VERA MCINTOSH,
and ROY MCCLAIN, in their official
capacities as Members of the SPALDING
County Board of Elections and Voter
Registration; CHARLES DAVE, in his
official capacity as BROOKS County

Civil Action No. 1:21-cv-01229-
JPB

**FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF**

Elections Superintendent; ZURICH DESHAZIOR, DON DISTEFANO, and KAREN MURRAY in their official capacities as members of the BROOKS County Board of Elections;  ALEX WAN, in his official capacity as Chairman of the FULTON County Registration and Elections Board; MARK WINGATE, KATHLEEN RUTH, VERNETTA KEITH NURIDDIN, and AARON JOHNSON, in their official capacities as Members of the FULTON County Registration and Elections Board; KEITH GAMMAGE, in his official capacity as the Solicitor General of FULTON County; and GREGORY W. EDWARDS, in his official capacity as the District Attorney for DOUGHERTY County,

                    Defendants.

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs THE NEW GEORGIA PROJECT, BLACK VOTERS MATTER FUND, RISE, INC., ELBERT SOLOMON, FANNIE MARIE JACKSON GIBBS, and JAUAN DURBIN file this Complaint for Declaratory and Injunctive Relief against Defendants BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State (the "Secretary"); REBECCA SULLIVAN, in her official capacity as the Vice Chair of the Georgia State Election Board; DAVID WORLEY, MATTHEW MASHBURN, and ANH LE, each in their official capacity as a

2

member of the Georgia State Election Board; MARGARET BENTLEY, in her official capacity as Chairman of the SPALDING County Board of Elections and Voter Registration; GLENDA HENLEY, in her official capacity as Secretary of the SPALDING County Board of Elections and Voter Registration; BETTY BRYANT, VERA MCINTOSH, and ROY MCCLAIN, in their official capacities as members of the SPALDING County Board of Elections and Voter Registration; CHARLES DAVE, in his official capacity as BROOKS County Elections Superintendent; ZURICH DESHAZIOR, DON DISTEFANO, and KAREN MURRAY in their official capacities as members of the BROOKS County Board of Elections; ALEX WAN, in his official capacity as Chairman of the FULTON County Registration and Elections Board; MARK WINGATE, KATHLEEN RUTH, VERNETTA KEITH NURIDDIN, and AARON JOHNSON, in their official capacities as members of the FULTON County Registration and Elections Board; KEITH GAMMAGE, in his official capacity as the Solicitor General of FULTON County; and GREGORY W. EDWARDS, in his official capacity as the District Attorney for DOUGHERTY County, and allege as follows:

## NATURE OF THE CASE

1.     Over the past year, Georgia voters turned out in record-shattering numbers. In the 2020 general election, nearly five million Georgians voted,

3

compared to 4.16 million in the 2016 general election. In the January 2021 runoff elections for both of Georgia's U.S. Senate seats, nearly 4.5 million voters cast ballots. The sky-high turnout in the runoff election bucked past trends, when voter participation typically dropped from the general election.

2.      The record-high turnout also led to a sea change in election outcomes at the statewide level. The Democratic nominee for president won Georgia's electoral votes for the first time in 28 years, and Georgia voters elected both Democratic candidates to the U.S. Senate, which means Georgia is now represented by two Democratic Senators for the first time since 2003. For the first time in state history, Georgia voters elected a Black U.S. Senator.

3.      After the high-turnout general election, officials conducted multiple recounts and audits. Supporters of former President Donald J. Trump filed several lawsuits seeking to overturn the general election results, falsely alleging widespread fraud and misconduct on the part of election officials. No court in any of these lawsuits found support for these litigants' fanciful claims. After the senatorial runoff elections, Secretary Raffensperger declared in a nationally televised interview that Georgia "had safe, secure, honest elections."

4.      Despite nationwide scrutiny of Georgia's elections, which only confirmed the absence of any fraud, insecurity, or wrongdoing, Republican members

of the General Assembly voted to pass sweeping omnibus legislation ("SB 202" or the "Voter Suppression Bill") that is clearly intended to and will have the effect of making it harder for lawful Georgia voters to participate in the State's elections. And it will impose these unjustifiable burdens disproportionately on the State's minority, young, poor, and disabled citizens. Among its provisions, the Voter Suppression Bill:

- Imposes unnecessary and burdensome new identification requirements for absentee voting;

- Moves the dates for absentee ballot distribution closer to the election by 20 days, reducing the time absentee voters have to cast their ballots;

- Repeals a law requiring counties to mail absentee ballots to unregistered eligible voters who submit an absentee ballot application and then return their registration card by the deadline;

- Unduly restricts the use of absentee ballot drop boxes;

- Bans mobile polling places;

- Prohibits state and local government officials from distributing unsolicited absentee ballot applications;

- Burdens voters with the risk of disenfranchisement due to meritless challenges that require an immediate defense of their qualifications;

- Invalidates ballots cast by lawful voters before 5:00 p.m. in a precinct other than the one to which they were assigned, regardless of the reason or their ability to travel to another location (or wait until after 5:00 p.m.) to cast their ballot;

- Bans any non-poll worker from giving food or drink, including water, to voters waiting in line; and

- Compresses the time period for a federal runoff election and reduces the number of required early voting days during any runoff election.

5.     This hodgepodge of unnecessary restrictions targets almost every aspect of the voting process but serves no legitimate or compelling state interest and advances no unifying goal other than to make absentee, early, and election-day voting more difficult—especially for minority voters.

6.     Sponsors and supporters of the Bill insist that one of its primary purposes is to restore voters' confidence in Georgia's election administration, but these provisions do no such thing. Many of the restrictions the Bill imposes on Georgia voters—for instance, the absolute prohibition on handing out *any* food or drink to voters waiting in line at a polling place—have nothing to do with the integrity of the ballot.

7.      To the extent there are concerns about voters' "confidence" in Georgia's elections, they are the result of a cynical and thoroughly rebuked misinformation campaign—not based in reality.

8.      As Secretary Raffensperger acknowledged in January, Georgia experienced "safe, secure, honest elections." He even characterized many proposed laws from which the Bill originates as "reactionary to a three[-]month disinformation campaign that could have been prevented," referring to the period during which former President Trump and his supporters attempted to disrupt the democratic process by baselessly casting doubt on the results of Georgia's elections.

9.      The Bill's supporters also claim that it will "ensure" election integrity. But legislators and the Secretary himself have admitted that Georgia's elections are *already* safe and secure. The Secretary has described the State's election administration system as the "gold standard" for the United States. At no point during the 2020 election cycle did any election official, any lawsuit, or any voter reveal anything in Georgia's election administration requiring any of the challenged provisions in the Voter Suppression Bill to "ensure" election integrity. Notably, this was not for want of trying.

10.     None of the Bill's burdensome and discriminatory changes to Georgia's election code will increase the public's confidence in the State's election

administration or ensure election integrity. The grab bag of voting restrictions that populate SB 202 make clear that the Bill was animated by an impermissible goal of restricting voting among Black voters, young voters, and others whose access to the ballot box Georgia legislators wish to impede.

11.    Taken together, these unjustified measures will individually and cumulatively operate to impose unconstitutional burdens on the right to vote, to deny or abridge the voting rights of Black Georgians, to deny Black voters in Georgia an equal opportunity to participate in the electoral process and elect candidates of their choice in violation of Section 2 of the Voting Rights Act, to unconstitutionally restrict and criminalize protected speech, and to deny the right to vote on the basis of an immaterial error or omission in violation of the Civil Rights Act.

## JURISDICTION AND VENUE

12.    Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

13.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343, because the matters in controversy arise under the Constitution and laws of the United States.

14.     This Court has personal jurisdiction over the Defendants, who are sued in their official capacities only.

15.     Venue is proper in the U.S. District Court for the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b)(2) and under Local Civ. R. 3.1 because, *inter alia*, several defendants reside in this district and this division and a substantial part of the events that gave rise to Plaintiffs' claims occurred in this judicial district. Plaintiffs The New Georgia Project, Black Voters Matter Fund, and Rise, Inc. all operate within this district and division. Plaintiff Elbert Solomon is a registered voter in Spalding County and Plaintiff Jauan Durbin is a registered voter in Fulton County.

16.     This Court has the authority to enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## PARTIES

17.     Plaintiff THE NEW GEORGIA PROJECT ("NGP") is a nonpartisan, community-based nonprofit organization based in Fulton County, Georgia. NGP is dedicated to registering eligible Georgians statewide to vote and to helping them become more civically engaged through voter education and engagement. NGP engages in voter education and registration activities in communities across the state to reach voters and help them to register, and eventually, to vote. It also encourages

voters to cast their ballots by, among other things, coordinating efforts to distribute food and drink at the polls.

