**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

THE NEW GEORGIA PROJECT, *et al.*,

      *Plaintiffs*,

v.

BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State, *et al.*,

      *Defendants*.

CIVIL ACTION

FILE NO. 1:21-CV-01229-JPB

**BRIEF IN SUPPORT OF STATE DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

## INTRODUCTION

After reviewing Defendants' first motion to dismiss, Plaintiffs decided to modify their claims. But they did not modify their extreme rhetoric about a law that is within the mainstream of other states, continuing to attack it as "burdensome," "discriminatory," and "unjustified." [Doc. 39, ¶¶ 10–11].

So what changed with the Amended Complaint? Plaintiffs added a few individuals as Plaintiffs and added some counties and officials as Defendants. They added an intentional-discrimination claim, challenges to several timeline updates made by SB 202, and a First Amendment claim about food and water against a subset of new Defendants. And they added a Civil Rights Act claim about the processing of absentee ballots.

What has not changed is New Georgia Project's (NGP) effort to impose its policy preference through litigation, just like it did before it knew the results of the 2020 elections. *See, e.g., New Ga. Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1279 (N.D. Ga. 2020), stayed by *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1284 (11th Cir. 2020) (*New Ga. Project I*). And despite modifying portions of their Complaint, Plaintiffs still have not cured their standing problem.

Despite Plaintiffs' protestations, SB 202 is designed "to address the lack of elector confidence in the election system on all sides of the political spectrum,

to reduce the burden on election officials, and to streamline the process of conducting elections in Georgia by promoting uniformity in voting." Ex. A[1] at 4:79-82. Plaintiffs now claim this explanation is just "pretextual," and darkly intone that the legislature had a more nefarious purpose—"burden[ing] voters (including, specifically, Black voters) and jurisdictions deemed to be unfavorable to the legislators who advanced [SB 202]." [Doc. 39, ¶¶ 117, 127]. But the truth contains far less intrigue, as the legislative history and surrounding circumstances of the law's passage clearly show SB 202 was a reasonable, nondiscriminatory update to Georgia's election rules in response to lessons learned from voting during a pandemic.

This Court should "follow the law as written and leave the policy decisions for others." *Ga. Ass'n of Latino Elected Officials, Inc. v. Gwinnett Cty. Bd. of Reg. & Elections*, No. 1:20-CV-01587-WMR, 2020 U.S. Dist. LEXIS 211736, at *4 (N.D. Ga. Oct. 5, 2020) ("*GALEO*"); *see also New Ga. Project I*, 976 F.3d at 1284. Plaintiffs' First Amended Complaint should be dismissed.

## ARGUMENT AND CITATION OF AUTHORITY

Where a motion to dismiss is brought pursuant to Fed. R. Civ. P. 12(b)(1), the Court is not limited to the four corners of the Complaint to adequately

---

[1] A copy of the enacted version of SB 202 is attached as Ex. A. Citations are to the page and line number of the bill.

satisfy itself of jurisdiction over the matter. *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 732 n.9 (11th Cir. 1982). In evaluating a 12(b)(1) motion, "no presumptive truthfulness attaches to plaintiff's allegations." *Id*.

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must "state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 677 (2009). While this Court must assume the veracity of well-pleaded factual allegations, it is not required to accept legal conclusions when they are "couched as [] factual allegation[s]." *Id*. at 678-79. This Court may also consider any matters appropriate for judicial notice. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007).

## I.    **Plaintiffs do not have standing.**

As the Eleventh Circuit explained recently, the "[f]ederal courts are not 'constituted as free-wheeling enforcers of the Constitution and laws.'" *Wood v. Raffensperger*, 981 F.3d 1307, 1313 (11th Cir. 2020) (quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006)). Accordingly, Plaintiffs must establish Article III standing which, at this stage of the litigation, requires them to plausibly allege "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to

be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). The party invoking federal jurisdiction bears the burden of establishing standing at the start of the lawsuit and at each phase of the litigation. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 570 n.5 (1992); *see also Johnson v. Bd. of Regents*, 263 F.3d 1234, 1267 (11th Cir. 2001). Within the "injury-in-fact" prong are several elements, including "an invasion of a legally protected interest that is both concrete and particularized and actual or imminent, not conjectural or hypothetical." *Wood*, 981 F.3d at 1314 (citing *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020)). And the imminence prong demands that there be either a substantial risk of an alleged future injury or that such injury is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Plaintiffs have failed to satisfy these requirements.

