**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

THE NEW GEORGIA PROJECT, *et al.*,

             Plaintiffs,

    v.

BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State, *et al.*,

           Defendants.

Civil Action No. 1:21-cv-01229-JPB

**PLAINTIFFS' RESPONSE IN OPPOSITION TO STATE**
**DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ..............................................................................1

LEGAL STANDARD..........................................................................2

ARGUMENT .....................................................................................3

    I.     Plaintiffs have standing. ......................................................3

          A.     Organizational Standing...............................................3

                 1.     The Organizational Plaintiffs allege a diversion of resources. ........................................................3

          B.     Associational Standing..............................................10

          C.     Individual Standing...................................................11

    II.    Plaintiffs have stated a claim on which relief can be granted.............12

          A.     Fundamental Right to Vote (Count I) .......................13

          B.     Section 2 of the Voting Rights Act (Count II).........................20

                 1.     Discriminatory Intent.......................................20

                 2.     Discriminatory Results ....................................21

          C.     Political Association and Expression (Count III) .....................22

          D.     Civil Rights Act (Count V)........................................24

CONCLUSION.................................................................................25

i

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983)................................................................13, 14, 16

*Anderson v. Raffensperger*,
  497 F. Supp. 3d 1300 (N.D. Ga. 2020)...............................................16

*Arcia v. Florida Secretary of State*,
  772 F.3d 1335 (11th Cir. 2014) ................................................4, 6, 7

*Askew v. City of Rome*,
  127 F.3d 1355 (11th Cir. 1997) .........................................................20

*Babbitt v. United Farm Workers Nat'l Union*,
  442 U.S. 289 (1979)..............................................................................8

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..............................................................................3

*Black Voters Matter Fund v. Raffensperger*,
  478 F. Supp. 3d 1278 (N.D. Ga. 2020)................................................7

*Bowen v. First Family Fin. Servs., Inc.*,
  233 F.3d 1331 (11th Cir. 2000) .........................................................10

*Burdick v. Takushi*,
  504 U.S. 428 (1992)......................................................................13, 14

*Cal. Democratic Party v. Jones*,
  530 U.S. 567 (2000)............................................................................23

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
  408 F.3d 1349 (11th Cir. 2005) .........................................................11

*Clapper. Fair Fight Action, Inc. v. Raffensperger*,
  413 F. Supp. 3d 1251 (N.D. Ga. 2019)................................................9

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013)................................................................9, 11

*Common Cause Indiana v. Lawson,*
    937 F.3d 944 (7th Cir. 2019) ....................................................passim

*Common Cause/Ga. v. Billups,*
    554 F.3d 1340 (11th Cir. 2009) ...........................................4, 6, 7, 12

*Danvers Motor Co., Inc. v. Ford Motor Co.,*
    432 F.3d 286 (3d Cir. 2005) ...............................................................12

*Democratic Exec. Comm. of Fla. v. Lee,*
    915 F.3d 1312 (11th Cir. 2019) .........................................................13

*Democratic Party of Ga., Inc. v. Perdue,*
    707 S.E.2d 67 (Ga. 2011) ..................................................................15

*Duke v. Cleland,*
    5 F.3d 1399 (11th Cir. 1993) ......................................................14, 18

*Fla. State Conf. of NAACP v. Browning,*
    522 F.3d 1153 (11th Cir. 2008) ...................................................passim

*Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs,*
    775 F.3d 1336 (11th Cir. 2015) ..................................................12, 22

*Georgia Ass'n of Latino Elected Officials, Inc. v. Gwinnett Cnty. Bd.*
    *of Registrations & Elections,*
    499 F. Supp. 3d 1231 (N.D. Ga. 2020)..............................................8

*Greater Birmingham Ministries v. Sec'y of State for Ala.,*
    992 F.3d 1299 (11th Cir. 2021) ..................................................10, 21

*Hand v. Scott,*
    888 F.3d 1206 (11th Cir. 2018) ..................................................23, 24

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982)............................................................................6

iii

*Jacobson v. Florida Sec'y of State*,
  974 F.3d 1236 (11th Cir. 2020) ............................................................7

*Lawrence v. Dunbar*,
  919 F.2d 1525 (11th Cir. 1990) ............................................................2

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) ..............................................................22

*Martin v. Crittenden*,
  347 F. Supp. 3d 1302 (N.D. Ga. 2018)..............................................24

*Muransky v. Godiva Chocolatier, Inc.*,
  979 F.3d 917 (11th Cir. 2020) (en banc) ...........................................10

*New Georgia Project v. Raffensperger*,
  484 F. Supp. 3d 1265 (N.D. Ga. 2020)................................................7

*People First of Ala. v. Merrill*,
  479 F. Supp. 3d 1200 (N.D. Ala. 2020)..............................................22

*Project Vote v. Blackwell*,
  455 F. Supp. 2d 694 (N.D. Ohio 2006) ..............................................24

