# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

NEW GEORGIA PROJECT; et al.,
                                        *Plaintiffs*,

    v.

Brad RAFFENSPERGER, in his
official capacity as the Georgia
Secretary of State; et al.,
                                        *Defendants*,

REPUBLICAN NATIONAL
COMMITTEE; et al.,
                                        *Intervenor-Defendants*.

No. 1:21-cv-1229-JPB

## NOTICE OF SUPPLEMENTAL AUTHORITY

Intervenors have moved to dismiss, among other claims, Plaintiffs' challenge to SB 202's ban on gift giving. *See* Mot. (Doc.73-1) 17-20. Plaintiffs, relying heavily on the Eleventh Circuit's decision in *Food Not Bombs I*, claimed that giving food and water to voters is "expressive conduct." Opp. (Doc. 75) 18-21 (citing *Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale*, 901 F.3d 1235 (11th Cir. 2018)). Plaintiffs then argued that the gift-giving ban is a content-based restriction that warrants strict scrutiny. Opp. 22-23. In response, Intervenors argued that *Food Not Bombs I* says distributing food and water is normally *not* expressive, and that it becomes expressive only in specific circumstances that Plaintiffs haven't alleged. *See* Reply (Doc. 77) 9-11. Intervenors also argued that the gift-giving ban is, at most, a content-neutral regulation that receives intermediate scrutiny. *See* Reply 11-12.

1

The Eleventh Circuit's recent decision in *Food Not Bombs II* confirms that Intervenors were right. *See Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, --- F.4th ----, 2021 WL 3870708 (11th Cir. Aug. 31) (attached as Exhibit A). Two holdings are particularly important.

First, the Eleventh Circuit held that "most social-service food sharing events will *not* be expressive." Ex. A at 51 (emphasis added). The Court thus reiterated that the plaintiffs could not bring a facial challenge, as most applications of the law regulated only nonexpressive conduct. *Id.* at 47 n.3. As it explained in *Food Not Bombs I*, "food sharing" can be deemed "expressive conduct only after a close examination of the specific context." Ex. A at 51; *accord* Reply 9-10. That context is missing here. *See* Reply 10-11; Mot. 18-19.

Second, the Eleventh Circuit held that the challenged law was content neutral. *See* Ex. A at 50-56. The law banned more than just "food sharing events"; it banned many other, nonexpressive forms of conduct. *Id.* at 51. Even as to food sharing, the law's regulations did "not depend on the content of the message." *Id.* It applied equally to people who shared food to send a political message, a nutritional message, a message of gratitude, "and so on." *Id.* at 51-52. While the law "'disproportionately'" affected groups who wanted to use food to communicate a message, that side effect did not make the law content based. *Id.* at 53. So too here. *See* Reply 12. Thus, even if SB 202's gift-giving ban regulated expressive conduct, it would be content neutral and "subject only to intermediate scrutiny, not the more demanding requirements of strict scrutiny." Ex. A at 56.

While the Eleventh Circuit held that the law in *Food Not Bombs II* failed intermediate scrutiny, it did so on grounds that have nothing to do with this case. The Eleventh Circuit did not hold that the city lacked a sufficient interest that could justify banning food sharing in public parks; it called that question "difficult" and refused to decide it. *Id.* at 47-48 & 4. Instead, the Eleventh Circuit held only that the challenged law "imposes a permitting requirement without implementing *any* standards to guide City officials' discretion over whether to grant a permit." *Id.* at 57. Plaintiffs make no such argument here. Nor could they, since the gift-giving ban is clear, objective, and easy to apply. *See* Reply 14.

This Court should dismiss all challenges to SB 202's gift-giving ban.

Respectfully submitted,

Dated: September 16, 2021

/s/ *Tyler R. Green*

John E. Hall, Jr.
  Georgia Bar No. 319090
William Bradley Carver, Sr.
  Georgia Bar No. 115529
W. Dowdy White
  Georgia Bar No. 320879
HALL BOOTH SMITH, P.C.
191 Peachtree St. NE, Ste. 2900
Atlanta, GA 30303
(404) 954-6967

Tyler R. Green (*pro hac vice*)
Cameron T. Norris (*pro hac vice*)
Steven C. Begakis (*pro hac vice*)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tyler@consovoymccarthy.com
cam@consovoymccarthy.com
steven@consovoymccarthy.com

*Counsel for Intervenor-Defendants*

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with Local Rule 5.1(B) because it uses 13-point Century Schoolbook.

*/s/ Tyler R. Green*

## CERTIFICATE OF SERVICE

On September 16, 2021, I e-filed this document on ECF, which will serve everyone requiring service.

*/s/ Tyler R. Green*

# Exhibit A

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13604

_____

D.C. Docket No. 0:15-cv-60185-WJZ

FORT LAUDERDALE FOOD NOT BOMBS,
NATHAN PIM,
JILLIAN PIM,
HAYLEE BECKER,
WILLIAM TOOLE,

Plaintiffs - Appellants,

versus

CITY OF FORT LAUDERDALE,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 31, 2021)

Before LAGOA, HULL, and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

This case presents the second appellate skirmish in Fort Lauderdale Food Not Bombs's ("FLFNB") challenge to Fort Lauderdale's efforts to shut down the practice of sharing food with the homeless in downtown Stranahan Park. FLFNB hosts food-sharing events in order to communicate the group's message that scarce social resources are unjustly skewed towards military projects and away from feeding the hungry. In Round One, a panel of this Court held FLFNB's food sharing to be expressive conduct protected by the First Amendment and remanded the case to the district court to address whether the City's regulations actually violated the First Amendment. Now, in Round Two, we must decide whether Fort Lauderdale Park Rule 2.2, which requires City permission for social service food-sharing events in all Fort Lauderdale parks, can withstand First Amendment scrutiny <u>as applied</u> to FLFNB's demonstrations.

It cannot. The Park Rule commits the regulation of FLFNB's protected expression to the standardless discretion of the City's permitting officials. The Park Rule bans social service food sharing in Stranahan Park <u>unless</u> authorized pursuant to a written agreement with Fort Lauderdale (the "City"). That's all the rule says. It provides no guidance and in no way explains when, how, or why the City will agree in writing. As applied to FLFNB's protected expression, it violates the First Amendment. It is neither narrowly drawn to further a substantial government interest that is unrelated to the suppression of free expression, nor, as

applied, does it amount to a reasonable time, place, and manner regulation on expression in a public forum.  Accordingly, we reverse the district court's order granting summary judgment in favor of the City and remand for further proceedings consistent with this opinion.

## I.

### A.

Fort Lauderdale Food Not Bombs is a nonprofit unincorporated association affiliated with the international advocacy organization Food Not Bombs.  FLFNB advocates the message "that food is a human right, not a privilege, which society has a responsibility to provide for all."  Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale, 901 F.3d 1235, 1238 (11th Cir. 2018) ("FLFNB I").

At the center of FLFNB's efforts are its weekly food sharing events in Fort Lauderdale's downtown Stranahan Park.  Stranahan Park "is known in the community as a location where the homeless tend to congregate and, according to FLFNB, 'has traditionally been a battleground over the City's attempts to reduce the visibility of homelessness.'"  Id.  "At these events, FLFNB distributes vegetarian or vegan food, free of charge, to anyone who chooses to participate.  FLFNB does not serve food as a charity, but rather to communicate its message 'that [ ] society can end hunger and poverty if we redirect our collective resources from the military and war . . . .'  Providing food in a visible public space, and

partaking in meals that are shared with others, is an act of political solidarity meant to convey the organization's message." Id.

"FLFNB sets up a table underneath a gazebo in the park, distributes food, and its members . . . eat together with all of the participants, many of whom are homeless individuals residing in the downtown Fort Lauderdale area.  FLFNB's set-up includes a banner with the name 'Food Not Bombs' and the organization's logo -- a fist holding a carrot -- and individuals associated with the organization pass out literature during the event." Id.  This includes flyers to convey FLFNB's social-justice message that all who are hungry deserve food.

B.

Sometime before 2000, the City of Fort Lauderdale promulgated Park Rule 2.2:

> Parks shall be used for recreation and relaxation, ornament, light and air for the general public.  Parks shall not be used for business or social service purposes unless authorized pursuant to a written agreement with City.  As used herein, social services shall include, but not be limited to, the provision of food, clothing, shelter or medical care to persons in order to meet their physical needs.

Some years ago, Arnold Abbott, who led a program to feed the homeless on a public Fort Lauderdale beach, obtained a state-court injunction against the Park Rule on the ground that it violated Florida's Religious Freedom Restoration Act, Fla. Stat. § 761.03.  (Abbott is not affiliated with FLFNB.)  The injunction required the City to either stop enforcing the Park Rule, designate an area in which Abbott

4

could lawfully distribute food, or specify objective criteria for permitted food-sharing locations.  See Abbott v. City of Fort Lauderdale, 783 So. 2d 1213, 1215 (Fla. Dist. Ct. App. 2001).

The City stopped enforcing the Park Rule until October 22, 2014, when it enacted Ordinance C-14-42 to amend the Fort Lauderdale Uniform Land Development Regulations ("ULDR").  The City enacted this ordinance at least in part as an effort to bring itself into compliance with the state-court injunction so that it could resume enforcement of the Park Rule.  In the years leading up to the enactment of Ordinance C-14-42, some citizens had complained about a series of problems they believed to be associated with feeding the homeless in public spaces, including safety risks, a lack of proper water and restroom facilities, and the negative impact this conduct may have on surrounding communities.  In January 2014, the City Commission held a workshop on the "the homeless population in the City of Fort Lauderdale," where stakeholders debated public food distribution and related issues.

Ordinance C-14-42, as relevant here, (1) defines an Outdoor Food Distribution Center as "[a]ny location or site temporarily used to furnish meals to members of the public without cost or at a very low cost as a social service"; (2) defines "social service[]" as "[a]ny service provided to the public to address public welfare and health such as, but not limited to, the provision of food; hygiene care;

group rehabilitative or recovery assistance, or any combination thereof;

rehabilitative or recovery programs utilizing counseling, self-help or other

treatment or assistance; and day shelter or any combination of same"; and (3)

requires a conditional use zoning permit for the operation of an Outdoor Food

Distribution Center in Stranahan Park.[1]  The other city parks in Fort Lauderdale (of

which there are more than 90, City of Fort Lauderdale, City Parks,

https://www.fortlauderdale.gov/departments/parks-recreation/city-parks (last

visited June 29, 2021)) are zoned so that public food-sharing events are not

allowed at all, even by permit.  Thus, the Ordinance prohibits social service food

distribution in most parks and does not provide for food sharing as of right in any

park.

 To obtain a conditional use permit, an individual or group must wind

through a lengthy process for receiving a zoning variance.  This involves an initial

application to the Development Review Committee (which meets twice a month);

upon approval, a subsequent submission and presentation to the Planning and

Zoning Board (which meets once a month); and then a subsequent review by the

---

[1] Ordinance C-14-42 implemented these regulations of outdoor food distribution by adding new provisions -- ULDR §§ 47-1B.31(B)(4), (C)(2)(c) -- and by making additions to ULDR §§ 47-6.12; 47-6.13; 47-7.10; 47-8.10; 47-8.11; 47-8.12; 47-8.13; and 47-13.10.  We refer to these specific components of Ordinance C-14-42 -- those that regulate outdoor food distribution -- as the "Ordinance."  Other provisions of Ordinance C-14-42 regulate other social services not relevant to this case, such as providing addiction treatment centers.  The constitutionality of the other provisions of Ordinance C-14-42 is not before this Court.