18.     NGP's mission is to register and civically engage all eligible citizens of color in Georgia. As of May 2021, NGP has registered more than 500,000 Georgians in all 159 counties in the state.

19.     The majority of voters registered by NGP are people of color, young voters, first-time voters (due to age or being newly naturalized citizens), and/or members of other underrepresented and vulnerable populations, including Georgians with disabilities and the elderly. NGP considers these half a million individuals it has registered to be a core part of its constituency.

20.     NGP has members and constituents across Georgia, whose right to vote will be burdened or denied as a result of the Voter Suppression Bill. NGP will also be forced to divert resources from its day-to-day voter registration activities to educate voters about and otherwise combat the suppressive effects of the Voter Suppression Bill. Likewise, the Voter Suppression Bill threatens to undermine NGP's mission of civically engaging Georgians because, under the Bill, even eligible and registered voters are denied the ability to vote or may not have their ballots counted. Finally, under the Voter Suppression Bill, NGP will be prevented from encouraging voters to stay in line to vote by coordinating distribution of food

and drink at the polls. NGP brings these claims on its own behalf, as well as on behalf of its member voters and constituents.

21.    Plaintiff BLACK VOTERS MATTER FUND ("Black Voters Matter") is a nonpartisan civic organization whose goal is to increase power in communities of color. Effective voting allows a community to determine its own destiny, but communities of color often face barriers to voting that other communities do not. Black Voters Matter focuses on removing those barriers. It does so by increasing voter registration and turnout, advocating for policies to expand voting rights and equity, and conducting organizational development and training. One of the ways that Black Voters Matter encourages voters to cast their ballots is by distributing food and water at the polls, both directly and in partnership with other organizations. Black Voters Matter is active statewide, particularly in communities that tend to have less access to national, state, and local resources and that have low-income and working-class populations.

22.    As a result of the Voter Suppression Bill, which threatens to undermine the organization's mission, Black Voters Matter must divert scarce resources away from its organizational development and training programs, as well as its traditional voter education and turnout programs, toward efforts to ensure that voters, and communities of color in particular, can navigate the restrictions to their voting

options imposed by the Voter Suppression Bill. Furthermore, the Voter Suppression Bill prevents Black Voters Matter from encouraging voters to stay in line to vote by coordinating distribution of food and water at the polls.

23.    Plaintiff RISE, INC. ("Rise") is a student-led 501(c)(4) nonprofit organization that runs statewide advocacy and voter mobilization programs in Georgia, as well as on a number of campuses nationwide. Rise's mission is to fight for free higher education, end student hunger and homelessness, and increase voting access for college students. Rise operates student-led advocacy campaigns, training programs, and volunteer networks across Georgia to further its mission. To meet its goal of expanding students' access to the franchise in particular, Rise's student organizers and volunteers engage in grassroots voter registration, education, and turnout activities, including on-campus get-out-the-vote drives and canvasses. Rise volunteers also distribute food and water at polling locations to encourage voters to cast their ballots.

24.    The Voter Suppression Bill directly harms Rise by making it more difficult for Georgia students who have joined the Rise movement to vote. The Voter Suppression Bill also frustrates Rise's mission and forces the organization to divert resources, as well as shift the focus of its day-to-day activities. Specifically, Rise and its student organizers will be forced to divert resources and day-to-day attention

from their college affordability, hunger, and homelessness advocacy programs in Georgia and elsewhere to implement effective voter education and mobilization efforts. Finally, the Voter Suppression Bill prevents Rise volunteers from encouraging voters to stay in line to vote by distributing food and water at the polls.

25.     Plaintiffs NGP, Black Voters Matter, and Rise encourage voters to stay in line and vote by distributing food and water at polling locations in counties throughout Georgia, including in Fulton and Dougherty Counties.

26.     Plaintiff ELBERT SOLOMON is a United States citizen and registered Georgia voter in Spalding County. Mr. Solomon is a 70-year-old Black man living in Griffin, Georgia who has worked as a farmer, teacher, and chemical engineer. He currently runs his own business creating curriculums that focus on character education and parental involvement with their children's education. Voting is extremely important to Mr. Solomon because it is how he expresses himself as a citizen. He especially cherishes voting because it is something his grandparents were unable to do in the Jim Crow South and his parents were able to do only after Jim Crow-era restrictions like the literacy test were ruled unconstitutional.

27.     In November 2020, Mr. Solomon put his absentee ballot in a drop box at the local elections office. In January, he physically handed his absentee ballot to the elections worker at the office because he wanted to be sure his vote was received.

Mr. Solomon prefers to vote absentee[1] because his age and health make it difficult for him to wait to vote should he encounter the long lines that have become all too common for Georgia voters, but he returns his ballot in person since he has encountered issues with mail delivery and does not want to risk his vote being lost. The Voter Suppression Bill will force Mr. Solomon to comply with additional burdensome identification requirements, restrict Mr. Solomon's access to drop boxes in upcoming elections, reduce the amount of time Mr. Solomon has to obtain and submit his absentee ballot (particularly during the compressed runoff election schedule), and should he instead decide to vote in person to avoid the increased burdens of voting absentee, will make it all the more difficult for Mr. Solomon to wait in line to exercise his right to vote.

28.    Plaintiff FANNIE MARIE JACKSON GIBBS is a United States citizen and registered voter in Brooks County. Ms. Gibbs is a 67-year-old Black woman living in Valdosta, Georgia. She has been an advocate for voting rights and civil rights since as early as the 1960s when she and her father took people to the polls to register to vote. Ms. Gibbs's family members and community have experienced

---

[1] By "vote absentee," "absentee voting," and "absentee ballot" and similar terms used in this Amended Complaint, Plaintiffs refer to the casting of a paper absentee ballot generally described in Article 10 of Chapter 2 of Title 21 of the Official Code of Georgia, but not to "advance voting," sometimes known as "early voting," as described in O.C.G.A. § 21-2-385(d) and which takes place in person.

voter suppression and intimidation, which still resonate among voters in her community today. Because Ms. Gibbs has disabilities that make it difficult for her to travel to an in-person voting location without assistance, she voted absentee by mail in both the November 2020 general election and the January 2021 runoff. In the June 2020 primary, she dropped her absentee ballot off at an outdoor drop box. The Voter Suppression Bill will force Ms. Gibbs to comply with additional burdensome identification requirements to vote absentee, restrict her access to drop boxes in upcoming elections, reduce the amount of time that she has to obtain and submit her absentee ballot in runoff elections, and will make it more difficult for her to wait in line at a polling place in the event that she needs to vote in person (as she has been forced to do in the past when her absentee ballot was not delivered).

29.    Plaintiff JAUAN DURBIN is a United States citizen and registered voter in Fulton County. He is a 22-year-old recent graduate of Morehouse College who lives in Atlanta, Georgia. Mr. Durbin has seen the power of voting firsthand, and he is committed to ensuring that all eligible voters are registered and able to vote. During both the November 2020 and January 2021 elections, Mr. Durbin voted early in person. He prefers to vote in person because he has encountered issues with mail security in the past and does not want to risk his vote not being counted. The Voter Suppression Bill will force Mr. Durbin to cast his ballot on a compressed

timeline for future runoff elections. Mr. Durbin travels frequently, and the significant decrease in in-person voting days for runoff elections will make it difficult for Mr. Durbin to cast his ballot. In the event the timeline for voting in person is incompatible with Mr. Durbin's schedule and he must vote absentee, the Voter Suppression Bill will force him to comply with additional identification requirements, restrict his access to drop boxes, and reduce the amount of time that he has to obtain and submit his absentee ballot.

30.     Defendant BRAD RAFFENSPERGER is the Secretary of State of Georgia, the State's chief elections official, O.C.G.A. § 21-2-210, and is named as a Defendant in his official capacity. In his official capacity, he is responsible for the administration and implementation of election laws in Georgia, including the Voter Suppression Bill. *See id.*; *see also* Ga. Op. Att'y Gen. No. 2005-3 (Apr. 15, 2005) ("[I]it is clear that under both the Constitution and the laws of the State the Secretary is the state official with the power, duty, and authority to manage the state's electoral system. . . ."). Among other responsibilities, the Bill tasks the Secretary of State with designing and making available the state's absentee ballot application form, which "shall require the elector" to supply the newly mandated proof of identification. SB 202, § 25.