### A.   Organizational Plaintiffs' standing.

#### 1.   *Diversion of resources.*

For a plaintiff to have standing under a diversion-of-resources theory, it must demonstrate that "a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Arcia v. Sec'y of Fla.*, 772 F.3d 1335, 1341 (11th Cir.

2014). As the Seventh Circuit recently explained, organizations cannot support a claim of standing "based solely on the baseline work they are already doing." *Common Cause Ind. v. Lawson*, 937 F.3d 944, 955 (7th Cir. 2019). Further, organizations "cannot convert ordinary program costs into an injury in fact. The question is what additional or new burdens are created by the law the organization is challenging." *Id.* (cleaned up). Put differently, organizations must demonstrate that the challenged law's effect "goes far beyond 'business as usual'" through "concrete evidence showing that [the law] is already disrupting their operations, and ... will likely require them to significantly change or expand their activities." *Id.*

In contrast, Plaintiffs in this case allege that they can show a diversion of resources through a much-more-lenient standard of "spending more money" or "expending additional effort." NGP, for example, alleges it "will ... be forced to divert resources from its day-to-day activities in order to combat the suppressive effects of [SB 202], which also threatens to undermine its mission." [Doc. 39, ¶ 20]. Similarly, Black Voters Matter Fund (BVMF) alleges that SB 202 "threatens to undermine the organization's mission," and that they "must divert scarce resources away from its organizational development and training programs, as well as its traditional voter education and turnout programs toward efforts to ensure that voters, and communities of color in particular,

5

can navigate the  restrictions to their voting options imposed by [SB 202]." *Id.* at ¶ 22. Rise, Inc. claims that SB 202 harms their organization "by making it more difficult for Georgia students who have joined the Rise movement to vote." *Id.* at ¶ 24. Further, Rise claims the law "forces the organization to divert resources, as well as shift the focus of its day-to-day activities." *Id.* Rise also guesses that it will have to divert resources from its "college affordability, hunger, and homelessness advocacy programs." *Id.* But Rise does not claim it has actually diverted resources.

While the Seventh Circuit has more clearly stated that an organization "cannot convert ordinary program costs into an injury in fact," this is really just a restatement of the Eleventh Circuit's holding in *Jacobson*. There, the Eleventh Circuit required not only that organizational plaintiffs explain what they are purportedly diverting resources *to* as a result of the challenged law, but also what they are diverting resources *from*. *Jacobson*, 974 F.3d at 1250. Taken together, this two-part requirement of resource diversion shows that an organization must be forced to go *beyond* merely executing its existing mission in a more deliberate way. Otherwise, simply alleging what resources are diverted *to* would be more than sufficient, and all that would be required for organizations to invoke federal-court jurisdiction is to move money within the organization in some documented process.

After the Eleventh Circuit's holding in *Jacobson*, at least one district court agreed with this approach. In *GALEO*, plaintiffs claimed that failing to send Spanish-language election materials violated federal law. 2020 U.S. Dist. LEXIS 211736 (N.D. Ga. October 5, 2020).[2] GALEO alleged in its complaint that it had standing because it was forced to divert resources "from getting out the vote and voter education to 'reach out to and educate [limited English proficiency voters] about how to navigate the mail voting process… as well as other aspects of the electoral process.'" *Id*. at *17. But it also alleged that its mission as an organization was, among other things, "organizing voter education, civic engagement, [and] voter empowerment." *Id*.

Despite these allegations, the district court dismissed the case and found "there is no indication that GALEO would in fact be diverting any resources *away from* the core activities it already engages in by continuing to educate and inform Latino voters." *Id*. (emphasis added). Allegations contained in the complaint of ostensibly new or additional efforts were "precisely of the same nature as those that GALEO engaged in before…" *Id*.

This holding supports the reading that *Jacobson* requires more than a formulaic recitation of an accounting maneuver—like moving money from one

---

[2] Plaintiffs appealed the dismissal and that appeal is currently pending at the Eleventh Circuit.

activity to another—because there is an additional step in the analysis. Courts must also determine whether the alleged diversion is one that actually is *inconsistent* with the organizational mission. In *GALEO*, the court found the plaintiffs fell short of this second step of the analysis.