*Reed v. Town of Gilbert, Ariz.*,
  576 U.S. 155 (2015)............................................................................23

*Rose v. Raffensperger*,
  Civil Action No. 1:20-cv-02921-SDG, 2021 WL 39578 (N.D. Ga.
  Jan. 5, 2021)..........................................................................................7

*Schwier v. Cox*,
  340 F.3d 1284 (11th Cir. 2003) ..........................................................24

*Shapiro v. McManus*,
  577 U.S. 39 (2015)........................................................................22, 23

*Soltysik v. Padilla*,
  910 F.3d 438 (9th Cir. 2018) ..............................................................14

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ..................................................................................3

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) ......................................................................................21

*Tsao v. Captiva MVP Restaurant Partners, LLC*,
    986 F.3d 1332 (11th Cir. 2021) ...................................................................9

*United States v. Students Challenging Regulatory Agency Procedures
    (SCRAP)*,
    412 U.S. 669 (1973) ....................................................................................11

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016) (en banc) ......................................................22

*Vieth v. Jubelirer*,
    541 U.S. 267 (2004) .............................................................................22, 23

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ....................................................................................20

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008) ....................................................................................14

## STATUTES

52 U.S.C. § 10101(a)(2)(B) ...............................................................................24, 25

52 U.S.C. § 10301 ........................................................................................20, 21, 22

52 U.S.C. § 20507(c)(2)(A) ....................................................................................19

O.C.G.A. § 21-2-229 ...............................................................................................17

O.C.G.A. § 21-2-414 ...............................................................................................19

O.C.G.A. § 21-2-419 ...............................................................................................25

## OTHER AUTHORITIES

First Amendment ........................................................................................22, 23, 24

v

Fourteenth Amendment ........................................................................... 13

Fed R. Civ. Proc. 12(b)(1) ........................................................................ 2

Fed. R. Civ. Proc. 12(b)(6) ....................................................................... 2

HB 316 (2019) ....................................................................................... 19

SB 202 § 25 ...................................................................................... 24, 25

SB 202 § 27-29 ...................................................................................... 24

SB 202 § 29 ............................................................................................ 25

SB 202 § 33 ............................................................................................ 19

SB 202 § 34 ............................................................................................ 17

**INTRODUCTION**

Georgia's General Assembly responded to the last election cycle's breakthrough success of Black voters, who finally elected a Black candidate to the U.S. Senate and awarded the state's electoral college votes to the Democratic candidate, by taking extraordinary steps to erect obstacles in the way of every method by which these victories were secured. The result was SB 202, an omnibus bill overstuffed with restrictions on the right to vote, that was rushed into law on paper-thin pretext. Unless invalidated, countless lawful voters will find it unjustifiably harder to participate in Georgia's elections. In some cases, the burdens will prove insurmountable. This was the General Assembly's intention, and but for this Court's enforcement of the Constitution and federal law, it will be the result.

Plaintiffs include three affected Georgia voters and organizations working to empower vulnerable communities in Georgia, including by protecting voting rights. They challenge eleven of SB 202's provisions under the Constitution, Voting Rights Act, and Civil Rights Act. In moving to dismiss many of these claims, the Secretary of State and members of the State Election Board (together, "State Defendants") miss the mark.[1] First, they challenge Plaintiffs' standing by offering legal tests that

---

[1] State Defendants do not seek dismissal of Plaintiffs' claims challenging the repeal of the provision that required counties to mail absentee ballots to unregistered

courts have explicitly rejected. Second, they get ahead of themselves on the facts, improperly objecting to the merits of Plaintiffs' case by minimizing the burdens imposed by the challenged provisions and concluding that each of the clauses of SB 202, one by one, are harmless. But this is not the time for the Court to weigh evidence, and Defendants' disagreements with Plaintiffs' characterization of the burdens do not warrant dismissal. Just as importantly, the challenged provisions must be read holistically: the impediments to voting that SB 202 introduced are not isolated obstacles, like hurdles neatly spaced around a track. They interlock and reinforce each other, each one exacerbating the burdens of the last, stacking into one towering, comprehensive barrier.

The Amended Complaint sufficiently alleges both the basis for Plaintiffs' standing and their claims. The motion to dismiss should be denied.

## LEGAL STANDARD

Where, as here, a motion under Rule 12(b)(1) facially attacks the legal sufficiency of a complaint's allegations in support of subject matter jurisdiction, the complaint's allegations are "taken as true." *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990). Likewise, to survive a motion to dismiss under Rule 12(b)(6),

---

eligible voters who apply for an absentee ballot and then return their registration card by the deadline. *See* Am. Compl. ¶ 81.

a complaint must include enough factual allegations, accepted as true and construed in the light most favorable to Plaintiffs, to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## ARGUMENT

### I.   Plaintiffs have standing.

Plaintiffs allege all that is necessary to establish this Court's jurisdiction under Article III's standing requirements: they have suffered an injury that is actual or imminent, fairly traceable to State Defendants, and likely to be redressed by a favorable decision. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

### A.   Organizational Standing

#### 1.   *The Organizational Plaintiffs allege a diversion of resources.*

State Defendants argue that the New Georgia Project ("NGP"), Black Voters Matter Fund ("BVMF"), and Rise (collectively, the "Organizational Plaintiffs") lack standing in their own right because they have failed to allege a diversion of resources "that actually is *inconsistent* with the organizational mission." MTD at 8. But under that theory, only plaintiffs with missions completely unrelated to SB 202 would have standing, while those actually involved in voter engagement—and thus most likely to be impacted by SB 202—would not. Of course, that rule does not exist. In fact, even the case upon which State Defendants primarily rely rejected that argument.