City Commission.  The City Commission has 30 days to decide whether to conduct its own review of the application; if the City Commission does not, the application is considered approved and returns to the Development Review Committee for a check to make sure the final permit is the same as the plan the Zoning Board approved.  There is no deadline for a permit to issue, and the City's zoning administrator could not provide an average time for resolving applications. Applicants must pay a fee for City staff time spent reviewing an application; the fee can rise as high as $6,000, which the City may reduce in its unguided discretion.

Permitting requirements for outdoor food distribution include that the proposed activities must not impose a nuisance or cause a change to the character of the area, that the use be 500 feet away from similar uses and residential property, that food be timely served and stored at safe temperatures, that a certified food service manager attend the event, and that the site provide handwashing, wastewater disposal, and restroom facilities.

Soon after the Ordinance passed, the City began enforcing it along with the Park Rule.  Police officers interrupted and stopped an FLFNB demonstration in Stranahan Park on November 7, 2014.  On that day, the city arrested and cited FLFNB members and other demonstrators for violating both the Ordinance and the Park Rule.  The City also issued citations to participants in FLFNB demonstrations

on November 14 and November 21.  FLFNB members Nathan Pim, Jillian Pim, Haylee Becker, and William Toole were not personally arrested or cited, but were present at each of these events and witnessed their co-demonstrators being arrested and cited on November 7 and November 14.  They did not directly witness any arrests or citations at the November 21 event; police later delivered a citation to the home of a participant in that demonstration.

The City also enforced the Ordinance and the Park Rule against Abbott, who moved the state court for an order to enforce its 2000 injunction and halt enforcement.  See Mot. to Enforce Inj., <u>Abbott v. City of Fort Lauderdale</u>, No. 99-03583 (05), Dkt. No. 37 (Fla. Cir. Ct. Nov. 12, 2014).  The Seventeenth Judicial Circuit Court in Broward County issued a temporary stay on December 2, 2014, and the City stopped enforcing the Ordinance along with the Park Rule.  Even though the state-court stay expired on January 1, 2015, the City voluntarily continued its non-enforcement, and has not enforced the Ordinance or the Park Rule since.  FLFNB continues to hold weekly food-sharing demonstrations in Stranahan Park.

## C.

Soon after the state-court stay expired, on January 29, 2015, FLFNB and members Nathan Pim, Jillian Pim, Haylee Becker, and William Toole (the "Individual Plaintiffs," and, together with FLFNB, the "Plaintiffs") sued the City

in the United States District Court for the Southern District of Florida pursuant to 42 U.S.C. § 1983.  They alleged that the Ordinance and the Park Rule violated their First Amendment rights to free expression and expressive association, and that these regulations were unconstitutionally vague, both facially and as applied. The Plaintiffs sought declaratory and injunctive relief as well as compensatory damages.

After discovery, the parties cross-moved for summary judgment.  The district court granted the City's motion on all claims, holding that FLFNB's food-sharing was not expressive conduct entitled to First Amendment protection.  <u>Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale</u>, No. 15-60185-CIV, 2016 WL 11700270, at *9 (S.D. Fla. Sept. 30, 2016).  In an analysis heavily influenced by its initial holding that FLFNB was not engaged in expressive conduct, the district court concluded that the Ordinance and the Park Rule did not infringe on the Plaintiffs' rights to expressive association.  <u>Id.</u>  Finally, the district court held that the Ordinance and the Park Rule were not unconstitutionally vague.  The court acknowledged that this holding was also influenced by its conclusion that FLFNB was not engaged in expressive conduct.  <u>Id.</u> at *10.

The Plaintiffs appealed the trial court's judgment to this Court.  On November 7, 2017, while the appeal was pending, the City repealed the Ordinance

insofar as it regulated outdoor food distribution.  However, Fort Lauderdale did not repeal the Park Rule, which remains on the books.

In Round One, a panel of this Court reversed the district court's summary judgment order.  FLFNB I, 901 F.3d at 1245.  We applied the two-part inquiry drawn from Spence v. Washington, 418 U.S. 405, 410–411 (1974), and held that FLFNB's demonstrations were expressive conduct protected by the First Amendment.  FLFNB I, 901 F.3d at 1240–43.  First, the panel had little difficulty concluding that FLFNB "inten[ded] to convey a particularized message" with its food sharing events.  Id. at 1240 (quoting Spence, 418 U.S. at 410–411).  FLFNB shared food in order "to convey that all persons are equal, regardless of socio-economic status, and that everyone should have access to food as a human right." Id. at 1240–41.

Next, the panel closely examined the circumstances surrounding FLFNB's food sharing in order to apply the second part of the Spence inquiry -- whether a "reasonable person would interpret FLFNB's food sharing events 'as some sort of message.'"  Id. at 1242 (quoting Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1270 (11th Cir. 2004)).  We held that five circumstances surrounding FLFNB's events would lead a reasonable observer to discern a message.  First, FLFNB wasn't just a group of acquaintances eating together in a park -- it adorned its events with tables and banners and distributed literature explaining its political

10

message.  Second, the events had "social implications" because they were open to all comers.  Id.  Third, FLFNB held its food sharings "in Stranahan Park, a public park near city government buildings."  Id.  Public parks, the panel noted, are "historically associated with the exercise of First Amendment rights."  Id. (citation omitted).  Fourth, treatment of the homeless was an issue of substantial public concern and discussion in the Fort Lauderdale community.  Indeed, the City had held a public workshop on the issue, and local media had covered "the status of the City's homeless population" for years.  Id.  Fifth, the sharing of food with others in order to communicate a message was a tradition that "date[d] back millennia."  Id. at 1243.  All of these circumstances combined to "put[] FLFNB's food sharing events on the expressive side of the ledger."  Id. at 1242.

Since each of the district court's merits holdings had turned in substantial part on its erroneous conclusion about expressive conduct, the panel remanded the case for the district court to reconsider these issues as well as to address in the first instance whether the Ordinance and the Park Rule violated the First Amendment. Id. at 1245 & n.2.

On remand, the district court took supplemental briefing, including on the effect of the repeal of the Ordinance.  For a second time, the district court entered summary judgment in favor of the City.  The court held that the Plaintiffs had standing based on the City's disruption of their events, and that FLFNB was a

"person" with a cause of action under 42 U.S.C. § 1983. The court noted that while the repeal of the Ordinance mooted the Plaintiffs' claims for declaratory and injunctive relief against the Ordinance, the court still had to rule on its constitutionality because the Plaintiffs also sought compensatory damages. Next, the district court held that even accepting <u>FLFNB I</u>'s binding holding that the Ordinance and the Park Rule interfered with the Plaintiffs' expressive conduct, both regulations passed First Amendment muster as lawful, content-neutral time, place, and manner regulations.

As for the Plaintiffs' claims that the Ordinance and the Park Rule's permitting requirements acted as a prior restraint by giving City officials unguided discretion to block their expression, the district court observed that the regime was "somewhat suspect." After all, Fort Lauderdale's officials could charge as much as $6,000 for the permitting process but could reduce that amount in any way if they "fe[lt]" it appropriate. Meanwhile, the Park Rule did not provide any standards to guide the exercise of discretion in determining whether to provide City permission to share food in the park. Even so, the district court concluded that the permitting schemes were not subject to either as-applied or facial challenges, because the Plaintiffs never applied for a permit and because the regulations were "laws . . . of general application" that did not directly regulate protected expression. The district court also rejected the Plaintiffs' expressive

association arguments, reasoning that the regulations "impose a content-neutral restriction on a kind of expressive conduct that is only incidentally associative." Finally, the trial court held that the terms found in the Ordinance and in the Park Rule, such as "social service," were not unconstitutionally vague.

Again, the Plaintiffs timely appealed to this Court.

## II.

Before we can consider the merits of the Plaintiffs' claims, we are required to address three threshold matters. As for the first one, we conclude that FLFNB is a "person" and therefore a proper plaintiff under § 1983 of Title 42. Second, as for the City's Ordinance, the Plaintiffs' claims for injunctive and declaratory relief are moot; however, their monetary damages claims arising out of the enforcement of the Ordinance are not. Finally, all of the Plaintiffs have standing to bring their remaining claims. Our review on each of these issues is de novo. See Hoever v. Marks, 993 F.3d 1353, 1357 (11th Cir. 2021); Taylor v. Polhill, 964 F.3d 975, 980 (11th Cir. 2020); Coral Springs St. Sys., Inc. v. City of Sunrise, 371 F.3d 1320, 1328 (11th Cir. 2004).

## A.

First, the City argues that FLFNB, as an unincorporated association, is not a "person" that may bring suit under § 1983, which provides in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia,

subjects, or causes to be subjected, any citizen of the United States <u>or</u> <u>other person</u> within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added).  There is some historical support for the City's reading, but this view stands in tension with the text's ordinary meaning, Supreme Court precedent, successive amendments to § 1983, and longstanding, settled practice.  Absent clear direction from the Supreme Court, we decline the City's invitation to bar all unincorporated associations (other than unions) from being able to sue under § 1983.

"As with any statutory interpretation question, our analysis 'must begin, and usually ends, with the text of the statute.'"  <u>United States v. Stevens</u>, 997 F.3d 1307, 1314 (11th Cir. 2021) (citation omitted).  When examining the phrase "any citizen of the United States <u>or other person</u>," "person" must refer to something beyond individuals who are United States citizens; otherwise, the term would be redundant.  <u>See, e.g.</u>, <u>Corley v. United States</u>, 556 U.S. 303, 314 (2009) (noting that "one of the most basic interpretive canons" is that "'[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant'") (citation omitted and alteration accepted).  At the very least, the phrase extends a § 1983 cause of action to non-

citizen individuals.  Congress enacted Section 1 of the Civil Rights Act of 1871

(also known as the Ku Klux Klan Act), the original version of what is now § 1983,

in order to enforce the Fourteenth Amendment.  See, e.g., Ngiraingas v. Sanchez,

495 U.S. 182, 187 (1990).  The word "person" in the Fourteenth Amendment

includes not only citizens but also non-citizens within the United States.  E.g.,

Graham v. Richardson, 403 U.S. 365, 371 (1971); see also Hague v. Comm. for

Indus. Org., 307 U.S. 496, 526 (1939) (opinion of Stone, J.) ("It will be observed

that the cause of action, given by [Section 1 of the 1871 Civil Rights Act], extends

broadly to . . . those rights secured to persons, whether citizens of the United States

or not, to whom the [Fourteenth] Amendment in terms extends the benefit of the

due process and equal protection clauses.").  We also know that the word "person"

in § 1983 extends to corporations, both municipal and otherwise.  See Monell v.