31.     Defendant REBECCA SULLIVAN is the Vice Chair of the Georgia State Elections Board (the "SEB") and is named as a Defendant in her official capacity. As a member of the SEB, she is responsible for "promulgat[ing] rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials, as well as the legality and purity in all primaries and elections." O.C.G.A. § 21-2-31(1). The SEB is specifically responsible for "formulat[ing], adopt[ing], and promulgat[ing] such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections; and, upon the adoption of each rule and regulation, the board shall promptly file certified copies thereof with the Secretary of State and each superintendent." *Id.* at (2). The SEB is also responsible for "promulgat[ing] rules and regulations to define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be counted as a vote for each category of voting system used in this state" and "tak[ing] such other action, consistent with law, as the board may determine to be conducive to the fair, legal, and orderly conduct of primaries and elections." *Id*. at (7), (10). Among other responsibilities, the Voter Suppression Bill tasks the SEB with enforcing county compliance with the new voter challenge provisions. SB 202, §§ 15, 16. The Vice Chair, personally and through the conduct of her employees,

17

officers, agents, and servants, acted under color of state law at all times relevant to this action.

32.    Defendants DAVID WORLEY, MATTHEW MASHBURN, and ANH LE are each members of the SEB and are named as Defendants in their official capacities ("SEB Member Defendants"). As SEB members, they are responsible for "promulgat[ing] rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials, as well as the legality and purity in all primaries and elections." O.C.G.A. § 21-2-31(1). The SEB is responsible for "formulat[ing], adopt[ing], and promulgat[ing] such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections; and, upon the adoption of each rule and regulation, the board shall promptly file certified copies thereof with the Secretary of State and each superintendent." *Id.* at (2). As SEB members, they are responsible for "promulgat[ing] rules and regulations to define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be counted as a vote for each category of voting system used in this state" and "tak[ing] such other action, consistent with law, as the board may determine to be conducive to the fair, legal, and orderly conduct of primaries and elections." *Id.* at (7), (10). Among other responsibilities, the Voter Suppression Bill tasks the SEB

with enforcing county compliance with the new voter challenge provisions. SB 202, §§ 15, 16. The SEB Member Defendants, personally and through the conduct of their employees, officers, agents, and servants, acted under color of state law at all times relevant to this action.

33.     Defendant MARGARET BENTLEY is the Chairman of the SPALDING County Board of Elections and Voter Registration; Defendant GLENDA HENLEY is the Secretary of the SPALDING County Board of Elections and Voter Registration; and Defendants BETTY BRYANT, VERA MCINTOSH, and ROY MCCLAIN are each Members of the SPALDING County Board of Elections and Voter Registration. Ms. BENTLEY, Ms. HENLEY, Mr. BRYANT, Ms. MCINTOSH, and Mr. MCCLAIN (collectively, the "Spalding Defendants") are sued in their official capacities only and are appointed officials in Spalding County who are responsible for administering elections in that county. Four members are appointed by county executive committees, and the fifth member is selected by the other four members of the board. *See* H.B. 820, 1987 Ga. Laws § 2, p. 4432. The Spalding Defendants are responsible for the conduct of primary and general elections in Spalding County. *See, e.g.*, *id.* § 1; O.C.G.A. § 21-2-40(b) (designating boards of elections and registration with powers and duties of election superintendent and board of registrars and assigning it powers related to conduct of

primaries and elections, voter registration, and absentee balloting procedures); *id*. § 21-2-70 (describing broad authority of superintendents); *id*. § 21-2-381 (absentee ballot applications); *id*. § 21-2-384 (preparing and delivering absentee mail-in ballots). Among other responsibilities, the Voter Suppression Bill tasks county election officials with enforcing the new identification requirements for voting by absentee ballot, SB 202, § 25; issuing absentee ballots during the condensed distribution period, *id.*; and holding hearings on voter registration challenges, *id.* §§ 15, 16.

34.     Defendant CHARLES DAVE is the BROOKS County Elections Superintendent. Defendants ZURICH DESHAZIOR, DON DISTEFANO, and KAREN MURRAY are each Members of the BROOKS County Board of Elections. These individuals (collectively, the "Brooks Defendants") are sued in their official capacities only. The Brooks Defendants are responsible for administering elections in Brooks County. *See, e.g.*, O.C.G.A. § 21-2-40(b) (designating boards of elections and registration with powers and duties of election superintendent and board of registrars and assigning it powers related to conduct of primaries and elections, voter registration, and absentee balloting procedures); *id*. § 21-2-70 (describing broad authority of superintendents); *id*. § 21-2-381 (absentee ballot applications); *id*. § 21-2-384 (preparing and delivering absentee mail-in ballots). Among other

responsibilities, the Voter Suppression Bill tasks county election officials with enforcing the new identification requirements for voting by absentee ballot, SB 202, § 25; issuing absentee ballots during the condensed distribution period, *id.*; and holding hearings on voter registration challenges, *id.* §§ 15, 16.

35.   Defendant ALEX WAN is the Chairman of the FULTON County Registration and Elections Board. Defendants MARK WINGATE, KATHLEEN RUTH, VERNETTA KEITH NURIDDIN, and AARON JOHNSON are each Members of the FULTON County Registration and Elections Board. Mr. WAN, Mr. WINGATE, Ms. RUTH, Ms. NURIDDIN, and Mr. JOHNSON (collectively, the "Fulton Defendants") are sued in their official capacities only and are appointed officials in Fulton County who are responsible for administering elections in that county. Four members are appointed by county executive committees, and the fifth member is selected by the governing authority of Fulton County. *See* H.B. 656, 2019 Ga. Laws § 2, p. 4181. The Fulton Defendants are responsible for the conduct of primary and general elections in Fulton County. *See, e.g.*, *id.*; H.B. 837, 1989 Ga. Laws § 1, p. 4578; O.C.G.A. § 21-2-40(b) (designating boards of elections and registration with powers and duties of election superintendent and board of registrars and assigning it powers related to conduct of primaries and elections, voter registration, and absentee balloting procedures); *id.* § 21-2-70 (describing broad

authority of superintendents); *id.* § 21-2-381 (absentee ballot applications); *id.* § 21-2-384 (preparing and delivering absentee mail-in ballots). Among other responsibilities, the Voter Suppression Bill tasks county election officials with enforcing the new identification requirements for voting by absentee ballot, SB 202, § 25; issuing absentee ballots during the condensed distribution period, *id.*; and holding hearings on voter registration challenges, *id.* §§ 15, 16.

36.     Defendant KEITH E. GAMMAGE is the Solicitor General of Fulton County, and is named as a Defendant in his official capacity. As Solicitor General, Mr. GAMMAGE is responsible for prosecuting misdemeanors, including violations of SB 202's criminal ban on the private distribution of food or water to people waiting in line to vote. *See* O.C.G.A. § 15-18-66.

37.     Defendant GREGORY W. EDWARDS is the District Attorney for Dougherty County, and is named as a Defendant in his official capacity. As Dougherty County District Attorney, Mr. EDWARDS is responsible for prosecuting felonies and misdemeanors, including violations of SB 202's criminal ban on the private distribution of food or water to people waiting in line to vote. *See* O.C.G.A. § 15-18-66.

## STATEMENT OF FACTS AND LAW

### The 2020 Election in Georgia

38.     After Black voters narrowly failed to elect their candidate of choice in Georgia's 2018 gubernatorial election, efforts to mobilize Black voters for the 2020 election cycle redoubled. Organizations such as Plaintiffs NGP, Black Voters Matter, and Rise launched to register new voters—with an emphasis on voters of color and young voters—and to ensure these individuals would have their voices heard in the 2020 elections.

39.     The results were historic. Even as the COVID-19 pandemic raged, Georgia voters participated in the democratic process at record rates, showing, in particular, unprecedented enthusiasm for absentee voting.

40.     In the June 2020 primary election, nearly 1.1 million absentee ballots were returned for counting.

41.     In the November 2020 general election, more than 1.3 million absentee ballots were returned and accepted. Nearly 30% of Black voters cast their ballot by mail in 2020, compared to only 24% of white voters.

42.     To ensure their absentee ballots were received by election officials, and to avoid mail-delivery errors or delays, voters relied heavily on drop boxes—secure

receptacles on government property under 24/7 video surveillance where absentee ballots could be submitted.

43.     In Fulton County, for example, which is majority nonwhite, more than half of the 146,000 absentee ballots cast in the November election were submitted in one of almost 40 drop boxes located throughout the County.

44.     Fulton County's embrace of drop boxes contrasted sharply with the approach in counties like Forsyth, where less than five percent of the population is Black, and which implemented only one drop box.