The reasoning that compelled the district court in *GALEO* to deny standing is equally applicable here. None of the organizational plaintiffs is alleging it must divert resources in a way that hinders or is inconsistent with its mission. NGP, for example, makes only the vague claim that SB 202 will *eventually* make it "divert resources from its day-to-day voter-registration activities to educate voters about and otherwise combat [its] suppressive effects…" [Doc. 39, ¶ 20]. But NGP also alleges that its mission is to "register and civically engage all eligible citizens of color in Georgia." *Id.* at ¶ 18. Plaintiffs' Amended Complaint does not explain how educating voters about SB 202 and engaging them to be able to navigate both new and old voting rules is in any way inconsistent with this mission. In fact, it seems that such activity *is* its mission. NGP's rote recitation of diversion of resources would give it standing to challenge *any* change to election administration that does not match its own policy agenda. But the requirements of Article III surely could not countenance such a result.

Similarly, BVMF claims its goal is to "increase power in communities of

color." *Id.* at ¶ 21. And it accomplishes this by "increasing voter registration and turnout, advocating for policies to expand voting rights and equity, and conducting organizational development and training." *Id.* While this mission is vague, nothing in SB 202 causes BVMF to depart from these goals.

Finally, Rise claims to have diverted resources because passage of SB 202 will force it to divert attention from its "college affordability, hunger, and homelessness advocacy programs... ." *Id.* at ¶ 24. But Rise acknowledges that, in addition to advocating for free college, its mission also includes quite a few voting-related initiatives. *See id.* at ¶ 23. Rise does not explain how SB 202 will hinder that mission, or how diverting resources from generic voting-access initiatives to other, more-specific, SB 202-related voting-access initiatives they might create is inconsistent with that mission.

In short, the purported plight of the Organizational Plaintiffs here mirrors that faced by the organization in *GALEO*. This Circuit requires more before Article III standing can be established. Without this limitation, organizations would *always* have standing to challenge any government action—including in situations where *no* individual would have standing—because they could simply allege they will alter their message.[3]

---

[3] For example, Plaintiffs' theory of diversion would have allowed individual plaintiffs suing in the aftermath of the 2020 election to avoid dismissal on

For these reasons, the organizational plaintiffs in this case have failed to establish Article III standing under a diversion-of-resources theory.

> 2.   *The alleged injuries are too speculative to establish Article III standing.*

In any event, the purported injury faced by Plaintiffs is far too speculative to amount to injury-in-fact sufficient to accord standing. Where, as here, an alleged injury is based on some future harm, that alleged injury must be "imminent" or "certainly impending." *Clapper*, 568 U.S. at 398. *Clapper* remains the primary case analyzing the imminence prong of standing, and the Court made clear that allegations of mere "*possible* future injury are not sufficient." *Id.* at 409 (emphasis in original).

The Eleventh Circuit recently "discussed *Clapper's* 'high standard for the risk-of-harm analysis' in the context of speculative allegations…" *Tsao v. Captiva MVP Rest. Partners, LLC.*, 986 F.3d 1332, 1339 (11th Cir. 2021) (quoting *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 931 (11th Cir. 2020) (en banc)). The *Muransky* plaintiffs alleged they were more susceptible

---

standing merely by incorporating—one can easily imagine a new organization called "Kraken Action, Inc."—and then claiming plans to spend some time or effort differently. *See Wood*, 981 F.3d at 1314 (no concrete injury to individual voter); *Bognet v. Sec'y Pa.*, 980 F.3d 336, 356 (3d Cir. 2020) (same); *Bowyer v. Ducey*, No. CV-20-02321-PHX-DJH, 2020 U.S. Dist. LEXIS 231093, at *15 (D. Ariz. Dec. 9, 2020) (same); *Gohmert v. Pence*, No. 6:20-cv-660-JDK, 2021 U.S. Dist. LEXIS 3, at *11 (E.D. Tex. Jan. 1, 2021) (same).

to identity theft because bad actors could observe extra credit-card digits on receipts. But the Eleventh Circuit found the plaintiff's "naked allegations that he and the [proposed] class were exposed to an 'elevated risk' of identity theft – but not that he and the class were ever *actually* the victims of identity theft – were not enough to confer standing." *Tsao*, 986 F.3d at 1339 (citing *Muransky*, 979 F.3d at 933) (emphasis added).