The Eleventh Circuit has repeatedly found that voter advocacy organizations

3

have standing to challenge laws that impede their election-related efforts. For instance, in *Arcia v. Florida Secretary of State*, 772 F.3d 1335, 1341 (11th Cir. 2014), the Court held that a voting rights organization had standing to challenge acts that "impair [its] ability to engage in its own projects by forcing the organization to divert resources in response." This standard is routinely met by groups similar to the Organizational Plaintiffs when states enact laws alleged to make voting more difficult. *See, e.g.*, *id.* at 1341-42 (holding voting rights groups had standing to challenge voter registration purge targeting non-citizens); *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009) (holding organization "actively involved" in "voter registration, mobilization, and education" had standing to challenge voter ID requirement); *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008) (holding voter engagement organizations had standing to challenge voter registration ID requirement).

State Defendants do not explain why these cases do not govern. Instead, they rely on a Seventh Circuit case, *Common Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019), to argue that organizations must exert resources *inconsistently* with their mission to incur the injury necessary for standing. *See* MTD at 5. But they misread *Lawson*, which actually held the opposite: "[A] voting law can injure an organization enough to give it standing," the Seventh Circuit explained, "'by

compelling [it] to devote resources' to combatting the effects of the law that are harmful to the organization's mission." 937 F.3d at 950. Thus, the court held that voter advocacy organizations had standing to challenge a voter purge based on non-residency because it would require them "to increase the time or funds (or both) spent on certain activities to alleviate potential harmful effects of" the challenged statute, "such as voter confusion, erroneous registration removal, and chaos at the polling place; and their missions will be thwarted, because even with those extra efforts, confusion around [the new law] and the need to combat it will displace other projects they normally undertake. This is enough to allege injury in fact." *Id.* at 952.

*Lawson* did not only affirmatively find standing, it forcefully *rejected* the arguments Defendants urge here—that diversion-of-resources standing requires "a seismic shift from work within the organization's mission to work outside of it." *Id.* at 954. Instead, the Seventh Circuit explained that the Supreme Court has recognized standing where an organization's "ability to do work *within* its core mission" is impaired. *Id.* (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Any other rule would be bizarre. "Indeed, we have a hard time imagining," the Seventh Circuit continued, "why it is that an organization would undertake any additional work if that work had nothing to do with its mission. And it would be an inside-out world indeed if organizations had standing to assert only interests that

they shared with the general public." 937 F.3d at 955.[2]

The organizational standing rule is simple: "a voting law can injure an organization enough to give it standing 'by compelling [it] to devote resources' to combatting the effects of the law that are harmful to the organization's mission." *Id.* at 950 (quoting *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd* 553 U.S. 181 (2008)). The "fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury." *Browning*, 552 F.3d at 1165.

There can be no question that each Organizational Plaintiff satisfies this standard. Because of the burdens that SB 202 imposes on voters, NGP, BVMF, and Rise must divert and expend resources to "educat[e] volunteers and voters on compliance" with the new law, *id.* at 1166, "to locate and assist" potentially affected voters, *Arcia*, 772 F.3d at 1342, and to manage an expected transition between absentee voting and in-person voting, *see Billups*, 554 F.3d at 1350. In fact, Georgia district courts have *already* held that NGP and BVMF have standing to challenge

---

[2] The Eleventh Circuit cases that govern here and *Lawson* consistently apply *Havens Realty*, which held that a nonprofit dedicated to equal opportunity in housing had standing to challenge a realty corporation's practice of steering prospective renters toward segregated apartments. The Court found those practices "perceptibly impaired" the nonprofit's ability to achieve its mission and served to "drain the organization's resources," satisfying the injury-in-fact requirement. 455 U.S. at 379.

6

election practices based on similar allegations. *See, e.g.*, *New Georgia Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1286-87 (N.D. Ga. 2020); *Black Voters Matter Fund v. Raffensperger*, 478 F. Supp. 3d 1278, 1299-1303 (N.D. Ga. 2020).