Dep't of Soc. Servs., 436 U.S. 658, 687, 690 (1978).  Indeed, in Monell, the

Supreme Court observed that "by 1871, it was well understood that corporations

should be treated as natural persons for virtually all purposes of constitutional and

statutory analysis."  Id. at 687.

However, the Supreme Court has also ruled that Native American Tribes

seeking to vindicate sovereign rights, States, State officers acting in their official

capacities, Territories, and Territory officers acting in their official capacities are

not "persons."  Inyo Cnty. v. Paiute-Shoshone Indians of the Bishop Cmty. of the

Bishop Colony, 538 U.S. 701, 712 (2003) (reasoning that § 1983 "was designed to

secure private rights against government encroachment" to reach this conclusion in

the case of a Tribe suing to vindicate its right to sovereign immunity from state

process); Ngiraingas, 495 U.S. at 187–92 (examining historical sources and the

context surrounding amendments to § 1983 to reach this conclusion with respect to

Territories and their officers); Will v. Mich. Dep't of State Police, 491 U.S. 58,

64–67 (1989) (relying on federalism concerns, the Eleventh Amendment, and the

"often-expressed understanding that 'in common usage, the term 'person' does not

include the sovereign, and statutes employing the word are ordinarily construed to

exclude it'" to reach this conclusion regarding States and their officials)

(alterations accepted and citation omitted).  Monell, Ngiraingas, and Will each

interpreted the first use of the word "person" in § 1983, which relates to which

entities may be proper § 1983 defendants -- "[e]very person" who under color of

law causes a deprivation of federal rights shall be liable to the party injured.  By

contrast, today we interpret § 1983's second use of the word "person" -- "any

citizen or other person" -- a phrase that delineates which entities may be proper §

1983 plaintiffs.  But these cases are nonetheless instructive, because we "generally

presume that 'identical words used in different parts of the same act are intended to

have the same meaning.'"  United States v. Cleveland Indians Baseball Co., 532

U.S. 200, 213 (2001) (citation omitted).

In order to decide whether FLFNB has a cause of action in this case, we must determine whether "other persons," in addition to including non-citizen individuals and corporate entities, extends to unincorporated associations. The words "other person," by themselves, do not definitively answer the question. Cf. Ngiraingas, 495 U.S. at 187 ("[Section 1983] itself obviously affords no clue as to whether its word 'person' includes a Territory."). Unlike sovereign entities, there is no presumption that unincorporated associations are not persons. To the contrary, the ordinary meaning of "person" in legal contexts includes unincorporated associations. See Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 273 (2012) ("Traditionally the word person . . . denotes not only natural persons (human beings) but also artificial persons such as corporations, partnerships, associations, and both public and private organizations.") (second emphasis added). Thus, the most natural reading of § 1983 extends a cause of action to unincorporated associations.

On the other hand, we "normally interpret[] a statute in accord with the ordinary public meaning of its terms at the time of its enactment." Bostock v. Clayton Cnty., 140 S. Ct. 1731, 1738 (2020). And in 1871, unincorporated associations were not legal persons with the capacity to sue or be sued absent some express authorization. United Mine Workers of Am. v. Coronado Coal Co., 259 U.S. 344, 385 (1922) ("Undoubtedly at common law an unincorporated association

17

of persons was not recognized as having any other character than a partnership in whatever was done, and it could only sue or be sued in the names of its members, and their liability had to be enforced against each member."); Wesley A. Sturges, Unincorporated Associations as Parties to Actions, 33 Yale L.J. 383, 383 (1924) (citing authorities dating as far back as 1884 to observe that "[t]he cases are remarkably in accord that, in the absence of enabling statute, an unincorporated association cannot sue or be sued in the common or association name").

Moreover, reading the word "person" to exclude unincorporated associations is fully consonant with the 1871 version of the Dictionary Act, which expressly limited "person" to "bodies politic and corporate." See, e.g., Will, 491 U.S. at 69 n.8. The Dictionary Act -- a statute that provides general definitions for common terms used across the United States Code, see 1 U.S.C. § 1 -- did not expand to include "associations" until 1948. See Act of June 25, 1948, Pub. L. No. 80-772, § 6, 62 Stat. 683, 859 (1948); Lippoldt v. Cole, 468 F.3d 1204, 1214 (10th Cir. 2006). The 1871 Dictionary Act definition matches the definition of "person" found in the first edition of Black's Law Dictionary, published in 1891, which confirms that an entity needed some express authorization in positive law to achieve legal personhood. Person, Black's Law Dictionary (1891) ("Persons are divided by law into natural and artificial. Natural persons are such as the God of nature formed us; artificial are such as are created and devised by human laws, for

18

the purposes of society and government, which are called 'corporations' or 'bodies politic.'").

What's more, the legislative history surrounding the adoption of the 1871 Civil Rights Act does not suggest any departure from the established legal meaning of "person" as it related to the capacity to sue in 1871.  See Monell, 436 U.S. at 690 (analyzing the legislative history of Section 1 to interpret § 1983).  The drafters of Section 1 of the 1871 Civil Rights Act likely did not contemplate that unincorporated associations were "persons" under the Act.  The Republican sponsors of the Civil Rights Act were aghast at reports of widespread vigilante violence against federal officials, northern transplants, Blacks, and Republicans in the post-war South.  These attacks, they believed, were the work of recalcitrant Confederates, including individuals organized as the Ku Klux Klan, who faced only weak opposition from ineffectual state officials.  See, e.g., Cong. Globe, 42d Cong., 1st Sess., 320 (1871) (hereinafter "Globe") (Rep. Stoughton) ("There exists at this time in the southern States a treasonable conspiracy against the lives, persons, and property of Union citizens, less formidable it may be, but not less dangerous, to American liberty than that which inaugurated the horrors of the rebellion."); id. at 820 (Sen. Sherman) (observing that the bill was based on the fact that "an organized conspiracy, spreading terror and violence, murdering and scourging both white and black, both women and men, and pervading large

communities of this country, now exists unchecked by punishment, independent of law, uncontrolled by magistrates" and that "of all the multitude of injuries not in a single case has redress ever been meted out to one of the multitude who has been injured").

Section 1 itself "was the subject of only limited debate and was passed without amendment." Monell, 436 U.S. at 665. At most, read together with statements about the 1871 Act generally, floor discussions of Section 1 suggest that both proponents and opponents of the 1871 Act believed that the typical plaintiff would be an individual who suffered a violation of constitutional rights, especially the denial of the equal protection of the laws at the hands of state officials. Thus, for example, proponent Senator Dawes spoke of "citizen[s]" who suffered violations of their rights -- phrasing that implies a concern for the individual plaintiff. Globe at 477 ("I conclude . . . [that] Congress has power to legislate for the protection of every American citizen in the full, free, and undisturbed enjoyment of every right, privilege, or immunity secured to him by the Constitution; and that this may be done . . . [b]y giving him a civil remedy in the United States courts for any damage sustained in that regard."). For their part, Democrats who opposed the passage of Section 1 generally claimed that it was too broad, but notably did not argue that the word "person" did anything to expand the range of entities that could traditionally sue. They, too, seemed to envision

individual plaintiffs.  E.g., id. at 337 (Rep. Whithorne) (complaining that "any person within the limits of the United States who conceives that he has been deprived of any right, privilege, or immunity secured him by the Constitution" would be able to sue and conjuring the hypothetical example of a drunk suing a police officer who had confiscated his pistol).

All told, historical context suggests that the word "person" as used in Section 1 of the 1871 Civil Rights Act did not extend to unincorporated associations.  But this does not end the analysis, because we are not interpreting Section 1 of the 1871 Civil Rights Act.  Instead, we must apply § 1983 of Title 42 of the United States Code as it exists today, that is, as thrice amended since its initial enactment in 1871.  We must therefore account for any changes in the legal meaning of "person" that may have informed Congress's decision to perpetuate that term across amended versions of § 1983.  Indeed, the Supreme Court in Ngiraingas looked not only to the history of the 1871 Civil Rights Act but also to "the successive enactments of [§ 1983], in context" -- and to changes to the definition of "person" in the Dictionary Act -- in order to interpret the word "person."  495 U.S. at 189, 191 n.10.

Congress amended the text of § 1983 twice after the 1948 amendment to the Dictionary Act -- which made clear that "person" in "any Act of Congress" includes "associations" and "societies" in addition to "corporations," "companies,"

"firms," "partnerships," "joint stock companies," and "individuals." <u>See</u> 62 Stat. at

859; 1 U.S.C. § 1.  A congressional amendment in 1979 extended § 1983's

coverage to injuries inflicted by those acting under the color of District of

Columbia law; a 1996 amendment limited the availability of injunctive relief

against judicial defendants.  <u>See</u> Act of December 29, 1979, Pub. L. No. 96-170,

93 Stat. 1284 (1979); Federal Courts Improvement Act of 1996, Pub. L. No. 104-

317, 110 Stat. 3847 (1996).  In neither re-enacted version of § 1983 did Congress

narrow the definition of "person" in light of the intervening clarification in the

Dictionary Act that associations are "persons" as that term is used in federal

statutes.  <u>Cf.</u> <u>United States v. Bryant</u>, 996 F.3d 1243, 1258 (11th Cir. 2021)

("[W]hen interpreting statutes, what Congress chose not to change can be as

important as what it chose to change.").

Similarly, Congress enacted both of these amendments after the 1937

promulgation of Federal Rule of Civil Procedure 17(b), which provided "that a

partnership or other unincorporated association, which has no such capacity by the

law of such state, may sue or be sued in its common name for the purpose of

enforcing for or against it a substantive right existing under the Constitution or law

of the United States."  Parties, 1937 Rep. Advisory Comm. on Civ. Rules 47

(1937); <u>see also</u> Fed. R. Civ. P. 17(b)(3) (the Rule's current text remains nearly

identical to that of the original version); <u>Centro De La Comunidad Hispana De</u>

Locust Valley v. Town of Oyster Bay, 954 F. Supp. 2d 127, 137 (E.D.N.Y. 2013)
(relying on Rule 17(b)(3) to conclude that "an unincorporated association[] ha[d]
legal capacity to bring [a § 1983] suit because all of its claims allege[d] violations
of the United States Constitution"), aff'd, 868 F.3d 104 (2d Cir. 2017), and aff'd,
705 F. App'x 10 (2d Cir. 2017); Playboy Enters., Inc. v. Pub. Serv. Comm'n of
P.R., 698 F. Supp. 401, 413–14 (D.P.R. 1988) (similar analysis regarding the
unincorporated Puerto Rico Cable Television association), aff'd as modified on
other grounds, 906 F.2d 25 (1st Cir. 1990).