45.     To accommodate historically high voter turnout, Fulton County also offered mobile voting units. These specially outfitted buses held eight to ten voting stations and were deployed across the county to make the voting process efficient and accessible in communities where it otherwise would not have easily been. Fulton County's mobile voting units were a great success, stopping at dozens of locations and enabling thousands of voters to cast their ballots.

46.     Notably, Fulton County has the largest Black population in Georgia, and it was the only county to use mobile voting units during the general and runoff elections.

47.     Fulton County's mobile voting units were so successful that, in early November, the Douglas County Board of Commissioners unanimously voted to purchase a mobile voting unit for its future elections.

48.     Douglas County has one of the fastest-growing Black populations in Georgia and, as of mid-2019, nearly 50% of the population in Douglas County was Black.

49.     In addition to absentee voting, approximately 2.7 million Georgians voted early in person in the 2020 general election; more than 2 million voters cast early in-person ballots in the U.S. Senate runoff elections.

50.     The high turnout among in-person voters resulted in long lines at many polling places—especially at polling places located in Black neighborhoods.

51.     While majority-Black neighborhoods comprise only one-third of Georgia's polling places, they account for two-thirds of the polling places that had to stay open late for the June primary to accommodate long lines.

52.     A recent study found that the average wait time in Georgia during the June primary after polls were scheduled to close was six minutes in neighborhoods that were at least 90% white, and 51 minutes in places that were at least 90% nonwhite.

53.     To ease the burden of these wait times, organizers delivered free food and water to polling places with long lines, and counties offered extended early voting hours, outdoor drop boxes, and mobile voting units to give voters additional opportunities to cast a ballot, hoping to minimize the number of voters who attempted to vote but were disenfranchised as a result of widespread extremely long lines.

54.     This successful mobilization effort was widely heralded as crucial in facilitating Black voter turnout and determining electoral outcomes.

55.     The presidential candidate preferred by Black voters won Georgia's electoral votes for the first time since 1992, and for only the second time since Georgia-native Jimmy Carter was on the ballot in 1980.

56.     Black voters also successfully elected their candidates of choice in runoff elections for both of Georgia's U.S. Senate seats, including Reverend Raphael Warnock, who became the first Black person ever to represent Georgia in the Senate.

57.     Not everyone shared the same enthusiasm over Black voter turnout and electoral success, however. Following the historic runoff, the paramount concern among leaders of the Republican Party was to prevent these results from repeating in future elections.

58.     As Alice O'Lenick, Chairwoman of the Gwinnett County Board of Registrations and Elections, explained to fellow Republicans, 2020 was a "terrible elections cycle" for the Republican Party. She said, "I'm like a dog with a bone. I will not let them end this session without changing some of these laws. They don't have to change all of them, but they've got to change the major parts so that we at least have a shot at winning."

59.     To justify the proposed voting restrictions, Republican Party leaders resorted to the exhaustively refuted canard of voter fraud. The same debunked falsehoods had been weaponized by Republican politicians across the country, including most visibly by former President Trump himself, in his and his allies' unsuccessful attempts to overturn his election loss. These efforts were repeatedly fueled by trumpeting unfounded accusations about illegal voting in heavily Black cities such as Philadelphia, Detroit, Milwaukee, and Atlanta.

60.     These efforts took on a special intensity in Georgia, where at least six different lawsuits challenged the legitimacy of, first, Georgia's November general election, and then the January runoff elections. Not a single one of those cases, however, was able to withstand even the slightest scrutiny. State and federal courts determined that the factual allegations of these lawsuits were unsubstantiated, and the legal contentions lacked merit.

61.     Meanwhile, Republican Secretary of State Brad Raffensperger explained in a letter to Congress that he had independently authenticated the legitimacy of Georgia's 2020 election. He reported:

> [M]y office has taken multiple steps to confirm that the result is accurate, including conducting a hand audit that confirmed the results of the Presidential contest, a recount requested by President Trump that also confirmed the result, an audit of voting machines that confirmed the software on the machine was accurate and not tampered with, and an audit of absentee ballot signatures in Cobb County that confirmed that process was done correctly. Law enforcement officers with my office and the Georgia Bureau of Investigation have been diligently investigating all claims of fraud or irregularities and continue to investigate. **Their work has shown me that there is nowhere close to sufficient evidence to put in doubt the result of the presidential contest in Georgia**. . . . While there is no such thing as a perfect election, our law enforcement officers are not seeing anything out of the ordinary scope of regular post-election issues that will be addressed by the State Election Board after the investigations are complete. There will end up being a small amount of illegal votes (there always is in any election because federal and state law err on the side of letting people vote and punishing them after the fact), but nowhere near the amount that would put the result of the presidential election in question.

(Emphasis added).

62.     Secretary Raffensperger went on to include a "point by point refutation of false claims" related to voter fraud. He explained that the audit of Cobb County found "no fraudulent absentee ballots" with a 99% confidence threshold, and further confirmed that "the number of illegal voters in Georgia alleged by the President's allies are not accurate or reliable."

63.    None of these facts have had any impact on Georgia lawmakers' calculated efforts to make voting more difficult in Georgia generally, and for Georgia's Black voters in particular.

64.    Two days after Republicans lost the U.S. Senate runoff elections, Republican Georgia House Speaker David Ralston announced he would appoint a "Special Committee on Election Integrity."

65.    But even Speaker Ralston, in a moment of candor, recognized that the premise of the Special Committee—that the integrity of the 2020 election had somehow been compromised—was fiction. He said: "Let's look at the facts here. The facts are we've had [two] recounts. We've had an audit and we've had more than six—I've lost count. I know there's at least six lawsuits that have been filed, all of which have been dismissed. Which kind of begs the question if there were, in fact, significant wrongdoing would it not have been disclosed?"

66.    But the absence of fraud was irrelevant to the Committee's creation and its subsequent efforts to make voting unjustifiably more difficult, particularly for Black voters.

**The Challenged Laws**

67.    In the wake of general and runoff elections that saw Black-preferred candidates prevail in the presidential and U.S. Senate races for the first time in

decades, Republican majorities in the Georgia General Assembly passed several restrictions on voting rights.

68. *First*, the General Assembly enacted a requirement that voters requesting an absentee ballot submit with their application their driver's license number, their personal identification number on a state-issued personal identification card, or a photocopy of other specified forms of identification, along with their date of birth and other information. Voters who choose to vote absentee must comply with substantially similar requirements a second time when they cast their ballot. Any omissions or errors will result in the application or ballot being rejected.

69. These provisions will disproportionately affect voters who are young, elderly, indigent, or from minority communities.

70. According to one national study, as many as 25% of Black voters do not possess a current and valid form of government issued photo ID, compared to 11% of voters of all races.

71. Voters in Georgia also do not have equal access to state offices that issue IDs on a full-time basis, with minorities bearing the brunt of these limitations. For instance, minority voters have greater difficulty getting to a state office that issues ID because minority households are less likely to have access to a vehicle than

white households (i.e., a full 11% of minority households lack access, versus only 4% of white households).

72.    Compounding these problems, affected voters are more likely to lack ready access to the internet or to a computer in order to print out proof of identification.

73.    A recent study about the effects of remote learning showed that, as of May 2020, "88 percent of white households with students enrolled in public or private K-12 education in Georgia reported having regular access to a computer for educational purposes, compared to 75 percent of Black households and 68 percent of Latino households . . . . During that same time period, 90 percent of white families reported having reliable internet access, compared to 85 percent of Black families and 72 percent of Latino families."[2]

74.    Further, "[h]ouseholds in [Georgia's] Black Belt are twice as likely as households outside the region to lack access to high-speed Internet."[3] *Id.*

---

[2] Maureen Downey, *Tech Gaps Limit Some Students' Contact with Teachers*, The Atlanta Journal-Constitution (Feb. 12, 2021), https://www.govtech.com/education/tech-gaps-limit-some-students-contact-with-teachers.html.
[3] *Id.*

75.    Young voters, especially college students who are registered to vote in Georgia but grew up elsewhere, are less likely to have state-issued ID and less likely to possess a driver's license than other age groups.

76.    *Second*, the General Assembly moved the dates for absentee ballot distribution in many elections closer to the election by 20 days, reducing the window for most absentee voters to complete and cast their ballots.

77.    This change will again disproportionately affect Black voters in Georgia, who voted absentee at a higher rate than white voters in the 2020 general and 2021 runoff elections, and who are more likely than white voters to need additional time to obtain the necessary identification documents.

78.    The change will also burden affected voters—not to mention election officials—by narrowing the period in which voters can cure issues with their ballots.