In essence, *Tsao* and *Muransky* stand for the proposition that some triggering event beyond a subjective fear of some abstract vulnerability is necessary to support standing. And other courts in this District found similar fears did not support jurisdiction in the elections context where plaintiffs sued because they believed, for example, that long lines would occur at the polls. *See Anderson v. Raffensperger*, No. 1:20-cv-03263, 2020 U.S. Dist. LEXIS 188677, at *11 n.3 (N.D. Ga. Oct. 13, 2020). Like these cases, Plaintiffs' claims of "voter suppression" with respect to SB 202 are entirely based on a political narrative rather than concrete demonstrations of harm affecting the organizations themselves or any of their members.

NGP claims that, as a result of SB 202, it "will also be forced to divert resources," indicating that any diversion of resources will occur at some point

in the future.[4] [Doc. 39, ¶ 20]. Similarly, BVMF claims SB 202 "threatens to undermine the organization's mission," and that BVMF "must divert scarce resources." *Id.* at ¶¶ 12–22. But neither NGP nor BVMF alleges it has *actually* diverted any resources. Finally, Rise states that it "and its student organizers will be forced to divert resources" as a result of SB 202, which also must be at some future date. *Id.* at ¶ 23.

In short, even if this Court were to determine the Organizational Plaintiffs' alleged resource diversions constitute an injury, that diversion is based solely on a speculative *future* injury and one that it is dependent on the occurrence of a "highly attenuated chain of possibilities." *Clapper*, 568 U.S. at 410. This does not satisfy the requirements of organizational standing.

### 3.    *Associational standing.*

Only NGP and Rise allege associational standing in any meaningful sense. *See* [Doc. 39, ¶¶ 20, 24]. But for the same reasons the purported injuries are too speculative for the organizations, any alleged injuries are also too

---

[4] Any diversion had to take place in the future because Plaintiffs filed this case the same day the Governor signed SB 202. [Doc. 1]. But Plaintiffs also immediately began fundraising off of this lawsuit. *See* https://twitter.com/marceelias/status/1377118411411529728 (Mar. 31, 2021).; https://twitter.com/NewGAProject/status/1379443734367109124 (Apr. 6, 2021); https://twitter.com/BlackVotersMtr/status/1387092953492082692 (Apr. 27, 2021); https://twitter.com/RiseFreeOrg (bio includes "Support our lawsuit challenging #SB202" with an arrow to a link).

speculative as to any of their members, and Plaintiffs have failed to establish standing on an associational basis.

**B.    Individual Plaintiffs' standing.**

As with the members of Plaintiff Organizations, the claimed harms by the newly added Individual Plaintiffs [Doc. 39, ¶¶ 26–29] do not satisfy the immediacy or concreteness aspects of standing. Instead, Individual Plaintiffs' claimed injuries are a fear of waiting in line or hypothetical concerns about particular methods of voting. For example, Elbert Solomon would prefer to vote via dropbox and is worried that identification requirements for voting in this way will somehow affect or inhibit his ability to do so. *Id.* at ¶ 27. Fannie Marie Jackson Gibbs likewise has a generalized fear that, if she votes in person, she will have to "wait in line," as she has in the past. *Id.* at ¶ 28. Jauan Durbin claims he would only suffer an injury depending on his future schedule during an election. *See, id.* at ¶ 29.

None of the Plaintiffs allege *how* SB 202 will in fact make it more difficult for them to vote, but make only conclusory and speculative allegations that this Court is not required to accept as true. *Ashcroft,* 556 U.S. at 677. Further, any possible injury from believing a voter will wait in line is not a sufficient injury. *See Anderson,* 2020 U.S. Dist. LEXIS 188677, at *11 n.3. Finally, the Individual Plaintiffs will only be injured if there is a "speculative chain of

[events]" that is barred by *Clapper* as a basis for standing. 568 U.S. at 414. The Amended Complaint should be dismissed.

## II.   Plaintiffs fail to state a claim on which relief can be granted.

Even if they have sufficiently alleged standing, Plaintiffs' claims must be dismissed in any event because they have not stated a claim for relief.

### A.   Legal standards.

#### 1.   *Fundamental right to vote claim (Count I).*

Plaintiffs first challenge ten provisions of SB 202 as undue burdens on the right to vote. [Doc. 39, ¶¶ 4, 159-163]. These challenges are apparently facial—which "must fail where the statute has a plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). Challenges to election practices weigh the alleged burden on the right to vote against the interests of government. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). "Regulations imposing severe burdens on the plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a state's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). Lesser burdens impose no burden of proof or evidentiary showing on states. *See Common*

*Cause*, 554 F.3d at 1353. To establish the requisite severe burden in voting cases under *Anderson/Burdick*, one must show that the burden imposed was a direct result of a State's laws and policies, not "arising from life's vagaries." *Crawford*, 553 U.S. at 197-98.