State Defendants try to avoid this same result by arguing that the Eleventh Circuit in *Jacobson v. Florida Secretary of State*, 974 F.3d 1236 (11th Cir. 2020), required organizations "to go *beyond* merely executing [their] existing mission" to establish standing. MTD at 6. But *Jacobson* was decided after a full trial on the merits and is not binding at the motion to dismiss stage. *Rose v. Raffensperger*, Civil Action No. 1:20-cv-02921-SDG, 2021 WL 39578, *10 (N.D. Ga. Jan. 5, 2021). Nor did it announce some new rule of organizational standing. It simply reiterated that organizations must show some change attributable to the alleged injury by explaining how diverted resources otherwise would have been spent. 974 F.3d at 1250. The Organizational Plaintiffs have done so. *See* Am. Compl. ¶¶ 20 (NGP must divert resources from day-to-day registration activities), 22 (BVMF must divert resources from organizational development and training programs), 24 (Rise must divert resources from college affordability, hunger, and homelessness programs). These types of allegations are indistinguishable from those that were deemed sufficient for standing in *Browning*, *Arcia*, *Billups*, and *Lawson*, among many others.

7

*See Lawson*, 937 F.3d at 952-53 (collecting cases).[3]

### 2. *Organizational Plaintiffs' injuries are not speculative.*

The Eleventh Circuit's decision in *Browning* also refutes State Defendants' argument that the injuries here are too "speculative." For standing purposes, prospective injuries must be "imminent," which "requires only that the anticipated injury occur with some fixed period of time in the future, not that it will happen in the colloquial sense of soon or precisely within a certain number of days, weeks, or months." *Browning*, 522 F.3d at 1161. As the Supreme Court has explained, although a plaintiff must establish "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement," it "does not have to await the consummation of threatened injury to obtain preventive relief." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).

In *Browning*, the court recognized there was nothing hypothetical about the

---

[3] Defendants also cite *Georgia Ass'n of Latino Elected Officials, Inc. v. Gwinnett Cnty. Bd. of Registrations & Elections*, 499 F. Supp. 3d 1231 (N.D. Ga. 2020) ("*Galeo*"), which is on appeal to the Eleventh Circuit. There, the district court held a civil rights organization lacked standing to challenge the failure of the Secretary and a county board to distribute bilingual absentee ballot applications because no federal law subjected the defendants to such a duty and the matter was moot. *Id.* No more is necessary to distinguish that case from this one, where State Defendants are responsible for violating duties imposed by federal law. To the extent *Galeo* also required the plaintiff to allege a diversion of resources away from "core activities" and toward activities of some other "nature," the court invented a novel test unsupported by precedent and directly at odds with binding caselaw.

injuries that plaintiff organizations attributed to Florida's new ID requirement for voter registration applications. The new law mandated the denial of certain applications, and those denials would occur before the next scheduled elections. 522 F.3d at 1161. Because the plaintiffs alleged "that they intend to increase voter registration efforts and anticipate[d] increased registration applications ahead of the upcoming presidential election," the court concluded, "[t]his is sufficient to meet the immediacy requirement[.]" *Id.*

So too here. Once SB 202 was enacted, its requirements—and the associated burdens of compliance—became concrete. There is no uncertainty as to whether plaintiffs will be affected by SB 202; for that reason, the cases cited by State Defendants are inapposite. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (denying standing where plaintiffs challenging surveillance measures could not demonstrate their own communications would ever be surveilled)[4]; *Tsao v. Captiva MVP Restaurant Partners, LLC*, 986 F.3d 1332, 1343-44 (11th Cir. 2021) (denying standing where plaintiffs challenging defendant's failure to conceal

---

[4] As recently as 2019, another court in this District corrected these same State Defendants for advancing standing arguments that "misread and oversimplify" *Clapper*. *Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251, 1268 (N.D. Ga. 2019). "Unlike the plaintiffs in *Clapper*," the court said, plaintiffs in that voting rights suit were "able to demonstrate a time period in which the injury will occur (*i.e.*, prior to the next scheduled elections). There is no speculation that elections will occur; thus, this satisfies the 'imminent' requirement." *Id.*

identifying information could only speculate whether any misuse of that information would result); *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 933-34 (11th Cir. 2020) (en banc) (same). As in *Browning*, the state has already erected new obstacles that voters must navigate to prove their identity. Mobile polling units and outdoor drop boxes are gone. And the time available for voters to mark their absentee ballot or vote early in person has been truncated. These and other changes made by SB 202 are Georgia law; no additional contingent action is necessary to pose the "substantial likelihood" that voters served by the Organizational Plaintiffs will face additional obstacles and fewer accommodations in each successive election. *Bowen v. First Family Fin. Servs., Inc.*, 233 F.3d 1331, 1340 (11th Cir. 2000).

### B.    Associational Standing

NGP and Rise also have standing on behalf of their members and constituents. For both organizations: (1) their members would otherwise have standing to sue in their own right; (2) the interests they seek to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1316 (11th Cir. 2021). State Defendants contest only the first factor, suggesting the members' injuries are too speculative. *See* MTD at 12-13. For the same reasons this argument fails for

organizational standing, it also fails for associational standing. SB 202 has already been enacted, making its burdens "certainly impending." *Clapper*, 568 U.S. at 409.