And perhaps most significantly, the Supreme Court held in 1974 that an
unincorporated union could "sue under 42 U.S.C. § 1983 as [a] person[] deprived
of [its] rights secured by the Constitution and laws." Allee v. Medrano, 416 U.S.
802, 819 n.13 (1974). Thus, by the time of the 1979 and 1996 amendments to §
1983, federal law made it quite clear that unincorporated associations were
"persons" that could sue to enforce constitutional rights under § 1983. It is telling
that against this backdrop, Congress did not choose to restrict the scope of the term
"person" when it re-enacted amended versions of § 1983. See Pollitzer v.
Gebhardt, 860 F.3d 1334, 1340 (11th Cir. 2017) ("Congress is presumed to be
aware of an administrative or judicial interpretation of a statute and to adopt that
interpretation when it re-enacts a statute without change.") (emphasis added)
(quoting Lorillard v. Pons, 434 U.S. 575, 580 (1978)); Fajardo v. U.S. Att'y Gen.,

659 F.3d 1303, 1310 (11th Cir. 2011) ("Where words are employed in a statute

which had at the time a well-known meaning at common law <u>or in the law of this

country</u> they are presumed to have been used in that sense unless the context

compels to the contrary.") (emphasis added) (quoting <u>Lorillard</u>, 434 U.S. at 583);

Scalia & Garner, <u>supra</u>, at 322 ("The clearest application of the prior-construction

canon occurs with reenactments: If a word or phrase has been authoritatively

interpreted by the highest court in a jurisdiction . . . a later version of that act

perpetuating the wording is presumed to carry forward that interpretation.").

Whatever "person" meant in 1871, its meaning included unincorporated

associations by the time Congress "perpetuated" the word "person" in new

versions of § 1983 in 1979 and 1996.  <u>See</u> Scalia & Garner, <u>supra</u>, at 322.

    Even setting these textual and historical considerations aside, <u>Allee</u> suggests

that an unincorporated entity like FLFNB, just like the unincorporated union in that

case, is a "person" for § 1983 purposes.  In <u>Allee</u>, individual organizers and a

union brought a § 1983 action against Texas officials on behalf of a class of union

members, alleging that law enforcement had threatened and harassed them for

engaging in union organizing activities, including by bringing criminal charges in

bad faith.  416 U.S. at 804–09.  A question arose as to whether there were pending

state prosecutions against any of the plaintiffs -- if not, the plaintiffs' request for

injunctive relief would be partially moot.  <u>Id.</u> at 818.  The Supreme Court

instructed that on remand, if there were indeed pending prosecutions against the

unnamed class members, the district court "must find that the class was properly

represented" by the named plaintiffs in part because the named-plaintiff union was

a "person[]" that could sue under § 1983 and that had standing to complain of the

unlawful intimidation of its members.  Id. at 819 n.13; see also id. at 831 (Burger,

C.J., concurring in the result in part and dissenting in part) (acknowledging that the

union plaintiff was unincorporated).

In holding that "[u]nions may sue under 42 U.S.C. § 1983 as persons," the

Court in Allee did not rest on any distinctive features of unions or suggest that

unions should be treated differently than any other kinds of unincorporated

associations.  Id. at 819 n.13.  The Court might have relied on, but did not so much

as mention, characteristics surrounding unions that other types of unincorporated

associations may not share, such as their affirmative recognition and privileges in

federal and state law.  See Coronado Coal Co., 259 U.S. at 385–90.  Instead, the

Court concluded, without limiting its reasoning, that unincorporated unions were §

1983 "persons."  The understanding of the meaning of the term "person" at the

time the Civil Rights Act was passed in 1871 presented no obstacle to the result the

Supreme Court reached in Allee.  A union was neither an individual nor a

corporation, yet the Supreme Court held that it still fell within the ambit of the

term "other person."

In keeping with a broad reading of Allee, most federal courts to have confronted the question of whether a non-union unincorporated association is a "person" under § 1983 have answered in the affirmative.  In Barrett v. United States, the Second Circuit reasoned that an estate administratrix could bring a § 1983 suit on behalf of the estate beneficiaries because they were a group of individuals "associated for a special purpose."  689 F.2d 324, 333 (2d Cir. 1982) ("Unions and unincorporated associations have also been found to possess standing to assert a § 1983 claim.").  The Second Circuit weighed in again in Jund v. Town of Hempstead, this time to hold that unincorporated local Republican committees were proper § 1983 defendants.  941 F.2d 1271, 1279–80 (2d Cir. 1991).  And at least two district courts have adopted this reading.  In Gay-Straight All. of Okeechobee High Sch. v. Sch. Bd. of Okeechobee Cnty., a court in the Southern District of Florida held that an "unincorporated, voluntary association of students" at a Florida high school was a § 1983 "person."  477 F. Supp. 2d 1246, 1248, 1249–51 (S.D. Fla. 2007).  A court in the Northern District of Illinois similarly held that an unincorporated organization representing the interests of a public housing development could bring a § 1983 suit and noted that "[u]nincorporated organizations have been found to be 'persons' entitled to bring suit under § 1983."  Cabrini-Green Loc. Advisory Council v. Chi. Hous. Auth., No. 04 C 3792, 2005 WL 61467, at *3 (N.D. Ill. Jan. 10, 2005).

26

Moreover, there is a longstanding and robust practice of treating

unincorporated associations as proper § 1983 plaintiffs as a matter of course.  The

Eleventh Circuit and an array of other courts have evaluated § 1983 claims brought

by all manner of unincorporated associations seeking to vindicate a diverse array

of constitutional interests -- including the Orlando and Santa Monica local Food

Not Bombs chapters -- without even hinting that they lacked a § 1983 cause of

action.  See, e.g., First Vagabonds Church of God v. City of Orlando, 638 F.3d

756, 758 (11th Cir. 2011) (en banc) (Orlando Food Not Bombs); Santa Monica

Food Not Bombs v. City of Santa Monica, 450 F.3d 1022, 1031 (9th Cir. 2006)

(Santa Monica Food Not Bombs); Rounds v. Or. State Bd. of Higher Educ., 166

F.3d 1032, 1034 (9th Cir. 1999) (Students for Legal government, an

unincorporated association of University of Oregon students); Citizens Against

Tax Waste v. Westerville City Sch., 985 F.2d 255, 256–57 (6th Cir. 1993)

(Citizens Against Tax Waste, an "unincorporated association of property owners in

the Westerville City School District"); Marcavage v. City of New York, 918 F.

Supp. 2d 266, 267 (S.D.N.Y. 2013) (Repent America, an unincorporated

association dedicated to Christian evangelism); Occupy Fresno v. Cnty. of Fresno,

835 F. Supp. 2d 849, 853 (E.D. Cal. 2011) (Occupy Fresno, an unincorporated

association of individuals who wished to assemble in a park); Good News Emp.

Ass'n v. Hicks, No. C-03-3542 VRW, 2005 WL 351743, at *1 (N.D. Cal. Feb. 14,

27

2005), aff'd, 223 F. App'x 734 (9th Cir. 2007) (unincorporated association organized to promote a faith-based concept of "Natural Family and Marriage"); Nat'l Ass'n of Alzheimer's Victims & Friends v. Pa. Dep't of Pub. Welfare, No. CIV.A. 88-2426, 1988 WL 29338, at *1 (E.D. Pa. Mar. 23, 1988) (National Association of Alzheimer's Victims & Friends, an "unincorporated association founded for the purpose of providing a mutual care and support group for persons suffering from Alzheimer's disease and their families and concerned friends"); Republican Coll. Council of Pa. v. Winner, 357 F. Supp. 739, 740 (E.D. Pa. 1973) (Republican College Council of Pennsylvania).  The same is true of a historically significant set of § 1983 plaintiffs, the unincorporated local chapters of the NAACP.  See N.A.A.C.P. v. Brackett, 130 F. App'x 648 (4th Cir. 2005).

This body of practice is not a body of holdings and, of course, cannot alter the meaning of the word "person" as used in the statute.  But when combined with the ordinary meaning of the text, Allee, persuasive interpretations from other courts, and the body of law informing Congress's amendments to § 1983 -- all of which indicate that unincorporated associations are "persons" --  it at least underscores the need for compelling evidence before we adopt the City's contrary interpretation.  See Nasrallah v. Barr, 140 S. Ct. 1683, 1697–98, (2020) (Thomas, J., dissenting) (protesting that when "presented with two competing statutory interpretations[,] one of which ma[de] sense of" the statute "without upending

28

settled practice, and one of which significantly undermine[d the statute] by removing a vast swath of claims from its reach," the Supreme Court majority should have "justif[ied]" its choice of the latter interpretation and "candidly confront[ed] its implications"); Fowler v. U.S. Parole Comm'n, 94 F.3d 835, 840 (3d Cir. 1996) (While "a practice bottomed upon an erroneous interpretation of the law is not legitimized merely by repetition," "general acceptance of a practice must be considered in any reasoned [statutory interpretation] analysis.").

The Tenth Circuit, which holds that unincorporated associations cannot sue under § 1983, stands alone against the trend of treating unincorporated associations as "persons."  See Lippoldt, 468 F.3d at 1216 (holding that Operation Save America, an unincorporated association devoted to anti-abortion advocacy, was not a "person" within the meaning of § 1983); see also Tate v. Univ. Med. Ctr. of So. Nev., No. 2:09-CV-01748-LDG (NJK), 2013 WL 1249590, at *11 (D. Nev. Mar. 26, 2013) (stating, in a single sentence devoid of analysis, that an unincorporated association was not a "person" subject to suit under § 1983), rev'd on other grounds, 617 F. App'x 724 (9th Cir. 2015).  The Tenth Circuit's otherwise thorough discussion of the legislative history of the 1871 Civil Rights Act, the background law in 1871, and the 1871 Dictionary Act did not account for the fact that Congress re-enacted the word "person" in § 1983 twice after intervening

developments in federal law clarified that unincorporated associations were "persons."

At bottom, in enacting § 1983, Congress "intended to give a broad remedy for violations of federally protected civil rights." Monell, 436 U.S. at 685. And the Supreme Court has instructed us that "Congress intended § [1983] to be broadly construed." Id. at 686. "[A]ny plan to restrict the scope of § 1983 comes with a heavy burden of justification -- a burden that is both constitutional and historical." Harry A. Blackmun, Section 1983 and Federal Protection of Individual Rights — Will the Statute Remain Alive or Fade Away?, 60 N.Y.U. L. Rev. 1, 28 (1985). Absent some indication from the Supreme Court that unincorporated associations are not "persons," we decline the City's invitation to upset longstanding practice recognizing that unincorporated associations are "persons" that may sue under § 1983. See id. at 3 (warning "that any restriction of what has become a major symbol of federal protection of basic rights [should] not be made in irresponsible haste" and that absent strong historical evidence, the scope and "underlying principles of § 1983 liability should be secure"). We hold that FLFNB is a person that may bring suit under § 1983.

## B.

The second threshold question, also prefatory to an analysis of the merits, concerns the principle of mootness. The Plaintiffs seek declaratory, injunctive, and

damages relief as to both the Ordinance and the Park Rule.  But well after the

commencement of this litigation, the City repealed the challenged Ordinance.  The

Park Rule remains in effect, so the Ordinance's repeal does not affect the

Plaintiffs' claims for declaratory, injunctive, and damages relief concerning the

Park Rule.  Likewise, the Plaintiffs' claims for monetary damages arising out of

the application of the Ordinance while it was still on the books remain viable

notwithstanding its subsequent repeal.  See, e.g., Checker Cab Operators, Inc. v.

Miami-Dade Cnty., 899 F.3d 908, 916 (11th Cir. 2018) ("Although a case will

normally become moot when a subsequent [law] brings the existing controversy to

an end, when the plaintiff has requested damages, those claims are not moot.")