79.    Black and other minority voters will be disproportionately affected because, in past elections, their mail-in ballots have been rejected at significantly higher rates than those of white voters.

80.    In the 2020 primary election, for example, 1.6% of Black voters' mail-in ballots were rejected or marked as spoiled, compared with just 0.9% of white voters' mail-in ballots. Black voters in Georgia also saw their mail-in ballots rejected at disproportionately high rates in the 2016, 2018, and 2020 general elections, when

the rejection rate for mail-in ballots returned by Black voters was between 67% and 79% greater than the comparable rate for white voters.

81.     *Third*, the General Assembly repealed a law that required counties to mail absentee ballots to unregistered eligible voters who apply for an absentee ballot and then return their registration card by the deadline. Unregistered eligible voters may now have to apply for an absentee ballot twice or risk losing the opportunity to vote absentee.

82.     *Fourth*, the General Assembly effectively prohibited the use of portable or mobile polling facilities, which are now permitted only in emergencies the Governor declares and only to supplement the capacity of the polling place where the emergency circumstance occurred.

83.     Fulton County, which is more than 44% Black and has the largest Black population in Georgia, successfully deployed mobile voting units, each with eight to ten voting stations, in the November general and January runoff elections. It was the only Georgia county to use mobile voting units in those elections, although Douglas County—which is nearly 50% Black—subsequently announced its intent to use mobile voting units in the future.

84.     By banning mobile voting units, the Voter Suppression Bill plainly targeted Fulton and Douglas Counties, and by extension, their Black voters.

85.     *Fifth*, the General Assembly dramatically cut back the availability and accessibility of drop boxes, which had been used successfully in Georgia's primary, general, and runoff elections in 2020 and 2021.

86.     The use of drop boxes during the November elections contributed to an approximately 80 percent reduction in the rate of absentee ballots rejected for being received after the Election Day deadline.

87.     The availability of drop boxes significantly benefitted Black voters. The seven counties—Fulton, DeKalb, Gwinnett, Cobb, Clayton, Chatham, Richmond—that collectively contain a majority of Black Georgians averaged nearly 19 drop boxes per county in the November and January elections, while the 16 counties that collectively contain a majority of white Georgians averaged eight drop boxes per election. Outside the seven counties where most Black Georgians reside, the other 152 counties averaged just *one drop box* per election.

88.     Drop boxes are especially valuable for eliminating the problem of mail delays. In the 2016, 2018, and 2020 general elections, Black voters had their mail-in ballots rejected for being late at disproportionately high rates. For example, the late-ballot rejection rate for Black voters was nearly 50% higher than the rate for white voters in the November 2020 general election.

89.     With the Voter Suppression Bill, the General Assembly has now barred counties from establishing drop boxes that are 1) outdoors or 2) available outside of regular business hours. These changes eliminated two drop box features that had previously accommodated voters unable to vote in person.

90.     The General Assembly also ordered counties to close drop boxes the Friday before the election, and it added a new requirement that drop boxes—which previously were required to be under 24/7 video surveillance—"be under constant surveillance by an election official or his or her designee, law enforcement official, or licensed security guard." SB 202 § 26(c)(1).

91.     Finally, the General Assembly limited the number of county-wide drop boxes to "the lesser of either one drop box for every 100,000 active registered voters in the county or the number of advance voting locations in the county," *id.*, far less than the U.S. Election Assistance Commission's recommendation of "one drop box for every 15,000–20,000 registered voters."

92.     The U.S. Election Assistance Commission recommends the use of drop boxes as a "secure and convenient means for voters to return their mail ballot," noting specifically that they guard against disenfranchisement of voters whose ballots are delayed in the mail, and where voters want to consider all of the

information available to them as close to the election as possible before voting their ballot.

93.     Georgia's new drop box restrictions directly undermine the benefits of having drop boxes for countless voters, including those voters who wait to vote their ballot until close to Election Day.

94.     Black voters are particularly likely to be negatively impacted by the changes, not least of all because they are more likely to work hourly jobs without flexible schedules, or even multiple jobs, making it harder for them to access drop boxes if they are not offered outside of regular business hours. Simply put, eliminating before- and after-hours voting opportunities will disproportionately burden their electoral participation.

95.     *Sixth*, the General Assembly prohibited the State from distributing unsolicited absentee ballot applications to voters, as it did before the 2020 primary elections due to the COVID-19 pandemic.

96.     *Seventh*, the General Assembly prohibited any person from offering food or drink to voters waiting in line at a polling place and makes any violation a misdemeanor.

97.    This prohibition will directly impact voters who are forced to wait in long lines at polling places, particularly in Black neighborhoods where polling locations are more likely to experience congestion.

98.    According to a study of Georgia's 2020 primary elections, the average wait time in Georgia after polls were scheduled to close was six minutes in neighborhoods that were at least 90% white, and 51 minutes in places that were at least 90% nonwhite. In the white neighborhoods, less than 3% of polling places were required to stay open late to accommodate long lines; in the nonwhite neighborhoods, 36% of polling places had to remain open at least an additional hour because of lines.

99.    The food and water prohibition will also harm individuals and organizations that engage in First Amendment-protected expressive conduct by distributing food or drink to voters waiting in line, including Plaintiffs NGP, Black Voters Matter, and Rise—each of which helped coordinate individuals who wanted to provide support in the form of food and drink to voters waiting to vote, provided such support themselves, or both.

100.    This blanket prohibition on people offering food or drink to voters advances no plausible election administration goal, exacerbates the burden of waiting in long lines, and disproportionately impacts Black voters.

37

101.   *Eighth*, while voters could previously cast provisional ballots in any precinct over the course of Election Day and have their votes counted for those contests that appear on their home precinct ballot, with the passage of the Voter Suppression Bill, the General Assembly has now prohibited the counting of any provisional ballot that was cast before 5:00 p.m. in  a precinct other than the one to which a voter is specifically assigned.

102.   This change is especially likely to disenfranchise Black voters, who are more likely than white voters to have moved within their county, making them more likely to erroneously present to vote in a precinct other than the one to which their current address assigns them. Black voters are also more likely to live in precincts that have been consolidated, and more likely to be assigned to polling places that serve multiple precincts.

103.   Further, many counties with substantial minority populations have seen polling places closed—or threatened with closure—in recent years. These events predictably create confusion about where a person should vote, and SB 202's new restrictions ensure the consequences will disproportionately be borne by Black voters.

104.   Voters without easy access to transportation or flexible schedules may be unable to correct the mistake and travel to the correct precinct in time to cast their

ballot—especially after having waited for hours in line to cast a ballot. Moreover, time and time again, voters have reported not being advised that they were in the wrong precinct to begin with; as a result, some voters may not even recognize their mistake.

105.   Moreover, the new restrictions arbitrarily lift when a voter presents at the wrong polling place after 5:00 p.m.; this exception alone demonstrates that the rejection of ballots voted out of precinct any time earlier in the day (including, by the letter of the law, at 4:59 p.m.) cannot legitimately be justified as an anti-fraud or elections "integrity" measure.

106.   *Ninth*, SB 202 subjects Georgia voters to unlimited challenges from fellow citizens, and local boards of registrars are now required to hold a hearing on any voter registration challenge  in the immediate weeks after the challenge is filed.

107.   Lawful voters targeted by indiscriminate challenges will now be forced to quickly arrange to defend their qualifications before a government board or risk disenfranchisement and removal from the registration rolls.

108.   *Finally*, the General Assembly has drastically compressed the timeframe for federal runoff elections from nine weeks to four weeks and cut the mandatory early voting period for all runoff elections from three weeks to, at most, a mere five days.

109.   The change eliminates the guarantee of early voting on weekends, which Black voters disproportionately rely on to cast their ballots. It will also make it significantly more difficult, and often impossible, for many electors to vote by mail during the limited runoff window.

110.   Collectively, these challenged provisions not only impose severe and unconstitutional restrictions on the voting rights of all Georgians, but they also disparately impact Black voters and effectively deny them an equal opportunity to participate in the electoral process and elect candidates of their choice—an outcome which the General Assembly was keenly aware of and intended.

**The Rushed Legislative Process and Pretextual Justifications for SB 202**

111.   The Voter Suppression Bill is the result of a rushed, opaque legislative process that was driven by the General Assembly's desire to restrict voting among Black, young, and Democratic voters—not by legitimate policy concerns.

112.   SB 202 was introduced in mid-February 2021. Over the course of just 36 days, the Bill was rushed through committee hearings and into final form, with limited opportunities for public input or testimony from interested parties.

113.   During that period, SB 202 grew from a short, two-page document to its final 98-page version, which imposes new and onerous restrictions on virtually every aspect of the elections process in Georgia.