        2.    *Section 2 claim (intent and effect) (Count II).*

Section 2 of the Voting Rights Act prohibits jurisdictions from "impos[ing] or appl[ying]" any "voting qualification or prerequisite to voting or standard, practice, or procedure ... which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" 52 U.S.C. § 10301(a). Plaintiffs must allege first that "the State's decision or act had a discriminatory purpose and effect. ... If Plaintiffs are unable to establish both intent *and* effect, their [intentional discrimination] claims fail." *Greater Birmingham Min. v. Sec'y of State for Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021) (*GBM*) (cleaned up). Claims of intentional discrimination require the use the multi-factor approach of *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977), to assess intent and effect.[5] *See Askew v. City of Rome*, 127 F.3d 1355, 1373 (11th Cir. 1997). Only if Plaintiffs establish that the State's act had a discriminatory intent and effect does "the

---

[5] The Eleventh Circuit summarized these factors in *GBM*, 992 F.3d at 1322, and Plaintiffs have failed to adequately allege these factors exist as to SB 202.

burden shift[] to the law's defenders to demonstrate that the law would have been enacted without this [racial-discrimination] factor." *GBM*, 992 F.3d at 1321, 1329 (quoting *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)); *see also Johnson v. Gov. of Fla.*, 405 F.3d 1214, 1222 (11th Cir. 2005). To make out a valid vote-denial[6] claim, the Eleventh Circuit requires (1) proof of disparate impact (a denial or abridgement) and (2) that the disparate impact is *caused* by racial bias. *See GBM*, 992 F.3d at 1328-29; *see also Dem. Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1012 (9th Cir. 2020); *Ohio Dem. Party v. Husted*, 834 F.3d 620, 631 (6th Cir. 2016); *Lee v. Va. State Bd. of Elec.*, 843 F.3d 592, 600-01 (4th Cir. 2016); *Frank v. Walker*, 768 F.3d 744, 753 (7th Cir. 2014).

### 3.   *First Amendment claim (Count III).*

Plaintiffs challenge all of SB 202 as somehow limiting their free speech rights in casting ballots. [Doc. 39, ¶¶ 178-184]. But the Supreme Court has "extended First Amendment protection *only* to conduct that is *inherently expressive.*" *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006) (emphases added). If the conduct prohibited by SB 202 related to elections is not expressive—and casting a secret ballot by nature cannot be, *see*

---

[6] While vote-dilution claims challenge district maps, vote-denial claims challenge specific practices. *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 239 (4th Cir. 2014); *Veasey v. Abbott*, 830 F.3d 216, 244 (5th Cir. 2016).

*Timmons*, 520 U.S. at 363 ("Ballots serve primarily to elect candidates, not as forums for political expression")—then either the First Amendment does not apply, or the appropriate analysis is *Anderson/Burdick*—the same as for Count I. *See Burdick*, 504 U.S. at 438; *Jacobson*, 974 F.3d at 1261. For this reason alone, all of Count III must be dismissed.

**B.    Application to challenged practices.**

*1.    Absentee ballot identification numbers.*

First, Plaintiffs take issue with the use of an identification number for absentee-ballot applications and ballots. [Doc. 39, ¶¶ 68, 159]. The General Assembly explained that the prior signature-matching process was subjective and challenged by Democratic[7] and Republican groups. Ex. A at 4:73-75. The reformed process in SB 202 is objective. Ex. A at 38:949-39:956; 51:1297-52:1305. Although Plaintiffs allege it has a disproportionate impact on minority voters [Doc. 39, ¶ 69-73], there is no unconstitutional burden on the right to vote by requiring photo identification, nor does it violate Section 2.[8] *See Crawford*, 553 U.S. at 181; *GBM,* 992 F.3d at 1320. Thus, even if there is

---

[7] The plaintiffs in *Dem. Party of Georgia v. Raffensperger*, Case No. 1:19-cv-05028-WMR (N.D. Ga.) were represented by the same counsel as Plaintiffs.
[8] Also, at least six other states utilize identification with absentee-ballot applications or ballots. *See* Code of Ala. § 17-9-30(b); A.C.A. § 7-5-412(a)(2)(B) (Arkansas); K.S.A. § 25-1122(c) (Kansas); Minn. Stat. Ann. § 203B.07(3); Ohio Rev. Code Ann. § 3509.03(B), .04(B); Wis. Stat. § 6.87(1).