### C.   Individual Standing

Elbert Solomon, Fannie Marie Jackson Gibbs, and Jauan Durbin (the "Individual Plaintiffs") also have standing to challenge the many provisions of SB 202 that will make voting more onerous. As alleged, SB 202 will force the Individual Plaintiffs to comply with additional burdensome ID requirements to vote absentee, restrict their access to drop boxes in upcoming elections, reduce the amount of time they have to obtain and submit their absentee ballot in runoff elections, and make it more difficult for them to wait in line to vote. *See* Am. Compl. ¶¶ 26-29. These allegations far surpass the "trifle" required by Article III. *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973) (rejecting argument that an injury must be "significant"; rather, no more than "an identifiable trifle" is necessary to confer standing).

Consistent with this low threshold, the Eleventh Circuit regularly rejects standing challenges to individuals who face burdens in the voting process. As the court has explained: "A plaintiff need not have the franchise wholly denied to suffer injury. Any concrete, particularized, non-hypothetical injury to a legally protected interest is sufficient." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349,

1352 (11th Cir. 2005). In *Billups*, the court recognized that even voters who had an acceptable form of photo ID had standing to challenge a Georgia statute requiring them to produce that ID to vote. 554 F.3d at 1351. Just as a modest poll tax may be challenged by those who can afford to pay it, "[r]equiring a registered voter either to produce photo identification to vote in person or to cast an absentee or provisional ballot is an injury sufficient for standing." *Id.* at 1351-52. ⸗

Like so many Black Georgians, the Individual Plaintiffs will be forced to navigate new barriers to methods of voting they used before and plan to use again. *See* Am. Compl. ¶¶ 26-29. That is enough for standing. *See Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005) (noting "[i]njury-in-fact is not Mount Everest" and the pleading requirement is "very generous").

## II.      Plaintiffs have stated a claim on which relief can be granted.

State Defendants' 12(b)(6) challenge should also be rejected. Plaintiffs have meticulously pleaded the elements of four claims against these Defendants. In response, State Defendants dispute—or ignore—the relevant allegations, but that cannot sustain their motion. Their general disagreements with Plaintiffs' allegations and the extent of the burden imposed by the challenged laws can be resolved only after intensive factfinding. *See, e.g.*, *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1348 (11th Cir. 2015) (recognizing pretrial resolution

of voting rights cases "presents particular challenges due to the fact-intensive nature of the legal tests"). Plaintiffs must be allowed to develop and present the evidence and expert analysis that will support their well-pleaded allegations.

### A.    Fundamental Right to Vote (Count I)

A court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights against the justifications put forward by the state. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). "[E]ven when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden. The more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318-19 (11th Cir. 2019).

Plaintiffs have adequately alleged that SB 202's challenged provisions— individually and cumulatively—substantially burden their right to vote. State Defendants dismiss those burdens as slight, but disagreements about the weight of the evidence are inappropriate at this stage. For example, they argue that "Plaintiffs fail to *show* that" the drop box restrictions burden the right to vote. MTD at 19 (emphasis added). But Plaintiffs are not yet required to *prove* anything. The Amended Complaint sufficiently *alleges* that voters who are unable to vote in person

or to rely on timely mail delivery will be burdened by the drop box restrictions. Am. Compl. ¶¶ 85-94. Resolving the character and magnitude of that burden will require an evidentiary record, which is why the Eleventh Circuit, like other circuits, has reversed dismissals of *Anderson-Burdick* claims on the pleadings. *See, e.g.*, *Duke v. Cleland*, 5 F.3d 1399, 1405 (11th Cir. 1993) (reversing dismissal because it was "impossible for [the court] to undertake the proper" *Anderson-Burdick* analysis when "[d]iscovery has not commenced"). The same is true about the other side of the *Anderson-Burdick* scale, where "[t]he existence of a state interest . . . is a matter of proof." *Id.* at 1405 n.6. Without a factual record, this Court will find itself "in the position of Lady Justice: blindfolded and stuck holding empty scales." *Soltysik v. Padilla*, 910 F.3d 438, 450 (9th Cir. 2018). Tellingly, State Defendants do not cite a single case supporting dismissal of a right-to-vote claim at the pleading stage, relying instead on cases decided at later points in litigation. *See, e.g.*, *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 448 (2008) (involving appeal of summary-judgment); *Burdick*, 504 U.S. at 432 (same); *Anderson*, 460 U.S. at 783 (same).