(alteration in original) (citation omitted).  However, the repeal mooted the

Plaintiffs' claims for declaratory and injunctive relief against the Ordinance.

"Plainly, if a suit is moot, it cannot present an Article III case or controversy

and the federal courts lack subject matter jurisdiction to entertain it."  Coral

Springs, 371 F.3d at 1328.  "Generally, a challenge to the constitutionality of a

statute is mooted by repeal of the statute," but an exception "applies if there is a

substantial likelihood that the challenged statutory language will be reenacted."  Id.

at 1329.  The Plaintiffs have failed to meet their burden of proving that this

exception applies.  See Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs,

868 F.3d 1248, 1256 (11th Cir. 2017) (en banc) ("[O]nce the repeal of an

31

ordinance has caused our jurisdiction to be questioned, [the plaintiff] bears the burden of presenting affirmative evidence that its challenge is no longer moot.") (alteration in original) (citation omitted).

"The key inquiry. . . is whether the evidence leads us to a reasonable expectation that the City will reverse course and reenact the allegedly offensive portion of its Code should this Court" conclude the case is moot. Id.; Coral Springs, 371 F.3d at 1331 ("Whether the repeal of a law will lead to a finding that the challenge to the law is moot depends most significantly on whether the court is sufficiently convinced that the repealed law will not be brought back.").  The Plaintiffs must present "concrete evidence," rather than "mere speculation," that the City will return to its old ways.  Nat'l Advert. Co. v. City of Miami, 402 F.3d 1329, 1334 (11th Cir. 2005).

"[T]hree broad factors" guide our inquiry: (1) "whether the change in conduct resulted from substantial deliberation or is merely an attempt to manipulate our jurisdiction"; (2) "whether the government's decision to terminate the challenged conduct was unambiguous," including "whether the actions that have been taken to allegedly moot the case reflect a rejection of the challenged conduct that is both permanent and complete"; and (3) "whether the government has consistently maintained its commitment to the new policy or legislative scheme." Flanigan's Enters., 868 F.3d at 1257.  These factors are neither exclusive

nor dispositive; rather, the question is whether "the totality of [the] circumstances persuades the court that there is no reasonable expectation that the government entity will reenact the challenged legislation." Id.

The first factor does not help the Plaintiffs. The City repealed the ordinance through its normal legislative process, rather than in "secrecy" or "behind closed doors." Id. at 1260. The Commission considered the repeal at a public meeting, and the Plaintiffs do not provide any reason to believe that "the procedures used by the City to repeal the Ordinance [do not] reflect the same level of deliberation we would expect for any other change in policy." Id. Moreover, the timing of the repeal does not provide reason to "doubt the City's sincerity." Coral Springs, 371 F.3d at 1320. Notably, the City repealed the Ordinance after the district court had granted final judgment in its favor in this case and before this Court had reversed that judgment in FLFNB I. This factor weighs heavily against a conclusion that the City will re-enact the Ordinance.

So does the second factor. The City enforced the Ordinance only for a brief period (about one month) after its October 22, 2014 enactment; the City did not enforce the Ordinance between December 2, 2014 and its repeal on November 7, 2017. To be sure, this cessation of enforcement was not the result of an independent change of heart; rather, on December 2, a state court stayed enforcement in connection with a separate lawsuit challenging the Ordinance under

Florida's Religious Freedom Restoration Act.  And the City has not unequivocally

assured that it will not re-enact the Ordinance.  See Flanigan's, 868 F.3d at 1262

(city council had passed a resolution disavowing any intent to re-enact the

challenged ordinance or anything similar).  Still, all the Plaintiffs can offer on the

second factor are inferences drawn from the timing of the City's enforcement

decisions in relation to litigation developments.  And these inferences are hardly

ironclad: the City voluntarily continued its policy of non-enforcement even after

the expiration of the state-court stay on January 1, 2015.

At first blush, the Plaintiffs do better on the third factor, for the Park Rule

still remains in effect and implicates the gravamen of Plaintiffs' complaint by

preventing them from carrying out their expressive food sharing in a public park.

When "a superseding statute leaves objectionable features of the prior law

substantially undisturbed, the case is not moot."  Naturist Soc'y, Inc. v. Fillyaw,

958 F.2d 1515, 1520 (11th Cir. 1992); cf. Ne. Fla. Chapter of Associated Gen.

Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 662 (1993) (The

enactment of a new statute similar to the one repealed saves a case from mootness

so long as the new statute implicates "the gravamen of [the original] complaint,"

even if the new statute "differs in certain respects from the old one" or

"disadvantage[s] [the plaintiffs] to a lesser degree than the old one.").  Even so, the

City stopped enforcing the Park Rule against FLFNB's demonstrations at the same

time it stopped enforcing the Ordinance (on December 2, 2014).  In practice, the City's commitment to its repeal of the Ordinance and retreat from the policies behind it has not wavered.

To sum it all up, notwithstanding the City's failure to repeal the Park Rule or to unequivocally "disavow[] any intent to reenact" the Ordinance, Flanigan's, 868 F.3d at 1263, the Ordinance's regulation of outdoor food distribution is a thing of the past.  The Plaintiffs have not offered "concrete evidence" that the City might re-enact the Ordinance.  Nat'l Advert. Co., 402 F.3d at 1334.  Their case depends almost entirely on conjecture based on the timing of the City's actions and its commitment to a related rule.  But the timing at best provides a weak reed to establish an intent to re-enact and at worst undermines the Plaintiffs' case: the City repealed the Ordinance after the district court initially upheld it.  This sequence does not betray a strategic repeal to avoid adverse litigation developments.  We lack jurisdiction to address the difficult constitutional questions that attend the Plaintiffs' requests for declaratory and injunctive relief against the Ordinance. These claims are moot.

## C.

The third, and last, of the threshold issues concerns Article III standing.  The City argues that all of the Plaintiffs lack standing to assert damages claims based on the Ordinance and the Park Rule because these regulations, by the City's

account, were not enforced against any of the Plaintiffs.  According to the City, the

Plaintiffs cannot prove a concrete injury connected to the Ordinance or the Park

Rule.  Like the district court before us, we remain unpersuaded.  Both the

Individual Plaintiffs and FLFNB have standing to bring damages claims against the

City based on its enforcement of the Ordinance and the Park Rule.  They also have

standing to bring claims for declaratory and injunctive relief against the Park Rule.

It is by now almost axiomatic that in order to establish constitutional

standing, a party plaintiff must show three things:

> First, the plaintiff must have suffered an injury in fact -- an invasion of
> a legally protected interest which is (a) concrete and particularized and
> (b) actual or imminent, not conjectural or hypothetical.  Second, there
> must be a causal connection between the injury and the conduct
> complained of -- the injury has to be fairly traceable to the challenged
> action of the defendant, and not the result of the independent action of
> some third party not before the court.  Third, it must be likely, as
> opposed to merely speculative, that the injury will be redressed by a
> favorable decision.

Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992) (internal citations and

quotation marks omitted and alterations accepted); see also Bischoff v. Osceola

Cnty., 222 F.3d 874, 883 (11th Cir. 2000).  Standing for injunctive relief requires

proof of a threat of future injury.  Houston v. Marod Supermarkets, Inc., 733 F.3d

1323, 1329 (11th Cir. 2013).  If there is a genuine issue of material fact as to

whether the Plaintiffs have standing, summary judgment against them on standing

grounds is inappropriate.  See Bischoff, 222 F.3d at 884.

*1. Individual Plaintiffs.*  The City applied the Ordinance and the Park Rule to the Individual Plaintiffs insofar as they each participated in a November 7, 2014 FLFNB food-sharing event in Stranahan Park that the police broke up under their authority drawn from the Ordinance and the Park Rule.  Plaintiff Nathan Pim, testifying on behalf of FLFNB, explained that the police "stopped" the event "short."  **[DE 49-1 at 41]**  We have already concluded that the Individual Plaintiffs were engaging in constitutionally protected expression, and the City forced them to stop and disperse.  Undeniably, the Ordinance and the Park Rule injured them by directly interfering with and barring their protected expression.  "[E]very violation [of a right] imports damage."  Uzuegbunam v. Preczewski, 141 S. Ct. 792, 796–97, 799 (2021) (citation omitted) (considering it beyond dispute that a college student suffered an injury in fact when he complied with a college official's order to stop speaking and handing out religious literature on campus); cf. Roman Cath. Diocese of Brooklyn v. Cuomo, 592 U.S. ----, 141 S. Ct. 63, 67–68 (2020) (per curiam order granting application for injunctive relief) (those who wished to attend religious services, an exercise of their First Amendment freedoms, would suffer irreparable injury if barred from attending by state executive order); Elrod v. Burns, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

In this way, the Individual Plaintiffs sustained an injury in fact sufficient to confer standing that does not depend on the arrests of their FLFNB colleagues at the same demonstrations.  What's more, those arrests provide an additional basis for standing, even though the Individual Plaintiffs were not personally arrested or cited.  "[S]tanding exists at the summary judgment stage when the plaintiff has submitted evidence indicating 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution.'"  Bischoff, 222 F.3d at 884 (quoting Wilson v. State Bar of Ga., 132 F.3d 1422, 1428 (11th Cir. 1998)); see also Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158–59 (2014).

Each Individual Plaintiff has declared under penalty of perjury that he or she will continue to participate in FLFNB's protected food-sharing demonstrations in Stranahan Park, and there is no dispute that this conduct is arguably proscribed by the Park Rule (and was proscribed by the Ordinance when it was in effect).  Of course, the threat of prosecution must be "genuine," not "imaginary" or "speculative," Leverett v. City of Pinellas Park, 775 F.2d 1536, 1538 (11th Cir. 1985), but the Individual Plaintiffs easily meet this requirement.  Each directly witnessed the police arrest and/or cite their co-demonstrators or others under the Ordinance and the Park Rule.  Citations issued to the Individual Plaintiffs' fellow demonstrators referenced both the Ordinance and the Park Rule.  These arrests and

citations of the Individual Plaintiffs' "companion[s]" render the threat of

enforcement "non-chimerical." Susan B. Anthony List, 573 U.S. at 159

(describing Steffel v. Thompson, 415 U.S. 452, 459 (1974)); cf. Bischoff, 222 F.3d

at 884–85 (plaintiffs who were threatened with arrest and whose co-demonstrators

were actually arrested suffered injury in fact).

   *2. FLFNB.* FLFNB does not claim that it has associational standing to sue

on behalf of its members; rather it claims "standing in its own right." Havens

Realty Corp. v. Coleman, 455 U.S. 363, 378 (1982).  An advocacy organization

like FLFNB suffers injury in fact when the defendant's conduct "perceptibly

impair[s] [the organization's] ability" to carry out its mission, including by causing

"drain on the organization's resources." Id. at 379; see also Fla. State Conf. of

N.A.A.C.P. v. Browning, 522 F.3d 1153, 1165 (11th Cir. 2008) ("[A] n

organization has standing to sue on its own behalf if the defendant's illegal acts

impair its ability to engage in its projects by forcing the organization to divert

resources to counteract those illegal acts.").