114.   The evolution of the Bill was far from transparent. The General Assembly failed to make updates publicly available in a timely manner. At the same time, it repeatedly pressed ahead and held multiple committee hearings on new versions of the Bill, even when those versions had not yet been posted to the legislature's website, or had only just been posted, making it impossible for the public to meaningfully engage with, and lodge timely objections or raise concerns with, the proposed legislation.

115.   The process was so hurried that, on March 8, 2021, the Georgia Secretary of State's Bipartisan Task Force for Safe, Secure, and Accessible Elections issued a public statement expressing "concern[] that the legislative process is proceeding at a pace that does not allow full examination of all the factors that must be considered. There is a need for responsible elections policymaking to be deliberate and evidence-based, not rushed."

116.   Lawmakers did not take the Task Force's advice. On March 25, the House of Representatives passed a substituted version of SB 202. The Bill was then rushed to the Senate, which passed it that same afternoon. Just a few hours later, Governor Brian Kemp signed SB 202 behind closed doors.

117.   The policy justifications for the Voter Suppression Bill are pretextual. For example, the sponsors of the Voter Suppression Bill cited a need to "address the

lack of elector confidence in the election system." SB 202 § 2(4). But as Secretary Raffensperger has acknowledged, Georgia's elections were "safe, secure, honest." Lieutenant Governor Geoff Duncan explained that the Voter Suppression Bill resulted from "the fallout" and "misinformation and sowing doubt" from former President Trump and Rudy Giuliani in the aftermath of the 2020 election.

118.   The Voter Suppression Bill also states that it is intended to "reduce the burden on election officials." *Id.* Yet many of its provisions do just the opposite. For example, SB 202 prohibits counties from accepting private grant funding, even though such funding helped pay for additional staffing at polling places and provided other support for election officials. It also requires counties to conduct almost-immediate hearings on an unlimited number of voter registration challenges, and it compresses the period in which voters can cure issues with their ballots. Contrary to the legislators' claims, these and other provisions will only *increase* the burdens on election officials, not alleviate them.

119.   Finally, the Voter Suppression Bill states that it is intended to "promot[e] uniformity in voting." *Id.* But the ways in which the Bill seeks uniformity are patently designed to *increase* white voter access while *restricting* access among Black and other minority voters.

120.   On the one hand, for example, SB 202 mandates early voting on two Saturdays prior to an election rather than just one. But that "expansion" of voting access mainly helps voters in whiter, more rural counties, since most Atlanta-area counties and other counties with large Black voter populations already offered multiple weekend advance voting days.

121.   On the other hand, however, SB 202 severely restricts the availability of drop boxes and effectively bans mobile voting units. Those restrictions will disproportionately burden Black and minority voters in urban areas like Fulton County, without affecting voters in whiter and more rural parts of the state.

122.   And instead of a uniform start date for early voting in runoff elections— previously the fourth Monday prior to the election—SB 202 leaves it to counties to begin early voting "[a]s soon as possible prior to a runoff[.]" § 28.

123.   In reality, SB 202 is a power grab designed to entrench control over all levels of the political process in Georgia.

124.   For instance, SB 202 radically changes the composition of the SEB. Under the Voter Suppression Bill, three of the five members of the SEB—a majority—are selected directly by the General Assembly. (Previously, the General Assembly selected only two of the members, and the Secretary of State held a third voting position.) The General Assembly retains particularly tight political control

over the newly-created position of chairperson, who does not have a set term of office and instead serves only until the General Assembly selects a replacement.

125.   The SEB also has new authority to "suspend" up to four county election superintendents at one time and appoint an individual replacement for each. *Id*. § 6(f). A replacement superintendent—who would be politically accountable to the SEB, not the voters in the county they serve—gains all of the superintendent's powers and duties. The Voter Suppression Bill specifically gives a temporary superintendent authority to make "all personnel decisions" for the election, including selecting the county's director of elections, the election supervisor, and all poll officers. *Id.*

126.   In this way, the SEB can exercise nearly plenary political control over local elections. In certain cases, the replacement superintendent even becomes "permanent" and cannot be removed from office by the local jurisdiction for nine months. *Id*. § 7(e)(2).

127.   The net result of these provisions, and others like them in SB 202, is a consolidation of power that reveals the real purpose behind SB 202: to burden voters (including, specifically, Black voters) and jurisdictions deemed to be unfavorable to the legislators who advanced the Voter Suppression Bill.

## Racial Discrimination and Voting in Georgia

128.   The Voter Suppression Bill is hardly Georgia's first racially discriminatory voting practice. Georgia has a long and egregious history of implementing election laws that hinder Black and minority citizens' ability to participate equally in the political process.

129.   This history began shortly after the abolition of slavery, when Black men in Georgia first gained the right to vote and cast ballots in April 1868. After that election, the Georgia General Assembly passed a resolution that expelled 25 Black representatives and three Black senators. The General Assembly's resolution was based on the belief that the right of Black men to vote did not give them the right to hold office, and Black legislators were thus deemed ineligible to serve under Georgia's post-Civil War state constitution.

130.   In 1871, Georgia became the first state to enact a poll tax. At the 1877 state constitutional convention, the General Assembly voted to make the poll tax permanent and cumulative, requiring citizens to pay all back taxes before being permitted to vote. As a result, Black turnout in Georgia's next elections plummeted. The poll tax was not abolished until 1945, after it had been in effect for nearly 75 years.

131.   Other means of disenfranchising Georgia's Black voters followed: literacy tests, strict residency requirements, onerous registration procedures, voter challenges and purges, the deliberate slowing down of voting by election officials so that Black voters would be left waiting in line when the polls closed, the adoption of "white primaries," and the use of discriminatory redistricting processes.

132.    After the poll tax was repealed in 1945, voter registration among Black men and women significantly increased. As a result of these purposeful voter suppression tactics, however, not a single Black citizen served in the Georgia General Assembly between 1908 and 1962.

133.   As late as 1962, 17 municipalities and 48 counties in Georgia required segregated polling places. When the U.S. Department of Justice filed suit to end the practice, a local Bibb County leader declared that the federal government was ruining "every vestige of the local government."

134.   To date, no Black man or woman has been elected governor of Georgia and just one, Senator Raphael Warnock, has been elected to the U.S. Senate—in the same election that immediately preceded (and spurred) the passage of the Voter Suppression Bill.

135.  Because of its history of discrimination against racial minorities, Georgia became a "covered jurisdiction" under Section 5 of the Voting Rights Act

when Congress passed the landmark civil rights law in 1965, meaning any changes to Georgia's election practices or procedures were prohibited until either the U.S. Department of Justice or a federal court determined that the change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color." 52 U.S.C. § 10304.

136.   Between 1965 and 2013, after which the Supreme Court effectively barred enforcement of the Section 5 preclearance requirement, the federal government's independent oversight helped guard Georgia's minority voters against disenfranchisement and arbitrary and disparate treatment by the State in its election practices and procedures. While Section 5 was in effect, Georgia received more than 170 preclearance objection letters from the U.S. Department of Justice under Section 5 of the Voting Rights Act.

137.   Georgia's history of racially discriminatory voting practices is so extensive and well-established, courts have effectively taken judicial notice of it. *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994) ("The history of the state['s] segregation practice and laws at all levels has been rehashed so many times that the Court can all but take judicial notice thereof."); *Johnson v. Miller*, 864 F. Supp. 1354, 1379–80 (S.D. Ga. 1994), *aff'd and remanded*, 515 U.S. 900 (1995) ("[W]e have given formal judicial notice of the State's past

discrimination in voting, and have acknowledged it in the recent cases."); *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs.*, 950 F. Supp. 2d 1294, 1314 (N.D. Ga. 2013), *aff'd in part, vacated in part, rev'd in part and remanded*, 775 F.3d 1336 (11th Cir. 2015) ("Generally, Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception.") (quoting *Brooks*, 848 F. Supp. at 1560).

138.   Discrimination in the not-so-distant past can have reverberating effects. "[P]ast discrimination can severely impair the present-day ability of minorities to participate on an equal footing in the political process. Past discrimination may cause blacks to register or vote in lower numbers than whites." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1567 (11th Cir. 1984).

139.   In addition to Georgia's history of discrimination against minorities in voting and elections, political campaigns in Georgia have often relied on both explicit and implicit racial appeals. These appeals have continued into modern-day elections.