a slight burden, it is more than justified by the State's regulatory interests and is permissible under Section 2.[9]

        2.    *Changes to dates for distributing absentee ballots.*

Second, Plaintiffs challenge the dates for distributing absentee ballots. [Doc. 39, ¶¶ 76, 159]. As the Georgia legislature explained, "Creating a definite period of absentee voting will assist electors in understanding the election process while also ensuring that opportunities to vote are not diminished." Ex. A at 5:107-110. After SB 202, Georgia is still well within the mainstream of other states in issuing absentee ballots: at least 14 States, including Colorado, Hawaii, and Massachusetts,[10] issue absentee ballots on the same or a tighter timeframe than the one set by SB 202. While Plaintiffs claim this change will burden voters (including that Black voters will require more time to obtain ID, [Doc. 39, ¶ 77]), there is no right to vote in any particular manner, *see Burdick*, 504 U.S. at 433, and changes to some pieces of voting access, while retaining others, is a minimal burden at best, *see Husted*, 834 F.3d at 630.[11] Further,

---

[9] The verification requirement in SB 202 also closely matches the identification requirements of federal law when registering to vote by mail. *See* 52 U.S.C. § 21083(b)(2).

[10] NCSL, *Table 7: When States Mail Out Absentee Ballots* (Sept. 4, 2020), https://www.ncsl.org/research/elections-and-campaigns/vopp-table-7-when-states-mail-out-absentee-ballots.aspx

[11] Moreover, where, as here a voter can select from multiple options, the right to vote may not be implicated. *See, e.g., New Ga. Project I*, 976 F.3d at 1281.

Plaintiffs' Section 2 claim fails because the only causal connection is the relative usage rates of absentee voting in the 2020-2021 elections, which is not sufficient when other methods of voting exist. *See GBM*, 992 F.3d at 1320.

>   3.   *Changes to drop boxes.*

Third, Plaintiffs challenge alleged "restrictions" on outdoor drop boxes, [Doc. 39, ¶¶ 85, 159]—an option that did not even exist in Georgia before SB 202 and was only optional in 2020 under an emergency rule that was intended as a temporary measure because of health risks posed by COVID-19. Ex. A at 5:113-118; Ga. Comp. R. & Regs. R. 183-1-14-0.8-.14; 183-1-14-0.10-.16; 183-1-14-.08-.14; *see also* O.C.G.A. § 50-13-4(b). Yet SB 202 *requires*[12] every county to have at least one drop box and allows them to be moved outside during emergencies. Ex. A at 47:1172-1174, 1188-1191. There is no right to vote in any particular manner, *see Burdick*, 504 U.S. at 433; *Anderson*, 460 U.S. at 788; *New Georgia Project I*, 976 F.3d at 1284-85 (Lagoa, J., concurring), and there are multiple options a Georgia voter can select from. *See New Ga. Project I*, 976 F.3d at 1281. Plaintiffs fail to show that the State's first-ever statutory authorization of drop boxes places any burden whatsoever on the right to vote—the fact that SB 202 arguably may not be as expansive as a temporary

---

[12] The emergency rules adopted by the State Election Board merely *permitted* a county to establish drop boxes but did not *require* that they have one.

emergency rule (which expired *before* the 2022 election cycle commences) is more than justified by the State's regulatory interests. *See Common Cause*, 554 F.3d at 1354; *Gwinnett Cty. NAACP v. Gwinnett Cty. Bd. of Registration & Elections*, 446 F. Supp. 3d 1111, 1124 (N.D. Ga. 2020). Further, while Plaintiffs allege that Black adults "are more likely to work multiple jobs" and had mail-in absentee ballots rejected for being late [Doc. 39, ¶¶ 88, 94], the speculation that they would therefore be burdened by fewer dropboxes that they did not use in prior cycles fails to allege a sufficient causal connection—particularly when other methods of voting exist, including returning ballots by mail, *see GBM*, 992 F.3d at 1320; O.C.G.A. § 21-2-385(a).