State Defendants' motion also conspicuously analyzes the burden of each challenged provision separately, without considering their cumulative effect. MTD at 17-25. But that approach ignores that an omnibus bill like SB 202 is more than

14

the sum of its parts: each of the challenged provisions interacts with the others, multiplying the total harm. *Eight* of the 11 challenged provisions directly respond to the huge increase in absentee and early voting in 2020—much attributable to Black voters—by imposing burdens to funnel those voters back to Election Day voting. For example, strict ID requirements for in-person voting were once justified on the basis that voters without ID could vote absentee, *see Democratic Party of Ga., Inc. v. Perdue*, 707 S.E.2d 67, 73 (Ga. 2011); but SB 202 does away with that safety valve. It also added an immaterial date-of-birth requirement at several stages of the absentee process, piling up directives that will result in disenfranchisement of eligible voters based on innocent errors or omissions. Meanwhile, restrictions on when and how absentee applications may be distributed, the compressed window for distributing absentee ballots, forbidding distribution of absentee ballots to certain newly registered voters, and the severely truncated window for early voting in runoff elections all guarantee that fewer voters will be able to vote absentee.

SB 202 does not stop there. It then takes away two of the most reliable and efficient means of casting a ballot before Election Day: secure drop boxes that are available outdoors outside of regular business hours, and mobile polling units. Am. Compl. ¶¶ 82-94, 159-60. These were essential means to ensure access to voting in high-population urban areas often plagued with polling place congestion. *See, e.g.*,

*id.* ¶¶ 42, 45, 89, 93. And because mailing an absentee ballot cannot guarantee its timely delivery, the necessary consequence of these changes once again will be that more individuals must attempt to vote in person on Election Day. *See, e.g.*, *id.*

By methodically steering would-be voters to the polls, the General Assembly assured the consequences of other challenged provisions would be especially harsh, and especially discriminatory. The predictable result of increased Election Day voting is increased Election Day lines. *Id.* ¶ 50. And lines will be longest in the most populated precincts, which, not coincidentally, are found in the urban areas where most Black voters live. *Id.* ¶¶ 97-98. This has historically been the case in Georgia; the General Assembly knew this; and yet it chose to exacerbate those burdens. In fact, the state worked to make the resulting burden as uncomfortable for voters as possible by prohibiting any humanitarian aid to individuals languishing in these lines. *Id.* ¶¶ 96-97, 100.[5]

SB 202's authorization to split precincts is no remedy for the law's increased

---

[5] State Defendants wrongly conflate Plaintiffs' allegations with those dismissed in *Anderson v. Raffensperger*, 497 F. Supp. 3d 1300 (N.D. Ga. 2020), where the court said plaintiffs did not have standing to request certain polling place changes to mitigate anticipated lines. *Anderson* did not hold that long lines are not an injury; it merely recognized that a prediction of long lines in an upcoming election cannot be "based almost entirely on the existence of long lines in past elections." *Id.* at 1309. Plaintiffs' current and impending injuries are not predicated on past injuries. They are the necessary result of SB 202, which State Defendants administer.

burdens. To the contrary, it offers a "solution" that itself will cause voter confusion, burdens, and in some cases, disenfranchisement. Every time a precinct changes, some voters previously assigned to that precinct will fail to learn of their new polling location. *Id.* ¶ 104. Another provision of SB 202 makes it more likely that this predicable confusion will more often result in disenfranchisement, as voters no longer can cast a provisional ballot before 5 p.m. in a precinct they mistakenly believed they were assigned to. *Id.* ¶¶ 101–04. Rather than reducing election lines, as Defendants claim to expect (*see* MTD at 22), this measure will aggravate them. After waiting to vote in the mistaken precinct, the voter will have to queue *again* to vote in their assigned precinct (assuming they are even able to travel there and spend that additional time waiting in line, again, to cast a ballot). *See* SB 202 § 34.

SB 202 still does not stop there. Even voters who manage to successfully navigate these many obstacles may find themselves snared in frivolous mass challenges and now immediately forced to defend their qualifications or risk disenfranchisement. State Defendants suggest local officials have discretion "to weed out the 'indiscriminate challenges,'" MTD at 24, but newly amended O.C.G.A. § 21-2-229 says no such thing, and State Defendants cite no authority to support their characterization.

These many burdens on the fundamental right to vote are unjustifiable. State

Defendants frequently fail to identify *any* interest justifying the challenged provisions, *see* MTD at 19 (discussing drop box restrictions), 21 (discussing mobile voting restrictions). And, while weighing interests that Defendants do identify would be premature, *Duke*, 5 F.3d at 1405 n.6, a quick review of the asserted interests not already addressed reveals that *none* justify the burdens imposed on voters.

For example, the new absentee ID requirements are touted as "objective," MTD at 17, but the state has no more interest in objective mechanisms of disenfranchisement than it had in previous experiments with subjective measures. The condensed period of absentee ballot distribution is supposedly necessary to "assist electors in understanding the election process" by "[c]reating a definite period of absentee voting." *Id.* at 18. But there already was a definite period of absentee voting: the new period is merely shorter, and more rushed. Similarly, there is no reason to believe unsolicited distribution of absentee ballot applications causes "significant voter confusion," *id.* at 20, any more than the usual variety of opportunities and invitations that people receive by mail.