   It is undeniable, as the district court found, that the City's enforcement of the

Ordinance and the Park Rule "impair[ed]" FLFNB's "ability to engage in its

projects" -- food-sharing demonstrations to criticize society's allocation of

resources between food and war -- in a number of ways.  Most directly, the police

shut down an FLFNB food-sharing demonstration on November 7, 2014.  This

blocked FLFNB from holding its traditional post-meal organizational meeting in Stranahan Park and cut short an exercise of its chief means of advocacy.  See Havens, 455 U.S. at 379 (plaintiff organization suffered injury where challenged practices impaired its ability "to provide counseling and referral services for low- and-moderate-income homeseekers").  Moreover, the challenged regulations caused FLFNB to expend resources in the form of volunteer time, including efforts to collect bail money and organize legal representation for its members who were arrested under the Ordinance and the Park Rule.  The threat of arrest also has practically hindered would-be volunteers from participating in FLFNB demonstrations.  Thus, for example, FLFNB had to stop accepting high school volunteers because it did not want to risk subjecting them to criminal liability. These injuries will continue, because FLFNB continues to hold demonstrations under the threat of Park Rule enforcement.

FLFNB volunteers who would have normally worked on preparing for food- sharing demonstrations had to divert their energies to advocacy activities such as attending City meetings and organizing protests against the Ordinance, as well as arranging for transportation and supplies for these events.  FLFNB's Rule 30(b)(6) representative unambiguously testified that this "drew away time and resources from free time we would be spending on preparing for . . . feedings."  See Fla. State Conf. of N.A.A.C.P., 522 F.3d at 1165–66 (organization suffered injury in

fact from anticipated diversion of "personnel and time to educating volunteers and voters on compliance with" a challenged law). In the face of these injuries, the fact that FLFNB has continued to hold food sharings in Stranahan Park since the enactment of the Ordinance does not deprive it of standing.

Nor, as the City suggests, does the fact that FLFNB is an informal organization with no formative documents, formal leadership offices, or written proof of membership. The City has not offered any authority to suggest that an unincorporated association's informal structure somehow renders it incapable of sustaining actual and concrete injury. To the contrary, unincorporated associations by their nature lack a charter and often lack formal organizational structures. See S. Cal. Darts Ass'n v. Zaffina, 762 F.3d 921, 931 (9th Cir. 2014) ("[A]n 'unincorporated association' is a 'voluntary group of persons, without a charter, formed by mutual consent for the purpose of promoting a common objective.'") (citation omitted). This does not block them from seeking redress for injuries they may sustain. See Thompson v. Metro. Multi-List, Inc., 934 F.2d 1566, 1571 (11th Cir. 1991) ("Empire is an unincorporated association. As such, it has standing to allege . . . injuries suffered directly by the organization."). On this record as a whole, FLFNB's relaxed organizational style does not denude it of standing.

III.

A.

To take stock so far, the Plaintiffs have standing to bring the following

justiciable claims: for declaratory and injunctive relief against the Park Rule, and

for compensatory damages with respect to both the Ordinance and the Park Rule.

Our next step would normally be to examine the merits of the Plaintiffs' arguments

that the Ordinance and the Park Rule are unconstitutional.  But there is a twist here.

As we see it, we need not, and therefore do not, pass upon the validity of the

Ordinance.  The Ordinance was repealed on November 7, 2017.  And the validity,

vel non, of the Ordinance has no bearing on the Plaintiffs' claims for past damages.

This is because the Plaintiffs' damages claims with respect to the Ordinance -- the

only Ordinance claims left -- are coextensive with their damages claims arising out

of the enforcement of the Park Rule.  The City enforced the Ordinance and the

Park Rule as one, so reviewing the constitutionality of the Park Rule is all we must

do in order to determine whether the Plaintiffs may be entitled to damages based

on the City's enforcement actions.  Because, as we will explain, the Park Rule

violates the First Amendment as applied to the Plaintiffs, a ruling on the Ordinance

provides no further benefit to the Plaintiffs.  Deciding the constitutionality of the

repealed Ordinance would therefore be an unnecessary exercise of our authority to

interpret the Constitution.  "Generally, we don't answer constitutional questions

that don't need to be answered."  Burns v. Town of Palm Beach, 999 F.3d 1317,

1348 (11th Cir. 2021); see Lyng v. Nw. Indian Cemetery Protective Ass'n, 485

U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial

restraint requires that courts avoid reaching constitutional questions in advance of

the necessity of deciding them.").

To explain, the core of the Plaintiffs' theory of damages is that they were

forced to exercise their First Amendment rights under the fear of City sanction.

The Ordinance and the Park Rule operated together to inflict this fear, so reserving

judgment on the Ordinance will not affect the Plaintiffs' pursuit of compensatory

damages.  The Plaintiffs explain that they "fear future harassment, arrest and

prosecution for continuing to engage in their weekly demonstrations at Stranahan

Park."  They also complain of associated "impairment of reputation, emotional

distress, and loss of protected constitutional freedoms."  Thus, for example,

plaintiff William Toole declared that "[i]f the City resumes enforcement of the

Ordinance and Park Rule, as I anticipate it will, I and other members of [FLFNB]

will continue to face the possibility of receiving criminal citations for engaging in

political expression, citations carrying a potential penalty of a $500.00 fine, 60

days in jail, or a combination of the two."  As an organization, plaintiff FLFNB

suffered similar damages because "people who want to associate with [FLFNB] for

purposes of engaging in [its] weekly political demonstrations do so by assuming a risk of citation or arrest."

A violation of the Ordinance and a violation of the Park Rule each carry the same penalty.  The City could impose the specific penalties Toole and the other plaintiffs fear -- a $500.00 fine and 60 days in jail -- either for a violation of the Ordinance (when it was in effect) or for a violation of the Park Rule.  Those convicted of violating the Ordinance "shall . . . be punished as provided in Section 1-6 . . . of the Code."  § 47-34.2(C).  Section 1-6 of the Code provides for a $500 fine or 60-day imprisonment punishment.  City Code § 1-6(c).

Meanwhile, Park Rule 2.2 prohibits social services in City parks without the City's permission.  Section 11.0 of the Park Rules deals with enforcement. Specifically, § 11.3, entitled "Trespass," says that "[a]ny person or group found in violation of [any Park Rule] shall be ordered to leave all [City parks] for a minimum 24-hour period.  Any person who fails to leave all City [parks] at the time requested may be arrested and prosecuted for trespassing or prosecuted under other existing ordinances."  This directs us to the "Trespassing" section of the City Code, which incorporates the punishment found in City Code § 1-6, the same penalty section incorporated into the Ordinance: "[v]iolators of this section shall be deemed trespassers and subject to punishment as provided in section 1-6 of this Code."  City Code § 16-26 (Trespassing).  Just as it does for violations of the

outdoor food distribution Ordinance, Section 1-6 provides for a fine up to $500 or up to 60 days in jail for Park Rule violations.  City Code § 1-6(c).  This identity in the available sanction makes sense, because the City enacted the Ordinance at least in part in an effort to bring itself into compliance with the 2000 state-court injunction against the Park Rule, "thereby permitting the resumption of enforcement of the Park Rule."

To support their fears of enforcement, the Plaintiffs identify five instances when the City arrested or cited fellow demonstrators in the Plaintiffs' presence.  The arrest documents for four of these demonstrators cite both the Ordinance and the Park Rule.  Thus, the Park Rule was an important element in most of the arrests that give rise to the Plaintiffs' claimed damages, namely their fear of arrest and prosecution for engaging in protected expression.  Indeed, on November 7, 2014, the same day as the initial arrests, the City's Public Information Officer announced that the City would not allow food sharing in Stranahan Park even pursuant to the conditions of the Ordinance "because social services activities are not allowed to be conducted in our parks per Rule 2.2 of the Parks and Recreation Rules and Regulations."  The City's policy of policing food sharing in Stranahan Park -- the source of the Plaintiffs' fear-based damages -- did not depend on the Ordinance.  In the City's own words, it arose alternatively, and independently, from the Park Rule.

It is true that the record does not indicate that the City ever brought any formal prosecutions under the Park Rule.  But the City ultimately dropped all but one of the prosecutions it brought under the Ordinance (one individual pleaded no contest and served ten hours of community service), so the absence of filed Park Rule prosecutions does not drive a meaningful wedge between any damages the Plaintiffs sustained from the enforcement of the Park Rule and any monetary damages arising from the enforcement of the Ordinance.

The Ordinance and the Park Rule operated in tandem and were enforced together against FLFNB's demonstrations.  The Plaintiffs acknowledge as much in their complaint: "[v]iolation of the Park Rule is a violation of the [O]rdinance because both require written permission from the City to share food in a City park."  The Plaintiffs' alleged damages all stem from a single root: the City's enforcement of the Park Rule.[2]  Succeeding in their constitutional claim against the Park Rule would allow the Plaintiffs to proceed in their quest for damages based on this enforcement.  Succeeding in their constitutional claim against the

---

[2] Some of the Plaintiffs' filings also might be read to claim damages that do not relate to fears of arrest, but rather to costs incurred in protesting the enactment of the Ordinance.  Even these alleged damages stem from the enforcement of the Park Rule.  The materials for one of the City meetings FLFNB attended in protest explained that the City wished to pass the Ordinance so that it could resume enforcement of the Park Rule.  So FLFNB allegedly expended resources to fight the Park Rule just as much as it did to fight the Ordinance.  Of course, nothing in this opinion should be taken to suggest that the Plaintiffs will ultimately be able to prove compensatory damages or even the required causation.  We observe only that the damages, as alleged, stem as much from the Park Rule as they do from the Ordinance.

Ordinance would not entitle them to anything more because their Ordinance-based damages theories invoke the same set of harms.  Cf. Patterson v. Balsamico, 440 F.3d 104, 113–14 (2d Cir. 2006) (nominal damages award was "contingent on the injuries suffered by [the plaintiff] rather than the number of statutes under which [the defendant was] liable").

And as we shall see, it is not especially difficult to conclude that the Park Rule cannot pass First Amendment muster as applied to these Plaintiffs.[3]  The Ordinance, however, presents a closer and more difficult question.  On the one hand, it presents serious constitutional issues arising out of its arduous permitting process and a fee that can rise as high as $6,000 subject to City officials' unfettered discretion.  And, at least arguably, the Ordinance effectively bans the Plaintiffs' expression in all City parks; the City did not take advantage of narrower potential alternatives such as allowing demonstrations in particular parks or permitting organizations to hold a limited number of annual food-sharing events as of right.  See First Vagabonds Church of God, 638 F.3d at 758 (upholding similar Orlando ordinance with these features).  On the other hand, the City has a substantial

---

[3] The Plaintiffs also purport to bring a facial challenge to the Park Rule.  But they have not shown that the Park Rule prohibits a substantial amount of protected conduct, especially since most of the social service park uses the Park Rule regulates will have no expressive component at all.  See Doe v. Valencia Coll., 903 F.3d 1220, 1232 (11th Cir. 2018).  Therefore, we follow FLFNB I and treat the Plaintiffs' challenge only as an as-applied one.  See 901 F.3d at 1241 ("Whether food distribution or sharing can be expressive activity protected by the First Amendment under particular circumstances is a question to be decided in an as-applied challenge.") (citation omitted and alterations accepted).

interest in managing its park property, see id. at 761, and the Ordinance (unlike the Park Rule) provides clear and objective standards to guide the City's permitting decisions, such as the requirement that each food sharing use must be at least 500 feet away from any other.