140.   For example, in the 2014 Democratic House of Representatives primary election in House District 105, an unidentified Republican firm reportedly conducted

a racially divisive robocall among likely Democratic voters in House District 105, asking if they would prefer to vote for "an Asian businessman or an African American swim mom." The poll was apparently referencing the two Democratic candidates in the primary race, Tim Hur, who is Asian-American, and Renita Hamilton, who is Black.

141.   In 2017, a member of the board of commissioners in Gwinnett County, the second most populous county in the state, called the late Representative John Lewis a "racist pig" and suggested that his re-election to the United States House of Representatives is "illegitimate" because he represents a majority-minority district.

142.   Also in 2017, the Republican mayor of Georgia's seventh-largest municipality, Roswell, insinuated that voters in Georgia's Sixth Congressional District—which is majority white and has been represented by white Republicans Newt Gingrich, Johnny Isakson, and Tom Price over the past three decades—would not vote for Democratic candidate (and now U.S. Senator) Jon Ossoff in the 2017 special election because he has an "ethnic-sounding" name. When describing voters in the Sixth District, the mayor said, "This is a mature voter base. If someone is going down the list, they're gonna vote for somebody who is familiar. . . If you just say 'Ossoff,' some folks are gonna think, 'Is he Muslim? Is he Lebanese? Is he

Indian?' It's an ethnic-sounding name, even though he may be a white guy, from Scotland or wherever."

143.   In the 2018 gubernatorial election, a white supremacist organization targeted Democratic candidate Stacey Abrams, who would have been Georgia's first Black governor, with robocalls laced with explicitly racist language.

144.   During the 2020 presidential and senatorial campaign, racist tactics and attacks accelerated. For example, then-Senator David Perdue mispronounced then-Senator Kamala Harris's name, saying "Ka-*ma*-la, *Ka*-ma-la, Kamala-mala-mala, I don't know, whatever."

145.   The Perdue campaign had previously depicted his opponent, now-Senator Jon Ossoff, who is Jewish, with a longer and thinner nose, playing into anti-Semitic stereotypes.

146.   Meanwhile, the National Republican Senatorial Committee ran ads on social media urging their voters to "stand your ground" next to a photo of a white man sitting in the bed of a truck holding a gun, a reference to laws that have been used to justify the deaths of unarmed Black people.

147.   The ability of Georgia's Black citizens to participate in the political process has been further hindered by significant and disparate effects of

discrimination in housing, education, employment, health, criminal justice, and other areas which persist to this day.

148.   For example, the Georgia Department of Community Health has reported that minorities in Georgia have worse health status and more chronic health conditions than whites. Between 2013 and 2017, the infant mortality rate for Black babies was twice that of white babies.

149.   In 2019, the unemployment rate for Black people in Georgia was 5.3%, compared to only 2.4% among white people, according to the Economic Policy Institute. Those inequities have gotten worse during the current recession as across the country unemployment rates among Black workers decline at a slower rate than white workers. Unemployment rates spiked in May 2020—and Black workers' 16.8% unemployment rate was the highest of all racial groups.

150.   Homes in cities and neighborhoods in Georgia that have significant minority populations have lower values than homes located in predominantly white areas. Moreover, while real estate in Georgia has increased in value in those areas with small Black populations, home values have decreased in all zip codes in the Atlanta metropolitan area where the population is at least 40% Black.

151.    In education, the racial gap in graduation rates persist. In the 2019-2020 school year, 87% of white students graduated on time while just 81% of Black students did.

152.    In 2017, more than half of Georgia's prison population was Black, even though Black people made up only approximately 32% of the population

153.    The ongoing COVID-19 pandemic has only further highlighted the disparities between Black and white Georgians. A survey the Centers for Disease Control and Prevention conducted of Georgia hospitals in March 2020 found that more than 80% of COVID-19 patients were Black. A study from the Morehouse School of Medicine found that a 1% increase in a county's Black population was associated with a 2.5% increase in the county's confirmed cases of COVID-19. Dougherty County, Georgia, which is 70% Black, had the most deaths from COVID-19—more deaths than even Georgia's largest county, Fulton County, which has more than *eleven times* Dougherty County's population.

154.    These disparities, among others, are vestiges of Georgia's history of discrimination against its Black citizens, which continues to this day. The Voter Suppression Bill interacts with these social conditions to deny or abridge the voting rights of Black Georgians, and to deny Black voters in Georgia an equal opportunity to participate in the electoral process and elect candidates of their choice. Protestors

outside the Capitol recognized this, calling the Bill "Jim Crow 2.0." In fact, State Representative Park Cannon of Atlanta, a Black woman, was arrested by state troopers after knocking on Governor Kemp's office door to try to witness the bill signing.

## CLAIMS FOR RELIEF

### COUNT I

**First and Fourteenth Amendments**
**U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202**
**Undue Burden on the Right to Vote**
**(Brought Against All Defendants)**

155.   Plaintiffs reallege and incorporate by reference Paragraphs 1 through 154, as though fully set forth herein.

156.   A court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the justifications put forward by the state for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

157.   "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (quotation marks omitted). "And even when a law imposes only a

slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden. The more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318–19 (11th Cir. 2019).

158.   The Voter Suppression Bill inflicts severe burdens on Georgia's voters through each individual restriction and the cumulative effect of all the suppressive measures which impose barriers to voting absentee and in person.

159.   Absentee voters will encounter an identification requirement that denies them the ability to vote absentee unless they possess certain limited forms of identification or identification numbers; a narrowed window in which they can return their absentee ballot; restrictions on drop boxes that limit the availability of safe and secure methods of returning absentee ballots; and restrictions preventing election officials and organizations from even distributing absentee ballot *applications* or assisting voters in returning them.

160.   Georgians who vote in person are also targeted by the Voter Suppression Bill. It imposes a ban on mobile polling places used by thousands of voters in recent high-turnout elections, limiting the accessibility to voting locations and requiring many voters to travel longer distances and wait in long lines. The Bill also prohibits votes cast in the wrong precinct before 5:00 p.m. from being counted,

which all but ensures that in-person voters whose inflexible schedules prevent them from voting after 5:00 p.m. face a significantly greater risk of outright disenfranchisement—the most severe burden on their voting rights.

161.   To make matters worse for in-person voters, the Voter Suppression Bill prohibits anyone from giving food or drink to those waiting in line, which serves no legitimate purpose other than to maximize the burdens of voting in person.

162.   For those who navigate these hurdles, the Voter Suppression Bill subjects them to unlimited voter challenges, the result of which imposes substantial burdens on voters who are forced to prove their eligibility and subjects voters to ongoing abuse and intimidation.

163.   And for elections that proceed to a runoff, the Voter Suppression Bill dramatically limits the runoff voting period, as well as opportunities for early and mail-in voting, all of which makes it more difficult for Georgians to vote in person during the runoff election.

164.   No state interest justifies any of these restrictions, which individually and cumulatively burden the right to vote. Before the General Assembly passed the Bill, the Secretary had referred to Georgia's election administration as the "gold standard" due to the State offering absentee voting, early voting, and election-day voting options. But after that system facilitated record turnout in the 2020 general

election and the 2021 U.S. Senate runoff elections, the General Assembly acted swiftly to radically and unjustifiably punish the electorate by dramatically curtailing opportunities to vote.

165.   Absentee voter fraud in Georgia—the justification for these restrictive measures—is virtually non-existent. According to the Arizona State University Cronkite School of Journalism, there have been only eight instances of voter fraud in Georgia since 2000 that resulted in a plea, consent order, or conviction—a negligible rate of fraud in absentee voting totaling 0.00003%.

166.   Rather than promote public confidence in Georgia's elections and ensure election integrity, the Voter Suppression Bill will make voting more difficult, result in disenfranchisement, and shatter voter confidence in Georgia's electoral process. In short, the challenged provisions of the Voter Suppression Bill are not supported by any state interest sufficient to justify the resulting restrictions on the voting process, and they unduly burden the right to vote in violation of the First and Fourteenth Amendments.

## COUNT II

### Section 2 of the Voting Rights Act
### 52 U.S.C. § 10301, *et seq.*
### Intentional Racial Discrimination & Discriminatory Results
### (Brought Against All Defendants)

167.   Plaintiffs reallege and incorporate by reference Paragraphs 1 through 154, as though fully set forth herein.

168.   Section 2 of the Voting Rights Act prohibits vote denial: the use of voting laws, policies, or practices, like absentee ballot procedures and qualifications, that deny, abridge, or otherwise limit Black voters' access or increase the burden for Black people to exercise the right to vote. 52 U.S.C. § 10301.

169.   Section 2 is violated where "the challenged methods of election either have a discriminatory purpose *or* effect." *Askew v. City of Rome*, 127 F.3d 1355, 1373 (11th Cir. 1997).