### 4. *Limitations on assistance for absentee ballots.*

Fourth, Plaintiffs challenge changes made to absentee-ballot applications and ballots. [Doc. 39, ¶¶ 95, 159]. SB 202 updated the process after significant voter confusion in 2020 surrounding absentee ballots, including applications sent by third-party groups. Ex. A at 5:102-112. Plaintiffs' only allegation of a burden is that Black voters used absentee voting at a higher rate and therefore are burdened, which is insufficient under Section 2. [Doc. 39, ¶ 79, 95]; *GBM*, 992 F.3d at 1320. When voters "must simply take reasonable steps and exert some effort to ensure that their ballots are submitted on time," "no one is 'disenfranchised.'" *New Ga. Project I*, 976 F.3d

at 1282. Given the extremely light burden imposed by changes to absentee applications, the State's strong regulatory interests in protecting voters and mitigating risk of potential intimidation more than justify any burden. *See Common Cause*, 554 F.3d at 1354.

### 5.    *Changes to mobile-voting units.*

Fifth, Plaintiffs attack limitations on mobile-voting units, which were utilized by one county for the first time in the 2020 elections to mitigate the effects of the COVID-19 pandemic. [Doc. 39, ¶¶ 82-84, 160]. These limitations are consistent with other provisions of the bill that require specific notice of the location of a precinct, not a bus traveling around the county. Ex. A at 30:741-757, 60:1525-1535. Other than a conclusory allegation that limiting two non-majority-minority counties from using mobile units in the future (which insufficiently pleads a Section 2 violation), [Doc. 39, ¶¶ 83-84], Plaintiffs do not identify *any* burden imposed by limiting an *optional* system used once by one county, and thus the State does not even need to demonstrate SB 202 advances its regulatory interests. *See Common Cause*, 554 F.3d at 1354; *Gwinnett Cty. NAACP*, 446 F. Supp. 3d at 1124.

### 6.    *Changes to out-of-precinct provisional ballots.*

Sixth, Plaintiffs challenge the limitations placed on out-of-precinct ballots. [Doc. 39, ¶¶ 101-105, 160]. Almost half of the States do not count a

provisional ballot cast out of precinct at all.[13] Georgia legislators explained that voters who vote out of precinct "add to the burden on election officials and lines for other electors because of the length of time it takes to process a provisional ballot in a precinct," and that not voting in the proper precinct prevents voters from voting "in all elections for which they are eligible." Ex. A at 6:135-138. The statutory provision also explicitly permits the counting of out-of-precinct ballots for voters who arrive at the wrong precinct after 5:00 P.M. and cannot get to their home precinct before 7:00 P.M. *Id.* at 75:1914-1919. Plaintiffs allege that moving within the county is more likely to lead to appearing at the wrong precinct [Doc. 39, ¶ 102], but the voter must be *directed* to his or her correct precinct if it is before 5:00 P.M. Ex. A at 74:1902-75:1907. Further, Plaintiffs claim that polling-place closures or lines will create confusion [Doc. 39, ¶ 103], but neither of these is traceable to State Defendants, *Fair Fight Action v. Raffensperger*, Case No. 1:18-cv-05391-SCJ (Doc. 617) (Mar. 31, 2021); *Anderson*, 2020 U.S. Dist. LEXIS 188677 at *64, and Plaintiffs have not sufficiently alleged a disparate impact. Moreover, Georgia provides voters with opportunities to vote before Election Day and after 5:00 P.M. out of precinct on Election Day, so any burden is minimal at best and is justified by the State's

---

[13] *Provisional Ballots*, NCSL https://www.ncsl.org/research/elections-and-campaigns/provisional-ballots.aspx#partial (September 17, 2020).

interests. *See Husted*, 834 F.3d at 630; *GBM*, 992 F.3d at 1320.

       7.     *Restrictions on approaching voters in line.*

Seventh, Plaintiffs challenge the prohibition on third parties giving anything of value to voters in line. [Doc. 39, ¶¶ 96-100, 161]. The General Assembly explained that "many groups" approached voters in line during the 2020 elections and updated rules to protect "electors from improper interference, political pressure, or intimidation while waiting in line to vote." Ex. A at 6:126-129. This is not unusual—New York has a similar prohibition on providing food or drink to voters, NY CLS Elec § 17-140, and campaign speech can be restricted near polling locations, *see Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1879, 1886 (2018); *Burson v. Freeman,* 504 U.S. 191, 193-94 (1992). Most States have "buffer zones" around polling places.[14] The important regulatory interests of the State—averting "fraud, voter intimidation, confusion, and general disorder," *Mansky*, 138 S. Ct. at 1886—are more than enough to justify the minimal burden[15] on a voter not being approached in line with an offer of food from a third party. *Common Cause,*

---

[14] *Electioneering Prohibitions*, NCSL, https://www.ncsl.org/research/elections-and-campaigns/electioneering.aspx (April 1, 2021).