Interests offered for the other challenged provisions are no better. State Defendants say line relief activities must be banned to prevent fraud and intimidation, but there is no conceivable connection between giving a voter bottled water and illegal voting, and the stated fears about polling place electioneering and

campaign speech fail to distinguish nonpartisan activities like those of Plaintiffs. *See* Am. Compl. ¶¶ 17, 21, 66. The speech inherent in Plaintiffs' activity is simply, "Do not be discouraged from voting"; the State has no legitimate interest in silencing this message. Besides, O.C.G.A. Section 21-2-414 already prohibited polling place campaign activities before SB 202's amendment. *See* SB 202 § 33.

New challenge procedures, meanwhile, are supposed to advance an interest in "up-to-date voter rolls," MTD at 24, but inviting mass challenges and requiring the corresponding hearings to be rushed on the eve of an election can only increase the likelihood that eligible voters will *erroneously* be removed from the rolls.[6] Finally, State Defendants suggest the severe shortening of the timeline for runoff elections will "reduc[e] burdens on election officials and voters." *Id.* at 25. Quite the contrary. Election officials will have less time to transition from the general election to the runoff, and voters will have fewer opportunities to evaluate the candidates who have advanced and to cast their ballots.[7]

The unmistakable thrust of SB 202 is to *burden* voters and election officials.

---

[6] This is precisely why the National Voter Registration Act prohibits programs to systematically remove voters from the rolls up to 90 days before an election, much less during the voting process (as SB 202 invites). *See* 52 U.S.C. § 20507(c)(2)(A).

[7] Notably, in 2019 the General Assembly lengthened the time for counties and the Secretary to certify votes, precisely because the then-existing timeline proved too burdensome in a competitive statewide election in 2018. *See* HB 316 (2019).

The Constitution does not permit it.

## B.    Section 2 of the Voting Rights Act (Count II)

Section 2 prohibits vote denial: the use of voting laws, policies, or practices, like absentee ballot procedures and qualifications, that deny, abridge, or otherwise limit Black voters' access or increase their burden to exercise their right to vote. 52 U.S.C. § 10301. Section 2 is violated where "the challenged methods of election either have a discriminatory purpose *or* effect." *Askew v. City of Rome*, 127 F.3d 1355, 1373 (11th Cir. 1997). SB 202 violates both tests.

### *1.    Discriminatory Intent*

Discriminatory intent may be established where defendants used race as a motivating factor in their decisions. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Even where challenged legislation appears neutral on its face, discriminatory intent may be inferred by analyzing the context during which and by which the challenged provisions were enacted, and by reviewing the challenged provisions' disproportionate racial impact. *See id.* at 266-68.

Plaintiffs have more than sufficiently alleged that a discriminatory purpose was a motivating factor in the passage of SB 202. For example, the Bill was introduced after the historic registration of Black voters and the breakthrough success of candidates that Black voters supported. Am. Compl. ¶¶ 38-41, 54-56.

Legislative consideration of the Bill was rushed, opportunities for public comment and analysis were limited, and the stated rationales for the Bill were unfounded pretext. *Id.* ¶¶ 56-66, 111-27. The Bill surgically removed processes relied on by Black voters at every step of voting—including drop boxes, mobile voting units, and mandatory weekend voting for runoff elections—while erecting new impediments that will disproportionately burden Black voters—including restrictions on out-of-precinct provisional ballots and burdensome ID requirements. *Id.* ¶¶ 41-54, 67-110.

## 2.     *Discriminatory Results*

SB 202 also violates Section 2's "results" test, which examines whether "a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). "This analysis turns on whether, based on the totality of the circumstances, the challenged law violates Section 2(a) because it deprives minority voters of an equal opportunity to participate in the electoral process and to elect representatives of their choice." *Greater Birmingham Ministries*, 992 F.3d at 1329.

Courts' evaluations of Section 2 vote denial cases regularly identify "the totality of the circumstances" to include, for example, the history of official discrimination in the jurisdiction that affects the right to vote; the degree to which

voting is racially polarized; the extent to which minorities are discriminated against in socioeconomic areas, such as education, employment, and health; the existence of overt or subtle racial appeals in campaigns; and whether the policy justification for the challenged law is tenuous. *See, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 257-64 (5th Cir. 2016) (en banc); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 245-46 (4th Cir. 2014). Plaintiffs have alleged, in detail, each of these circumstances. *See* Am. Compl. ¶¶ 57-66, 128-153; *see also id.* ¶ 154 (alleging SB 202 interacts with discriminatory social conditions to deny or abridge the voting rights of Black Georgians). Any disagreements State Defendants have with the facts underlying these allegations can only be resolved on a full record. *See, e.g.*, *Ga. State Conf. of NAACP*, 775 F.3d at 1348; *see also People First of Ala. v. Merrill*, 479 F. Supp. 3d 1200, 1214 (N.D. Ala. 2020) (denying a motion to dismiss Section 2 claims where "plaintiffs allege that because of the pervasive legacy of discrimination, it is harder for African Americans to comply with the challenged practices").