The resolution of these issues does not matter here. The Ordinance has been repealed, and its validity does not bear on the Plaintiffs' quest for damages. Since the repeal of the Ordinance renders its validity a wholly academic question, in keeping with the judicial restraint principals of constitutional avoidance, we do not answer it.[4]  See Lyng, 485 U.S. at 446 (lower courts should have answered a constitutional question only if "a decision on that question could have entitled [the plaintiffs] to relief beyond that to which they were entitled on their statutory claims"); Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 347 (1936) (courts "will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of"); Boss Cap., Inc. v. City of Casselberry, 187 F.3d 1251, 1254 (11th Cir. 1999) ("[I]t is our custom not to decide difficult constitutional questions unless we must."), abrogated on other grounds by City of Littleton v. Z.J. Gifts D-4, L.L.C., 541 U.S. 774 (2004).

---

[4] For similar reasons, we do not reach the Plaintiffs' alternative theories for why the Park Rule is unconstitutional, namely their expressive association, vagueness, and prior restraint theories.

B.

Finally, we come to the merits of the Plaintiffs' as-applied challenge to the

Park Rule.  Our review of the district court's summary judgment holding that the

Park Rule was constitutional is de novo.  FLFNB I, 901 F.3d at 1239.  We draw all

reasonable inferences in the light most favorable to the Plaintiffs, the non-moving

parties.  Id.

But first, we pause to clarify what is not up for debate in this appeal.  In

FLFNB I, a panel of this Court held that FLFNB's food-sharing demonstrations in

Stranahan Park are expressive conduct protected by the First Amendment.  Id. at

1245.  This holding binds us under both the law of the case doctrine, see Rath v.

Marcoski, 898 F.3d 1306, 1312 (11th Cir. 2018), and our Court's prior precedent

rule, Andrews v. Biggers, 996 F.3d 1235, 1236 (11th Cir. 2021).  The sole

remaining question for us, then, is whether the Park Rule's regulation of this

protected conduct passes First Amendment scrutiny.

To answer this question, we must first decide whether the Park Rule is

content neutral or content based, for a content-neutral regulation of expressive

conduct is subject to intermediate scrutiny, while a regulation based on the content

of the expression must withstand the additional rigors of strict scrutiny.  See Texas

v. Johnson, 491 U.S. 397, 403–04 (1989); Burk v. Augusta-Richmond Cnty., 365

F.3d 1247, 1255 (11th Cir. 2004).  As we explain, the Park Rule is content neutral.

49

So, we only apply intermediate scrutiny.  Specifically, we apply the <u>United States</u> <u>v. O'Brien</u>, 391 U.S. 367 (1968), test for content-neutral regulations of expressive conduct and ask whether the Park Rule "is narrowly drawn to further a substantial governmental interest . . . unrelated to the suppression of free speech."  <u>Clark v.</u> <u>Cmty. for Creative Non-Violence</u>, 468 U.S. 288, 294 (1984) (citing <u>O'Brien</u>, 391 U.S. at 377).

Alternatively, we evaluate the Park Rule as a time, place, and manner restriction on expressive conduct.  This sort of law also must be "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information."  <u>Clark</u>, 468 U.S. at 293.  These standards substantially overlap and yield the same result in this case.  Either way, the Park Rule violates the First Amendment as applied to the Plaintiffs' food-sharing events.

*1. Content Neutrality.*  <u>Johnson</u> instructs us that a regulation of expressive conduct is content neutral if the justification for the regulation is unrelated to the suppression of free expression.  491 U.S. at 403.  Even a content-neutral purpose, however, cannot save a regulation that "'on its face' draws distinctions based on the message a speaker conveys."  <u>Reed v. Town of Gilbert</u>, 576 U.S. 155, 163–64 (2015).

The Park Rule does not draw content-based distinctions on its face:

> Parks shall be used for recreation and relaxation, ornament, light and air for the general public.  Parks shall not be used for business or social service purposes unless authorized pursuant to a written agreement with City.  As used herein, social services shall include, but not be limited to, the provision of food, clothing, shelter or medical care to persons in order to meet their physical needs.

The Rule applies not just to food sharing events but also to a host of other social services, including the provision of clothing, shelter, and medical care.  These services usually do not involve expressive conduct.  Even most social-service food sharing events will not be expressive.  See FLFNB I, 901 F.3d at 1242 (holding that FLFNB's food sharing was protected expressive conduct only after a close examination of the specific context surrounding the events).  That the Park Rule regulates a range of activity, most of which has no expressive content at all, suggests its application does not vary based on any message conveyed.  The Rule does not single out messages which relate to food or the importance of sharing food with the homeless.

Instead, the Park Rule's application to food sharing (and other services) turns on whether the services are provided "in order to meet [the recipients'] physical needs."  This distinction does not depend on the content of the message associated with any food sharing that happens to be expressive.  The Park Rule (at least in the City's view) applies to FLFNB's sharing of low-cost food with the homeless in order to communicate a message about the societal allocation of resources between food and the military, but it would also apply to an organization

51

that shared low-cost food with the homeless in order to communicate that the City's homeless shelters serve food that lacks vital nutrients.  It would likewise apply to an organization that shared low-cost food with struggling veterans in order to emphasize the debt our society owes for their sacrifice, and so on.  Indeed, it would apply to organizations that share food with those in need to communicate any number of messages.  Simply put, the Rule does not "draw[] distinctions based on [any] message" food-sharers convey.  Reed, 576 U.S. at 163.

The Plaintiffs rely on Reed's allusion to the possibility that some facial distinctions might be content based because they define "regulated speech by its function or purpose" to argue that the Park Rule's social-service-purpose distinction is content based.  Id. at 163–64.  But we have characterized this language in Reed as "dicta."  Harbourside Place, LLC v. Town of Jupiter, 958 F.3d 1308, 1319 (11th Cir. 2020).  In any event, as just described, the purpose on which the regulatory definition turns -- sharing food to provide for physical welfare -- is not one that draws a distinction based on the content of any expression.  See Recycle for Change v. City of Oakland, 856 F.3d 666, 671 (9th Cir. 2017) (holding, after Reed, that a regulation that applied to unattended donation boxes that collected personal items "for the purpose of distributing, reusing, or recycling those items" did not turn on "communicative content"); Josephine Havlak Photographer, Inc. v. Vill. of Twin Oaks, 864 F.3d 905, 915 (8th Cir. 2017)

(regulation that applied to photography for commercial purposes, but not non-commercial purposes, was not content based under <u>Reed</u>).  To be sure, it seems likely that most expressive food sharings subject to the Park Rule's regulation will involve some sort of message related to the importance of sharing food with those in need.  "But a facially neutral law does not become content based simply because it may disproportionately affect speech on certain topics."  <u>McCullen v. Coakley</u>, 573 U.S. 464, 480 (2014).

Likewise, the City's justifications for the Park Rule do not relate to content.  "A regulation that serves purposes unrelated to the content of expression is deemed [content] neutral, even if it has an incidental effect on some speakers or messages but not others."  <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989).  The City enacted the Park Rule, and the Ordinance designed to facilitate its enforcement, in order to address a series of problems associated with large group food events in public parks, including loitering and crowds, trash build-up, noise, and food safety issues, as well as to ensure that similar uses of public property did not concentrate in one area.  Citizens had complained about some of these problems in connection with food-sharing events.  In January 2014, the City Commission held a workshop on homelessness in the community where stakeholders debated public food distribution and related topics.  More generally, the Ordinance states that its purpose is "to regulate social service facilities in order

to promote the health, safety, morals and general welfare of the residents of the City of Fort Lauderdale."  (This statement illuminates the Park Rule's purpose as well, since the City enacted the Ordinance so that it could resume enforcement of the Park Rule.)

These concerns, which boil down to an interest in maintaining public parks and other property in a pleasant, accessible condition, are not related to the suppression of the Plaintiffs' (or any other party's) expression, so they are content neutral.  See First Vagabonds Church of God, 638 F.3d at 762 ("[T]he interest of the City in managing parks and spreading large group feedings to a larger number of [locations] is unrelated to the suppression of speech."); see also McCullen, 573 U.S. at 480–81 (public safety, the need to protect security, and regulation of congestion are content-neutral concerns); Ward, 491 U.S. at 797 ("The city enjoys a substantial interest in ensuring the ability of its citizens to enjoy whatever benefits the city parks have to offer, from amplified music to silent meditation.").

One could phrase the City's motives in terms that are perhaps less flattering. The district court said the City was concerned "that food sharing as a social service attracts people who act in ways inimical to" keeping parks safe, clean and enjoyable; the Plaintiffs put a finer point on it and accuse the city of "deter[ring] homeless and hungry people from parks because of how they might act."  Fort Lauderdale's elected officials seem to have decided that sharing food with large

groups of homeless people in public parks causes problems that make those parks less useful to the broader public.  But even accepting these descriptions does not alter the First Amendment analysis, which at this stage asks only whether the City's desire to prevent groups of homeless people from gathering in public parks is a goal related to the content of the Plaintiffs' or any other party's expression. The First Amendment does not permit us to go further and comment upon whether this objective is virtuous public policy.  We hold simply that the Park Rule is not related to expressive conduct; it has nothing to do with the Plaintiffs' critique of society's allocation of scarce resources between welfare and defense spending.

The Plaintiffs are wrong to say that the City's concern with the behavior of the crowds that gather at FLFNB expressive food-sharing events is a justification related to "[l]isteners' reaction to speech," which they correctly point out would not be "a content-neutral basis for regulation."  Forsyth Cnty. v. Nationalist Movement, 505 U.S. 123, 134 (1992).  Forsyth and related cases stand for the principle that a city may not regulate speech because it "cause[s] offense or ma[kes] listeners uncomfortable," McCullen, 573 U.S. at 481, or because it might elicit a violent reaction or difficult-to-manage counterprotests, Forsyth Cnty., 505 U.S. at 134.  The City is concerned not that FLFNB's expression will offend or cause violence, but that it will cause the gathering of crowds -- participants in the meals, rather than a bystander audience -- and associated logistical problems such

55

as the accumulation of trash.  Addressing the practical problems crowds pose is a

content-neutral concern.  See McCullen, 573 U.S. at 481 ("Whether or not a single

person reacts to abortion protestors' chants or petitioners' counseling, large crowds

outside abortion clinics can still compromise public safety, impede access, and

obstruct sidewalks."); cf. Coal. for the Abolition of Marijuana Prohibition v. City

of Atlanta, 219 F.3d 1301, 1317–18 (11th Cir. 2000) (a regulation that

distinguished between events based on whether they would require municipal

services to "accommodate . . . large public gatherings" was "justified without

reference to the content of the regulated speech") (emphasis omitted).