170.   Discriminatory intent may be established by proof that the defendants used race as a motivating factor in their decisions. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Even where challenged legislation appears neutral on its face, discriminatory intent may be inferred by analyzing the context during which and by which the challenged provisions were enacted, and by reviewing the challenged provisions' disproportionate racial impact. *See id.* at 266–68.

57

171.   All of the relevant indicia demonstrate that a discriminatory purpose was a motivating factor in the passage of the Voter Suppression Bill. For example, the Bill was introduced after the historic registration of Black voters and the breakthrough success of candidates that Black voters supported. Legislative consideration of the Bill was rushed, opportunities for public comment and analysis were limited, and the stated rationales for the Bill were unfounded pretext. And the Bill surgically removed accommodations relied on by Black voters at every step of the voting process—including drop boxes, mobile voting units, and mandatory weekend voting for runoff elections—while erecting new impediments that will disproportionately burden Black voters—including restrictions on out-of-precinct provisional ballots and burdensome ID requirements.

172.   The Voter Suppression Bill also violates Section 2 under the "results" test, which examines whether "a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

173.   This inquiry requires a "totality of the circumstances" analysis that includes factors such as:

> the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or

58

political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; the exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Id.* at 44–45.

174.   As detailed above, there is a long history of voting-related discrimination against Black people in Georgia. Moreover, voting in Georgia is highly polarized, and the shameful legacy of racial discrimination is visible today in Georgia's housing, economic, and health disparities.

175.   In large part because of the racial disparities in areas outside of voting—such as socioeconomic status, housing, and employment opportunities— the Voter Suppression Bill disproportionately impacts Black voters and interacts with these vestiges of discrimination in Georgia to deny Black voters an equal opportunity to participate in the political process and/or elect a candidate of their choice.

176.   Under the totality of circumstances, the Voter Suppression Bill abridges and, in some cases, entirely denies the rights of Black voters, including Plaintiffs

Elbert Solomon, Fannie Marie Jackson Gibbs, and Jauan Durbin, as well as the Black voters who make up the core membership and constituency of Plaintiffs NGP, Black Voters Matter, and Rise.

## COUNT III

**First Amendment**
**U.S. Const. Amend. I, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202**
**Violation of the Rights to Freedom of Political Association and Expression**
**(Brought Against All Defendants)**

177.  Plaintiffs reallege and incorporate by reference Paragraphs 1 through 154, as though fully set forth herein.

178.  The First Amendment to the United States Constitution, incorporated to the states through the Fourteenth Amendment, protects the right of political association and freedom of expression through voting. *See Shapiro v. McManus*, 577 U.S. 39, 46 (2015); *Vieth v. Jubelirer*, 541 U.S. 267, 314–15 (2004) (Kennedy, J., concurring in judgment).

179.  Under the First Amendment, a state government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 164 (2015) (quoting *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)).

180.  A law regulating speech that is adopted "because of disagreement with the message [the speech] conveys," even if facially content-neutral, is

"presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Id.* at 163, 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

181.   Strict scrutiny thus applies to a law that regulates speech because of the government's disagreement with the speaker's political beliefs, expression, or association. *See Hand v. Scott*, 888 F.3d 1206, 1211–12 (11th Cir. 2018) (recognizing that a voting law "that was facially or intentionally designed to discriminate based on viewpoint—say, for example, by barring Democrats, Republicans, or socialists from reenfranchisement on account of their political affiliation—might violate the First Amendment").

182.   SB 202 was enacted immediately after Black voters, young voters, and Democratic voters saw their preferred candidates win Georgia's electoral votes in the November 2020 presidential election and both of Georgia's U.S. Senate races in the January 2021 runoff election.

183.   As detailed above, the General Assembly enacted the challenged provisions in SB 202 with the purpose of restricting these voters' ability to cast ballots for their preferred candidates in future elections on the basis of their viewpoint.

184.   None of the challenged provisions in the Voter Suppression Bill are narrowly tailored to serve a compelling government interest. They are therefore unconstitutional restrictions on speech under the First Amendment to the U.S. Constitution.

**COUNT IV**

**First Amendment**
**U.S. Const. Amend. I, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202**
**Violation of the Rights to Freedom of Speech and Expression**
**(Brought Solely Against Gammage and Edwards)**

185.   Plaintiffs reallege and incorporate by reference Paragraphs 1 through 25, 36 through 66, 96 through 100, and 110, as though fully set forth herein.

186.   The First Amendment to the United States Constitution, incorporated to the states through the Fourteenth Amendment, protects the rights of free speech and expression—including "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 422–23 (1988).

187.   Organizations and individuals, like Plaintiffs NGP, Black Voters Matter, and Rise, who plan to distribute, or coordinate the distribution of, food and drink to voters waiting in line engage in First Amendment-protected core political speech and expression by encouraging those voters to stay in line.

188.   SB 202 unconstitutionally criminalizes protected speech and expression by making it a misdemeanor to "give, offer to give, or participate in the giving of any money or gifts, including, but not limited to, food and drink, to an elector." SB 202 § 33(a).

189.   That provision unconstitutionally restricts individuals' and organizations' First Amendment rights, and it is not sufficiently related to any compelling, or even legitimate or important, government interest.

## COUNT V

**Civil Rights Act**
**52 U.S.C. § 10101, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202**
**Immaterial Voting Requirement**
**(Brought Against All Defendants Except Gammage and Edwards)**

190.   Plaintiffs reallege and incorporate by reference Paragraphs 1 through 35, 38 through 75, and 110, as though fully set forth herein.

191.   The Civil Rights Act prohibits any person acting under color of law from "deny[ing] the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B).

192.   This provision was "intended to address the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters." *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003).

193.   SB 202 requires the rejection of any absentee application or ballot that fails to provide the elector's date of birth.

194.   "[A]n elector's year of birth is not material to determining the eligibility of an absentee voter." *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308 (N.D. Ga. 2018).

195.   The only conceivable purpose of the date-of-birth requirement is to confirm an elector's identity. But SB 202 already requires electors applying for and voting by absentee ballot to prove their identity with a unique identifier, such as a driver's license or state identification number.

196.   Because an elector's date of birth is not a unique identifier, its inclusion does not materially improve election officials' ability to confirm an elector's identity. If SB 202's driver's license or state identification number requirements are determined to be lawful, then the additional requirement that an elector provide a date of birth is entirely redundant.

197.   By requiring election officials to reject absentee applications and ballots solely on the basis of a missing or incorrect year of birth, SB 202 violates the Civil Rights Act.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

(a)   Declaring that the challenged provisions in the Voter Suppression Bill violate the First and Fourteenth Amendments to the U.S. Constitution as undue burdens on the right to vote;

(b)   Declaring that the challenged provisions in the Voter Suppression Bill violate Section 2 of the Voting Rights Act;

(c)   Declaring that the challenged provisions in the Voter Suppression Bill violate the First Amendment to the U.S. Constitution;

(d)   Declaring that the challenged provisions in the Voter Suppression Bill violate the Civil Rights Act;

(e)   Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing any of the challenged provisions of the Voter Suppression Bill;

(e)     Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

(f)     Granting any such other and further relief as this Court deems just and proper.

Respectfully submitted, this 17th day of May, 2021.

| | |
|---|---|
| Halsey G. Knapp, Jr. | /s/ *Uzoma N. Nkwonta* |
| Georgia Bar No. 425320 | Uzoma N. Nkwonta* |
| Joyce Gist Lewis | Jacob D. Shelly* |
| Georgia Bar No. 296261 | Zachary J. Newkirk* |
| Adam M. Sparks | Jyoti Jasrasaria* |
| Georgia Bar No. 341578 | PERKINS COIE LLP |
| KREVOLIN & HORST, LLC | 700 Thirteenth St., N.W., Suite 800 |
| 1201 W. Peachtree St., NW | Washington, D.C. 20005-3960 |
| One Atlantic Center, Suite 3250 | Telephone: (202) 654-6200 |
| Atlanta, GA 30309 | Facsimile: (202) 654-9959 |
| Telephone: (404) 888-9700 | unkwonta@perkinscoie.com |
| Facsimile: (404) 888-9577 | jshelly@perkinscoie.com |
| hknapp@khlawfirm.com | znewkirk@perkinscoie.com |
| jlewis@khlwafirm.com | jjasrasaria@perkinscoie.com |
| sparks@khlawfirm.com | |

Laura Hill*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: (206) 359-3349
Facsimile: (206) 359-4349
LHill@perkinscoie.com

*Counsel for Plaintiffs*
*Admitted pro hac vice*

66