[15] Voters can still receive water within the buffer and SB 202 requires officials to make changes to avoid long lines. Ex. A at 74:1887-1889; 29:721-734. If Plaintiffs challenge lines, [Doc. 39, ¶ 97], long lines are not traceable to State Defendants. *See Anderson*, 2020 U.S. Dist. LEXIS 188677 at *64.

554 F.3d at 1354; *Gwinnett Cty. NAACP*, 446 F. Supp. 3d at 1124.

8.   *Minor changes to voter-challenge rules.*

Eighth, Plaintiffs contest minor clarifications to Georgia's existing voter-challenge law. [Doc. 39, ¶¶ 106-107, 162]. SB 202 clarified that (1) there was no limit on challenges, which was a reasonable reading of existing law; and (2) that challenges must be resolved quickly. Ex. A at 23:575-24:581, 25:622-623. Neither of these requirements is facially unconstitutional—even Plaintiffs acknowledge that no injury can occur if challenges are not filed by "fellow citizens." [Doc. 39, ¶ 106]. And any burden on the right to vote is minimal at best, given the discretion for local officials to weed out the "indiscriminate challenges" that Plaintiffs fear, *id*. at ¶ 107, especially when compared to the regulatory interest in up-to-date voter rolls. Plaintiffs do not allege there is any racially disparate impact, dooming their Section 2 claim.

9.   *Changes to runoff election timelines.*

Ninth, Plaintiffs challenge the shortening of time for runoff elections. [Doc. 39, ¶¶ 108-109, 163]. Four weeks was used for all runoffs in Georgia before a change in 2014 resulting from a federal-court decision, and state offices still used a four-week runoff.[16] O.C.G.A. § 21-2-501(a)(3) and (4) (2020).

---

[16] Extended runoffs were required for federal offices due to requirements for overseas and military voters. *See U.S. v. Georgia*, 892 F. Supp. 2d 1367, 1375

Plaintiffs' only complaint about this change is that it shortens the early-voting period and eliminates weekend voting for runoffs, [Doc. 39, ¶ 109]. But there is no right to early voting and any changes are only minimally burdensome. *See Husted*, 834 F.3d at 631. As a result, the State's interests in reducing burdens on election officials and voters, Ex. A at 5:119-6:122, more than justify the changes SB 202 made to runoff elections and the mere allegation that Black voters use weekend voting more is insufficient for Plaintiffs' Section 2 claim.

### 10.   *Materiality of date of birth (Count V).*

Plaintiffs' last challenge is to requiring voters to provide a birth date on an absentee-ballot envelope. [Doc. 39, ¶ 191-196]. While denying the right to vote based on nonmaterial[17] issues is prohibited, *see* 52 U.S.C. § 10101(a)(2)(B), SB 202 requires notice and an opportunity to cure the defect if the election official is unable to identify the individual. Ex. A at 63:1599-1612. As a result, this requirement is not a violation of the Civil Rights Act.

### CONCLUSION

For all the foregoing reasons, this Court should allow the General Assembly to set Georgia's election policy and dismiss this case.

---

(N.D. Ga. 2012). SB 202 uses the Alabama system to avoid the 45-day period. *See* Code of Ala. §§ 17-13-8.1; 17-13-18.

[17] There are times when a date of birth *is* material—for example, when two voters share the same name and address.

Respectfully submitted this 1st day of June, 2021.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene McGowan
Assistant Attorney General
Georgia Bar No. 697316
**Office of the Georgia Attorney General**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

Gene C. Schaerr*
gschaerr@schaerr-jaffe.com
Erik Jaffe*

26

ejaffe@schaerr-jaffe.com
H. Christopher Bartolomucci*
cbartolomucci@schaerr-jaffe.com
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC  20006
Telephone: (202) 787-1060
Fax: (202) 776-0136

* Admitted *pro hac vice*

*Counsel for Defendants Brad
Raffensperger, in his official capacity as
Secretary of State of Georgia, and State
Election Board members Rebecca
Sullivan, David Worley, Matthew
Mashburn, and Anh Le*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing Brief in Support of State Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/Bryan P. Tyson*
Bryan P. Tyson