## C.    Political Association and Expression (Count III)

State Defendants' argument that Plaintiffs' First Amendment claim should be dismissed is without merit. The First Amendment protects voting-related association and expression. *See Shapiro v. McManus*, 577 U.S. 39, 46 (2015); *Vieth v. Jubelirer*, 541 U.S. 267, 314-15 (2004) (Kennedy, J., concurring). Laws that restrict these

rights to suppress a disfavored viewpoint are subject to strict scrutiny and can be justified only if the state proves they are narrowly tailored to serve compelling state interests. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163-64 (2015).

Here, Plaintiffs allege that SB 202 was passed to restrict Black, young, and Democratic voters' ability to associate in elections and express broadly shared viewpoints. This is what the Constitution forbids. *See Hand v. Scott*, 888 F.3d 1206, 1211-12 (11th Cir. 2018) (recognizing voting law "that was facially or intentionally designed to discriminate based on viewpoint—say, for example, by barring Democrats, Republicans, or socialists from reenfranchisement on account of their political affiliation—might violate the First Amendment"); *see also Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000) (recognizing democracy "is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views").

State Defendants completely ignore Plaintiffs' allegations that SB 202 violates their associational rights. *Compare* Am. Compl. ¶¶ 111, 177-84 *with* MTD at 16-17. And the right to free expression is not nearly as narrow as State Defendants claim. *See McManus*, 577 U.S. at 46; *Vieth*, 541 U.S. at 314-15. Voters have a strong interest in expressing their support for a candidate, and courts have struck down onerous laws when they impinge on "expressive and associational rights which are

protected by the First Amendment" and "belong to—and may be invoked by . . . voters." *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 700 (N.D. Ohio 2006); *see also Hand*, 888 F.3d at 1217–19 (Martin, J., concurring in part) (summarizing voters' rights protected by the First Amendment). Plaintiffs have thus adequately pled that SB 202 violates the First Amendment rights to speech and association.

### D.    Civil Rights Act (Count V)

The Civil Rights Act prohibits State Defendants from denying any individual the right to vote because of an error or omission that is "not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). This provision was "intended to address the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters." *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003).

SB 202 requires the rejection of any absentee application or ballot that fails to provide the elector's date of birth. *See* §§ 25, 27-29. As another court in the Northern District of Georgia has already recognized, "an elector's year of birth is not material to determining the eligibility of an absentee voter." *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308 (N.D. Ga. 2018). State Defendants suggest a date of birth may

be material when two voters share the same name and address, MTD at 25 n.17, but this ignores that SB 202 already requires electors applying for and voting absentee to prove their identity with a unique identifier, such as a driver's license or state ID number. An elector's date of birth is not a unique identifier; its inclusion does not materially improve election officials' ability to confirm an elector's identity.

The date-of-birth requirement also cannot be saved merely because SB 202 offers an opportunity to cure the defect. *See* MTD at 25. Under this logic, states could require all manner of information entirely immaterial to a voter's qualifications and evade the Civil Rights Act merely by offering "notice and an opportunity to cure." *Id.* The fact remains that a voter who neglects to include a date of birth on the absentee application or ballot, or who mistakenly marks the wrong date, will be denied the right to vote on that basis. Just because a voter may *regain* the right to receive an absentee ballot or to have it counted by undertaking additional burdens does not mitigate the underlying violation.[8]

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss should be denied.

Respectfully submitted, this 15th day of June, 2021.

---

[8] Of course, many eligible voters may not have the means to cure any identified error in the brief three-day window available after the election. *See* SB 202 §§ 25, 29; O.C.G.A. § 21-2-419.

Halsey G. Knapp, Jr.
Georgia Bar No. 425320
Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
KREVOLIN & HORST, LLC
1201 W. Peachtree St., NW
One Atlantic Center, Suite 3250
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
hknapp@khlawfirm.com
jlewis@khlwafirm.com
sparks@khlawfirm.com

/s/ *Uzoma N. Nkwonta*
Uzoma N. Nkwonta*
Jacob D. Shelly*
Zachary J. Newkirk*
Jyoti Jasrasaria*
PERKINS COIE LLP
700 Thirteenth St., N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-9959
unkwonta@perkinscoie.com
jshelly@perkinscoie.com
znewkirk@perkinscoie.com
jjasrasaria@perkinscoie.com

Laura Hill*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: (206) 359-3349
Facsimile: (206) 359-4349
LHill@perkinscoie.com

*Counsel for Plaintiffs*
*Admitted *pro hac vice*

26

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of L.R. 5.1, using font type of Times New Roman and a point size of 14.

Dated: June 15, 2021.                              s/ *Uzoma N. Nkwonta*
                                                                *Counsel for Plaintiffs*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 15, 2021, I electronically filed this document with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record.

Dated: June 15, 2021.                    <u>s/ *Uzoma N. Nkwonta*</u>
                                             *Counsel for Plaintiffs*