    *2. Intermediate Scrutiny.*  Since the Park Rule is a content-neutral regulation

of expressive conduct, it is subject only to intermediate scrutiny, not the more

demanding requirements of strict scrutiny.  Specifically, under United States v.

O'Brien, the Park Rule may regulate the Plaintiffs' expressive food sharing only so

long as food sharing "itself may constitutionally be regulated" (no one has

suggested it may not) and the Park Rule "is narrowly drawn to further a substantial

governmental interest" that is "is unrelated to the suppression of free speech."

Clark, 468 U.S. at 294 (1984) (citing O'Brien, 391 U.S. 367, 377 (1968)).

    The City does have a "substantial interest in ensuring the ability of [its]

citizens to enjoy whatever benefits the city parks have to offer."  Ward, 491 U.S. at

797.  More specifically, the Park Rule seeks to further the City's "substantial

interest in managing park property and spreading the burden of large group

feedings throughout a greater area." First Vagabonds Church of God, 638 F.3d at

762.  As we have explained, the regulations are concerned with avoiding

concentration of similar park uses and with sanitation and other logistical problems

that crowded food distribution events cause -- substantial government interests that

are unrelated to the suppression of free speech.

However, the Park Rule is not narrowly tailored to the City's interest in park

maintenance.  Under intermediate scrutiny, the regulation "'need not be the least

restrictive or least inclusive means' of serving the government's interests."

McCullen, 573 U.S. at 486 (citation omitted).  Rather, "the requirement of narrow

tailoring is satisfied 'so long as the regulation promotes a substantial governmental

interest that would be achieved less effectively absent the regulation,'" and "the

means chosen are not substantially broader than necessary to achieve the

government's interest." Ward, 491 U.S. at 799–800 (citation omitted and

alterations accepted).

Fatally, the Park Rule imposes a permitting requirement without

implementing any standards to guide City officials' discretion over whether to

grant a permit.  The Rule bans social-service food sharings in City Parks "unless

authorized pursuant to a written agreement with City."  That's it.  Under the terms

of the Rule, a City official may deny a request for permission to hold an expressive

food sharing event in the Park because he disagrees with the demonstration's message, because he doesn't feel like completing the necessary paperwork, because he has a practice of rejecting all applications submitted on Tuesdays, or for no reason at all.  In a word, the complete lack of any standards allows for arbitrary enforcement and even for discrimination based on viewpoint.

Generally, subjecting protected expression to an official's "unbridled discretion" presents "too great" a "danger of censorship and of abridgment of our precious First Amendment freedoms."  Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 553 (1975).  "[D]istaste for [such] censorship -- reflecting the natural distaste of a free people -- is deep-written in our law."  Id.  It comes as no surprise, then, that "a long line" of Supreme Court decisions makes it abundantly clear that a regulation which "makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official -- as by requiring a permit or license which may be granted or withheld in the discretion of such official -- is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms."  Shuttlesworth v. City of Birmingham, 394 U.S. 147, 151 (1969) (quoting Staub v. City of Baxley, 355 U.S. 313, 322 (1958)).

The facts of Shuttlesworth illustrate the point.  A Birmingham, Alabama ordinance empowered the city commission to deny parade permits whenever they thought it necessary for "public welfare," "decency," "morals, or "convenience."

Id. at 148–50.  In 1963, city officials used this ordinance to arrest and prosecute

participants in a peaceful civil rights march held without a license, including Rev.

Fred Shuttlesworth.  Id.  But the Supreme Court invalidated Shuttlesworth's

conviction.  Id. at 159.  The risk that the ambiguity in the licensing regime would

permit officials to target individuals, like Shuttlesworth, on the basis of their

disfavored expression was too great for the First Amendment to bear.

The reasoning of these prior restraint cases controls the as-applied narrow

tailoring inquiry we conduct in this case: "[e]xcessive discretion over permitting

decisions is constitutionally suspect because it creates the opportunity for

undetectable censorship and signals a lack of narrow tailoring."  Burk, 365 F.3d at

1256.  The Park rule does not even supply malleable standards like those found in

Shuttlesworth; it doesn't provide any standards at all.  As applied to the Plaintiffs'

protected expression, the Park Rule fails First Amendment scrutiny.

Moreover, the Park Rule's sweeping grant of discretion to City permitting

officials is not necessary to further the City's interests in crowd control and park

conservation.  The government "may not regulate expression in such a manner that

a substantial portion of the burden on speech does not serve to advance its goals."

McCullen, 573 U.S. at 486 (citations omitted).  Of course, the mere availability of

less restrictive alternatives will not cause a regulation to fail narrow tailoring

scrutiny, and we may not "replace the City as the manager of its parks."  First

Vagabonds Church of God, 638 F.3d at 762 (citation omitted and alterations accepted).  But an abundance of targeted alternatives may indicate that a regulation is broader than necessary.  See McCullen, 573 U.S. at 490–94  (relying in part on available alternatives to conclude that a regulation of speech near abortion clinics burdened more speech than necessary).

The Park Rule amounts to an outright ban on public food sharing in all of Fort Lauderdale's parks; any exception is subject only to the standardless whims of City permitting officials.  For a model of a narrower regulation targeting more or less the same interests, the City need only have looked 218 miles to the northwest.  In First Vagabonds Church of God, we upheld an Orlando regulation that permitted public food distribution without a license in sixty-six parks.  638 F.3d at 761.  For the group of forty-two parks in the central downtown district near City Hall, each organization was entitled to two licenses per year.  Id.  And the Orlando ordinance applied only to events likely to attract twenty-five or more people.  Id. at 759.

Fort Lauderdale offers no reason it could not have similarly narrowed the Park Rule's permission requirement or tailored it in some other way.  Thus, for example, in addition to adding "narrowly drawn, reasonable and definite standards" to guide officials' permitting discretion, Forsyth Cnty., 505 U.S. at 133 (citation omitted), the City could have required permission only for events likely to attract groups exceeding a certain size.  Or it could have required City permission

60

only for certain parks.  Central to the City's conclusion that public food distribution causes problems in parks is a collection of seven citizen and organizational complaints about food-sharing events.  Six of these are specific to the downtown Fort Lauderdale area.  The City could have required permission only in downtown parks or designated limited areas within parks for sharing food.  See McCullen, 573 U.S. at 493 (evidence of disruptive demonstrations at a single Boston clinic did not justify a statewide regulation of demonstrations at abortion clinics); see Clark, 468 U.S. at 295 (rejecting challenge to a limited ban on camping in Washington, D.C.'s Lafayette Park as applied to an anti-homelessness demonstration; the Park Service allowed camping in designated areas in other parks); Smith v. City of Fort Lauderdale, 177 F.3d 954, 956–57 (11th Cir. 1999) (upholding ban on begging that applied only to a five-mile "designated, limited beach area" and did not ban begging in "many other public fora").  The City also might have allowed groups like FLFNB a limited annual number of food distribution events in Stranahan Park as of right.  Again, we do not presume to tell the City exactly how it should manage its parks; all this is only to say that the Park Rule's utterly standardless permission requirement is "substantially broader than necessary to achieve" the City's interest in maintaining its parks.  Ward, 491 U.S. at 782–83.  The Park Rule therefore cannot qualify as a valid regulation of the Plaintiffs' expressive conduct.

Alternatively, we evaluate the Park Rule under <u>Clark</u>'s standard for time place, and manner restrictions.  A content-neutral law regulating the time, place, and manner of expression in a public forum must be "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information."  <u>Clark</u>, 468 U.S. at 293.  Stranahan Park is "an undisputed public forum."  <u>FLFNB I</u>, 901 F.3d at 1238.  We underscore that parks "occupy a special position in terms of First Amendment protection because of their historic role as sites for discussion and debate."  <u>McCullen</u>, 573 U.S. at 476 (quotation omitted); <u>United States v. Grace</u>, 461 U.S. 171, 177 (1983) (Public parks are "historically associated with the free exercise of expressive activities."); <u>Hague</u>, 307 U.S. at 515 (opinion of Roberts, J.) ("Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.  Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.").  "[T]he government's ability to permissibly restrict expressive conduct" in Stranahan Park is therefore "very limited."  <u>Grace</u>, 461 U.S. at 177.  But the government nevertheless "may enforce reasonable time, place, and manner regulations" on expression in the park.  <u>See</u> <u>id.</u>

As a practical matter, there is little difference between this standard and the

O'Brien test we have just discussed, and, in any event, they yield the same result in

this case.  Clark, 468 U.S. at 298 (observing that the O'Brien standard "is little, if

any, different from the standard applied to time, place, or manner restrictions"); see

First Vagabonds Church of God, 638 F.3d at 761–62 (analyzing a similar

ordinance under both standards).  Both require that the regulation be narrowly

tailored to serve a significant government interest.  Clark, 468 U.S. at 293, 298.

Just as it does under O'Brien, the Park Rule's grant of standardless discretion to

the City's permitting officials causes it to fail time, place, and manner scrutiny:

"[a] government regulation that allows arbitrary application is 'inherently

inconsistent with a valid time, place, and manner regulation because such

discretion has the potential for becoming a means of suppressing a particular point

of view.'"  Forsyth Cnty., 505 U.S. at 130–31 (quoting Heffron v. Int'l Soc'y for

Krishna Consciousness, Inc., 452 U.S. 640, 649 (1981)); Burk, 365 F.3d at 1256

("[T]ime, place, and manner regulations must contain narrowly drawn, reasonable

and definite standards, to guide the official's decision and render it subject to

effective judicial review.") (internal quotation marks and citations omitted).  Since

the Park Rule fails because it is not narrowly tailored, we need not address whether

it leaves open ample alternative channels for the communication of the Plaintiffs'

message.

63

The long and short of it is that the Park Rule as applied to the Plaintiffs'
expressive food sharing activities violates the First Amendment.  Accordingly, we
**REVERSE** the district court's summary judgment order and **REMAND** for
further proceedings consistent with this opinion.

## REVERSED AND REMANDED.

HULL, Circuit Judge, with whom LAGOA, Circuit Judge, joins, concurring:

I concur in full in the panel opinion.  I write separately to emphasize that this is the second appeal in this case and that our panel is bound by this Court's holding as to whether the plaintiff FLFNB's food-sharing conduct is sufficiently expressive to warrant First Amendment protection.  See Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale, 901 F.3d 1235 (11th Cir. 2018).

In that prior appeal, this Court held that, "on this record," the nature of the plaintiff FLFNB's weekly food-sharing activity in a public park, "combined with the factual context and environment in which it was undertaken," led to the conclusion that FLFNB's food sharing conduct "express[es] an idea through [that] activity," conveys "some sort of message" to a reasonable observer, and constitutes "a form of protected expression" under the First Amendment.  Id. at 1240–45 (quotation marks omitted).  This holding relied on a well-developed factual record about the plaintiff FLFNB's many years of food-sharing events (1) that are held in the City's Stranahan Park, a public forum where the homeless congregate, and (2) that are accompanied by FLFNB's banners and distribution of literature.  Id. As the panel opinion points out, "most social-service food sharing events will not be expressive."  Maj. Op. at 51.  Here, however, we are bound by the holding in the prior appeal that was based on a particular and extensive list of factual circumstances.