UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

THE NEW GEORGIA PROJECT, et al.,

       Plaintiffs,

     v.

BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State, et al.,

       Defendants.

CIVIL ACTION NO.
1:21-cv-01229-JPB

## **ORDER**

Before the Court are the following motions:

1. Defendants Brad Raffensperger, Rebecca Sullivan, David Worley, Sara Tindall Ghazal, Matthew Mashburn and Anh Le's (collectively "State Defendants") Motion to Dismiss Plaintiffs' First Amended Complaint (ECF No. 45);

2. Defendant Gregory Edwards' ("Edwards") Motion to Dismiss Plaintiffs' First Amended Complaint (ECF No. 53);[1]

3. Defendants Margaret Bentley, Glenda Henley, Betty Bryant, Vera McIntosh and Roy McClain's (collectively the "Spalding County Defendants") Motion to Dismiss Plaintiffs' First Amended Complaint (ECF No. 55);

---

[1] Edwards is sued in his official capacity as the District Attorney of Dougherty County.

4. Defendant Keith Gammage's ("Gammage") Motion to Dismiss (ECF No. 57);[2]

5. Defendants Alex Wan, Mark Wingate, Aaron Johnson, Kathleen Ruth and Vernetta Keith Nurridin's (collectively the "Fulton County Defendants") Motion to Dismiss Plaintiffs' First Amended Complaint (ECF No. 61);

6. Defendants Republican National Committee, National Republican Senatorial Committee, National Republican Congressional Committee and Georgia Republican Party, Inc.'s (collectively "Intervenor Defendants") Motion to Dismiss (ECF No. 73); and

7. Defendants Charles Dave, Zurich Deshazior, Don Istefano and Karen Murray's (collectively the "Brooks County Defendants") Motion to Dismiss Plaintiffs' First Amended Complaint (ECF No. 74).[3]

Having fully considered the papers filed therewith, the Court finds as follows:

## I.   **BACKGROUND**

Plaintiffs The New Georgia Project, Black Voters Matter Fund, Rise, Inc., Elbert Solomon, Fannie Marie Jackson Gibbs and Jauan Durbin (collectively "Plaintiffs") filed this action seeking injunctive and declaratory relief with respect to certain provisions of Georgia Senate Bill 202 ("SB 202").[4]  Governor Brian Kemp signed SB 202 into law on March 25, 2021, and the challenged provisions

---

[2] Gammage is sued in his official capacity as the Solicitor General of Fulton County.

[3] The Spalding County Defendants, Fulton County Defendants and Brooks County Defendants are collectively referred to as "County Defendants."  State Defendants, County Defendants and Intervenor Defendants are collectively referred to as "Defendants."

[4] Plaintiffs amended their Complaint on May 17, 2021.

2

regulate election-related processes and activities ranging from absentee ballot voting to out-of-precinct in-person voting.

Plaintiffs allege that the challenged provisions violate the United States Constitution, the Voting Rights Act and/or the Civil Rights Act.  Specifically, Plaintiffs oppose the specified regulations on the following grounds: discrimination, undue burden on the right to vote, immaterial voting requirement and abridgement of free speech, expression and association.

## II.   DISCUSSION

All County Defendants move to dismiss the Amended Complaint on standing grounds; Spalding County Defendants additionally assert arguments based on the sufficiency of process and failure to join an indispensable party; Intervenor Defendants challenge Plaintiffs' claims on the merits only; State Defendants seek dismissal both on standing grounds and on the merits; Edwards joins the State Defendants' motion; and Gammage separately seeks dismissal on standing grounds.[5]

---

[5] Count IV of the Amended Complaint alleges claims solely against Gammage and Edwards related to SB 202's line warming prohibition.  "Line warming" refers to the provision of refreshments, such as food and drinks, to voters standing in line to vote at a polling place.  *See generally* Am. Compl. ¶ 187, ECF No. 39.

The Court will address the jurisdiction and other threshold questions first. *See Cuban Am. Bar Ass'n v. Christopher*, 43 F.3d 1412, 1422 (11th Cir. 1995) (stating that the Court is obligated "'to ensure it is presented with the kind of concrete controversy upon which its constitutional grant of authority is based'" (quoting *Hallandale Professional Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 759 (11th Cir. 1991))).

## A. Standing[6]

To satisfy standing requirements under Article III of the United States Constitution, a plaintiff must show:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

---

[6] Standing is jurisdictional, *see Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1203 n.42 (11th Cir. 1991), and a motion to dismiss for lack of standing can rest on either a facial or factual challenge to the complaint, *see Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008). In evaluating a facial challenge, a court considers only the allegations in the complaint and accepts them as true, whereas in a factual challenge, a court considers matters outside the pleadings, such as testimony and affidavits. *See Morrison v. Amway Corp.*, 323 F.3d 920, 924 n.5 (11th Cir. 2003). Here, the parties do not reference matters outside the Complaint with respect to their standing arguments. Therefore, the Court will evaluate State Defendants' standing argument as a facial challenge and will limit its analysis to facts alleged in the Complaint.

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).  These requirements ensure federal courts adjudicate only actual "cases" and "controversies."[7]  *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1210 (11th Cir. 2019).

### 1.    Injury

"'[A]n organization has standing to sue on its own behalf if the defendant's illegal acts impair [the organization's] ability to engage in its projects by forcing [it] to divert resources to counteract those illegal acts.'"  *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009) (quoting *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008)).  In *Common Cause/Georgia*, the Eleventh Circuit Court of Appeals found that the plaintiff had established an injury sufficient to challenge a Georgia voting statute because the

---

[7] "Where only injunctive relief is sought, only one plaintiff with standing is required."  *Gwinnett Cnty. NAACP v. Gwinnett Cnty. Bd. of Registration & Elections*, 446 F. Supp. 3d 1111, 1118 (N.D. Ga. 2020) (quoting *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1333 (N.D. Ga. 2018)); *see also, e.g.*, *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981) (finding that it was not necessary to consider the standing of other plaintiffs where standing was established as to one plaintiff); *Glassroth v. Moore*, 335 F.3d 1282, 1293 (11th Cir. 2003) ("Having concluded that those two plaintiffs have standing, we are not required to decide whether the other plaintiff, the one who has not altered his behavior . . . , has standing.").  Therefore, the Court's analysis will focus on one plaintiff for the purpose of deciding the instant motions to dismiss.

plaintiff planned to divert resources from its regular voter registration, mobilization and education activities to a campaign to educate and assist voters in complying with the new voter photo identification requirement under the challenged statute. *See id.*  The court reasoned that this diversion constituted an adequate injury because it would cause the organization's noneconomic goals to suffer.  *See id.* at 1350-51.  Courts have found that a sufficient injury is demonstrated for standing purposes even when the diversion of resources is only "reasonably anticipate[d]." *E.g.*, *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1260 (11th Cir. 2012) (alteration in original) (internal punctuation and citation omitted).

Here, the Amended Complaint alleges that SB 202 will cause Plaintiff Rise, Inc. ("Rise") to divert resources away from its core activities to initiatives that will inform voters of and help them navigate SB 202's changes to the election process. Rise states that it "runs statewide advocacy and voter mobilization programs in Georgia, as well as on a number of campuses nationwide" and that its "mission is to fight for free higher education, end student hunger and homelessness, and increase voting access for college students."  Am. Compl. ¶ 23, ECF No. 39. Rise's "student organizers and volunteers engage in grassroots voter registration, education, and turnout activities, including on-campus get-out-the-vote drives and

canvasses." *Id*. "Rise volunteers also distribute food and water at polling locations to encourage voters to cast their ballots." *Id*.

Rise asserts that SB 202 "frustrates Rise's mission and forces [it] to divert resources, as well as shift the focus of its day-to-day activities" to address SB 202's changes to Georgia's election processes. *Id*. ¶ 24. This includes Rise's "student organizers [who] will be forced to divert resources and day-to-day attention from their college affordability, hunger, and homelessness advocacy programs in Georgia and elsewhere to implement effective voter education and mobilization efforts." *Id*. Rise also asserts that SB 202 prevents one of its normal activities of distributing food and water at the polls for the purpose of encouraging voters to stay in line. *Id*.

Based on these allegations, which are analogous to those asserted by the organization plaintiff in *Common Cause/Georgia*, the Court finds that Rise has alleged a diversion of resources that is sufficient to show an injury for standing purposes.[8] *See Common Cause/Georgia*, 554 F.3d at 1350.

The Court is not persuaded by State and County Defendants' argument that Rise lacks standing because its alleged diversion of resources is not different in

---

[8] Notwithstanding this decision, Plaintiffs will be expected to prove at trial that they have indeed suffered an injury to be entitled to relief. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.21 (1982).

nature from its current work and instead constitutes baseline work it is already doing. *E.g.*, State Defs.' Br. 4-5, ECF No. 45-1. In *Common Cause/Georgia*, the court noted that one of the plaintiffs was "actively involved in voting activities" and planned to divert resources "to educate and assist voters" in complying with the challenged voting identification requirements. 554 F.3d at 1350. In finding that standing was established there, the court focused on the ***diversion*** of resources—the shifting of resources from one activity to another—as the essence of the inquiry and did not mention, much less impose, the counterintuitive requirement that the new activities must further a different purpose within the organization. *Id*. And, as stated above, a reasonably anticipated diversion of resources suffices.

Even the court in *Common Cause Indiana v. Lawson*, which State and County Defendants cite in support of their position, had a "hard time imagining" why "an organization would undertake any additional work if that work had nothing to do with its mission." 937 F.3d 944, 955 (7th Cir. 2019). In the end, the *Common Cause Indiana* court concluded that the voting advocacy organizations had established an injury for standing purposes by showing that they planned to

expand voter education programs, among other things, to counter the effects of the challenged statute.[9] *Id*.

Additionally, State and County Defendants' reliance on *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), is misplaced. The Supreme Court of the United States in *Clapper* found that the plaintiffs lacked standing because the future injury they identified was not certainly impending where they did not have knowledge of the government's enforcement practices relating to the statute, and they could not provide a credible basis for their fear of prosecution under the statute. *Id*. at 411. Unlike in *Clapper*, the key standing question here is whether Rise has demonstrated that SB 202 will cause it to divert resources away from its normal activities, not necessarily whether it faces potential prosecution under SB 202.

The opinion in *Tsao v. Captiva MVP Restaurant Partners, LLC*, 986 F.3d 1332 (11th Cir. 2021), which State Defendants cite as an additional reason to find that Plaintiffs lack standing in this case, similarly does not require a different result. *Tsao* involved an "insubstantial," "non-imminent" and general threat of

---

[9] The only other case State and County Defendants cite in support of their argument—*Georgia Ass'n of Latino Elected Officials, Inc. v. Gwinnett County Board of Registration and Elections*, 499 F. Supp. 3d 1231, 1240 (N.D. Ga. 2020)—is on appeal to the Eleventh Circuit.

identity theft to an individual as a result of a data breach.  *Id.* at 1345.  That type of case is thus quite different from the instant pre-enforcement challenge to SB 202.

In any event, it is well settled that "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging [a] law." *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1304 (11th Cir. 2017) (internal punctuation omitted) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). To the contrary, "'the very purpose of the Declaratory Judgment Act'" is to address the "[t]he dilemma posed by . . . putting the challenger to the choice between abandoning his rights or risking prosecution." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 152 (1967)).  Therefore, courts allow a plaintiff to bring a pre-enforcement suit "when he has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution." *Wollschlaeger*, 848 F.3d at 1304 (internal punctuation omitted) (quoting *Driehaus*, 573 U.S. at 159).  This type of injury is not considered too remote or speculative to support standing.  *See id.* at 1305.

Gammage's additional argument that Plaintiffs cannot show an injury because he has not announced that he will prosecute parties who engage in line

warming lacks merit.  The danger of prosecution is credible and supports standing

where the government has not disavowed prosecuting persons who violate the

challenged legislation.  *See, e.g.*, *Holder v. Humanitarian L. Project*, 561 U.S. 1,

16 (2010) (finding a credible threat of prosecution existed because the government

did not indicate it would forego prosecuting the plaintiffs if they violated the

statute).  In *Wollschlaeger*, the Eleventh Circuit found that the plaintiff doctors had

demonstrated an injury sufficient for the purposes of standing where they

challenged a new statute that prohibited them from discussing firearm safety with

their patients, although they had ceased those discussions as a result of the statute's

enactment.  848 F.3d at 1304.  There, an actual threat of prosecution was not

required for standing, and the court explained that "[w]here the 'alleged danger' of

legislation is 'one of self-censorship,' harm 'can be realized even without an actual

prosecution.'"  *Id*. at 1305 (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S.

383, 393 (1988)).

Here, the Amended Complaint alleges that Rise (and other plaintiffs) engage

in line warming activities throughout Georgia, including in Fulton and Dougherty

counties, where Gammage and Edwards have authority to enforce SB 202.  Am.

Compl. ¶ 25, ECF No. 39.  Gammage confirms that "[t]hroughout his tenure as

Solicitor General, [he] has diligently and effectively prosecuted violations of the

laws of the State of Georgia and Fulton County" but states that he has not "threatened" anyone with prosecution for line warming activities "at this juncture."[10]  *Id*. at 6.  Notably, Gammage not only concedes that he has the authority to prosecute violations of SB 202's line warming prohibition, but he is also silent on whether he intends to prosecute such violations.  Gammage's Br. 5-6, ECF No. 57-1.  Gammage's assertion regarding current prosecution efforts is not enough to deny Plaintiffs standing in this case, and an injury is established in light of SB 202's prohibition of line warming activities.  *See, e.g.*, *Doe v. Bolton*, 410 U.S. 179, 188 (1973) (finding that the plaintiffs had standing to challenge the statute, "despite the fact that the record [did] not disclose that any one of them ha[d] been prosecuted, or threatened with prosecution, for violation of the [challenged statute]," because the statute operated to bar the actions they wished to take).

    *Younger v. Harris*, 401 U.S. 37, 42 (1971), which Gammage cites, is inapposite because in that case, the plaintiffs did not allege that they would be prosecuted for the proscribed conduct.  They claimed only that they felt "inhibited" by the mere presence of the statute.  *Id*.  The Supreme Court found that such a claim was not concrete enough to support standing.  *Id*.  The circumstances in

---

[10] Edwards does not address this point.

*Younger* were quite different from the allegations here that Plaintiffs have engaged

in line warming activities in the past, but those activities now directly violate SB

202 with corresponding penalties.

## 2.   Traceability and Redressability[11]

It is well-settled that "[t]o satisfy the causation requirement of standing, a

plaintiff's injury must be 'fairly traceable to the challenged action of the defendant,

and not the result of the independent action of some third party not before the

court.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020)

(quoting *Lujan*, 504 U.S. at 560).  Further, "it must be *the effect of the court's*

*judgment on the defendant*—not an absent third party—that redresses the

plaintiff's injury, whether directly or indirectly."  *Lewis v. Governor of Ala.*, 944

F.3d 1287, 1301 (11th Cir. 2019) (internal punctuation omitted) (quoting *Digit.*

*Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015)).

Therefore, the court must be satisfied that a decision in the plaintiff's favor would

"significantly increase the likelihood that [the plaintiff] would obtain relief that

---

[11] State Defendants do not address the traceability and redressability prongs of the
standing analysis and have therefore waived their arguments on these points.  *See*
*Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012)
(stating that "the failure to make arguments and cite authorities in support of an
issue waives it").  Since Spalding County Defendants simply joined State
Defendants' motion to dismiss and did not make independent standing arguments,
they have similarly waived any traceability and redressability arguments.

directly redresses the injury that she claims to have suffered." *Id.* (internal punctuation and alteration omitted) (quoting *Harrell v. Fla. Bar*, 608 F.3d 1241, 1260 n.7 (11th Cir. 2010)).

In *Luckey v. Harris*, which involved a complaint against the governor of Georgia and certain state judges regarding the state's provision of legal services to indigent criminal defendants, the Eleventh Circuit explained that "[a]ll that is required [for injunctive relief against a state official] is that the official [sued] be responsible for the challenged action." 860 F.2d 1012, 1015 (11th Cir. 1988). Thus, "the state officer sued must, by virtue of his office, have some connection with the unconstitutional act or conduct complained of. Whether this connection arises out of general law, or is specially created by the act itself, is not material so long as it exists." *Id.* at 1015-16 (internal punctuation, alteration and citation omitted). The court therefore concluded that prospective relief could be ordered against the judges because they were "responsible for administering the system of representation for the indigent criminally accused." *Id.* at 1016.

Relying on this "binding precedent" from *Luckey*, the Eleventh Circuit, in *Georgia Latino Alliance*, rejected the state officials' argument that the plaintiffs did not have standing to sue because the state officials lacked enforcement authority over the challenged statute. 691 F.3d at 1260 n.5. The court emphasized

that it was "easily satisfied" that the plaintiffs met the traceability and redressability requirements to bring a pre-enforcement challenge against the officials, where "[e]ach injury [was] directly traceable to the passage of [the challenged statute] and would be redressed by enjoining each provision" of the statute. *Id*. at 1260.

Following this reasoning, the Court finds that the traceability and redressability requirements are satisfied in this case. The injuries Plaintiffs allege are directly traceable to SB 202, for which State, County and the individual Defendants have enforcement responsibility.

Fulton and Brooks County Defendants' argument that SB 202's provisions are not traceable to them and cannot be redressed by entering an injunction against them is without merit. Indeed, they concede that they must enforce SB 202 and do not dispute Plaintiffs' assertion that county officials are directly responsible for enforcing numerous election administration provisions of SB 202—from the new absentee ballot application and voting requirements to the provision of ballot drop boxes.

Further, Fulton and Brooks County Defendants have not cited any authority that supports their argument that Plaintiffs cannot establish redressability without bringing suit against all Georgia counties. *Bush v. Gore*, 531 U.S. 98 (2000), is

inapposite because that opinion did not analyze standing.  Rather, the Supreme

Court addressed the manual recount of paper ballots in a Florida election and the

related issue of disparate treatment of voters across the state under the Equal

Protection Clause of the Fourteenth Amendment.  *Id*. at 107.  Those circumstances

are easily distinguishable from Fulton and Brooks County Defendants'

redressability argument.

Regardless, to satisfy redressability requirements for standing purposes,

Plaintiffs need to show only that an injunction against Fulton and Brooks County

Defendants would address at least some of the alleged injuries in this case.  *See*

*Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 943 (11th Cir. 2021) (finding that

the plaintiff had standing to sue the defendant even if only "a small part of the

[total] injury [was] attributable to" the defendant).  They have fulfilled that

requirement.

Based on the foregoing analysis, the Court finds that the Article III standing

requirements to bring this suit are satisfied by at least Rise.

**B.    Sufficiency of Process**

Spalding County Defendants argue that Plaintiffs failed to effect service on

them according to applicable law.  They contend that Marcia L. Ridley ("Ridley"),

the county elections supervisor who accepted service on their behalf, is not a

person authorized by law to do so.  They also assert that she was not otherwise designated to accept service for the elections board, and she incorrectly told the process server that she was authorized to accept service.  As such, Spalding County Defendants maintain that the Court lacks jurisdiction over them.

Plaintiffs respond that Spalding County Defendants have failed to offer any evidence in support of their claims, despite having the burden of proof in a sufficiency of process challenge.  Plaintiffs further argue that as the election board's administrative director under law, Ridley is a "clerk" authorized under O.C.G.A. § 9-11-4(e)(5) to accept service on behalf of Spalding County Defendants.

Spalding County Defendants do not dispute that section 9-11-4(e)(5) provides for proper service on them through a "clerk" of the organization.  They do not even address Plaintiffs' argument that Ridley is a "clerk" within the meaning of that statute.  Instead, they focus on the arguments that the elections supervisor is not specially designated by the statute to accept service of process and that Ridley's voluntary acceptance of service cannot otherwise bind them.

Spalding County Defendants, however, miss the point.  Since they do not dispute that, as the election board's administrative director, Ridley's role encompasses clerk functions such as recordkeeping, they cannot dispute that

Ridley can be considered a "clerk" authorized to accept service under section 9-11-4(e)(5). *See Summerlin v. Ga. Pines Cmty. Serv. Bd.*, 630 S.E.2d 115, 118 (Ga. Ct. App. 2006) (finding that a personnel manager whose duties included keeping records and accounts was a "clerk" within the meaning of section 9-11-4(e)(5) and could therefore accept service on behalf of the public entity). This is a separate and proper basis for service, and it makes no difference that the statute lacks a specific provision designating Ridley's role as an agent for service of process or that Ridley accepted service without Spalding County Defendants' designating her as such an agent.

Accordingly, the Court finds that Spalding County Defendants' argument claiming insufficiency of process lacks merit.

### C.   Indispensable Party

Spalding County Defendants initially argued that the Amended Complaint should be dismissed for failure to join an indispensable party because it names members of the election board who no longer serve in that capacity and does not name their replacements. However, Spalding County Defendants appear to concede in their reply brief that the proper remedy for this issue is substitution.

Under Federal Rule of Civil Procedure 25(d):

An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while

> the action is pending.  The officer's successor is automatically substituted as a party.  Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded.  The court may order substitution at any time, but the absence of such an order does not affect the substitution.

Accordingly, the Court **DIRECTS** Plaintiffs to substitute the new election board members' names in place of former members in all subsequent proceedings.

### D.    Failure to State a Claim

Having resolved the threshold issues, the Court now turns to Defendants' arguments that the Amended Complaint fails to state a claim upon which relief may be granted.

In evaluating a motion to dismiss under Rule 12(b)(6), a court "accept[s] the allegations in the complaint as true and constru[es] them in the light most favorable to the plaintiff."[12] *Traylor v. P'ship Title Co.*, 491 F. App'x 988, 989 (11th Cir. 2012).  However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550

---

[12] A court is limited to reviewing what is alleged "'within the four corners of the complaint.'"  *Hayes v. U.S. Bank Nat'l Ass'n*, 648 F. App'x 883, 887 (11th Cir. 2016) (quoting *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1329 n.7 (11th Cir. 2006)).  If the court accepts matters outside the complaint, it "must convert the motion to dismiss into one for summary judgment." *Prop. Mgmt. & Invs., Inc. v. Lewis*, 752 F.2d 599, 604 (11th Cir. 1985).

Case 1:21-cv-01229-JPB   Document 86   Filed 12/09/21   Page 20 of 41

U.S. 544, 555 (2007) (internal punctuation and citation omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (stating that a complaint does not suffice "if it tenders 'naked assertions' devoid of 'further factual enhancement'" (alteration omitted) (quoting *Twombly*, 550 U.S. at 557)).

Moreover, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "This standard does not require a party to plead facts with such particularity to establish a significant probability that the facts are true, rather, it requires a party's pleading of facts to give rise to a 'reasonable expectation that discovery will reveal evidence [supporting the claim].'" *Burch v. Remington Arms Co.*, No. 2:13-cv-00185, 2014 WL 12543887, at *2 (N.D. Ga. May 6, 2014) (alteration in original) (quoting *Twombly*, 550 U.S. at 556); *see also Twombly*, 550 U.S. at 570 (dismissing complaint because the plaintiffs did not state facts sufficient to "nudge[] their claims across the line from conceivable to plausible").

At bottom, the complaint must contain more than "an unadorned, the-defendant-unlawfully-harmed-me accusation," *Iqbal*, 556 U.S. at 678, and must "'plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,'" *Traylor*, 491 F. App'x at 990

(quoting *Speaker v. U.S. Dep't of Health & Hum. Servs.*, 623 F.3d 1371, 1380 (11th Cir. 2010)).

The Court will now address the question of whether Plaintiffs have satisfied their pleading burden with respect to each count of the Amended Complaint.[13]

### 1. Count I (undue burden on the right to vote under the First and Fourteenth Amendments)

Plaintiffs allege that SB 202 "inflicts severe burdens on Georgia's voters through each individual restriction and the cumulative effect of" the measures. Am. Compl. ¶ 158, ECF No. 39. In particular, they contend that absentee voters will face:

> an identification requirement that denies them the ability to vote absentee unless they possess certain limited forms of identification or identification numbers; a narrowed window in which they can return their absentee ballot; restrictions on drop boxes that limit the availability of safe and secure methods of returning absentee ballots; and restrictions preventing election officials and organizations from even distributing absentee ballot applications or assisting voters in returning them.

*Id.* ¶ 159.

---

[13] State Defendants address the challenged provisions individually rather than in connection with the specified counts of the Amended Complaint. This approach, however, analyzes the challenged provisions out of context and does not account for Plaintiffs' contention that the challenged provisions also ***collectively*** violate the law. For the purpose of deciding the instant motions, the Court will evaluate each count as a whole and determine whether Plaintiffs have stated a claim as to the specific count.

Plaintiffs assert that SB 202 also targets Georgians who vote in person because many voters will be required "to travel longer distances and wait in long lines" and because "voters whose inflexible schedules prevent them from voting after 5:00 p.m. [will] face a significantly greater risk of outright disenfranchisement." *Id*. ¶ 160.  Plaintiffs further allege that voters will be subjected to "unlimited voter challenges," which "impose[] substantial burdens on voters who are forced to prove their eligibility and subject[] voters to ongoing abuse and intimidation." *Id*. ¶ 162.  In Plaintiffs' view, "[n]o state interest justifies any of these restrictions." *Id*. ¶ 164.

Among other points, State Defendants repeatedly argue that Plaintiffs have not established an actionable burden under the *Anderson/Burdick* framework for evaluating voting rights claims because the changes to the election process are "only minimally burdensome," and the state's interests "more than justify the changes."  State Defs.' Br. 25, ECF No. 45-1.

Intervenor Defendants additionally argue that because "[m]ost of the challenged provisions of SB 202 regulate only absentee voting," "the right to vote is not at stake here."  Intervenor Defs.' Br. 3, ECF No. 73-1 (internal punctuation omitted).  They also argue that "[t]he only burdens that Plaintiffs assert are legally

22

irrelevant because they are special burden[s] on some voters, not categorical burdens on all voters." *Id*. at 6.

In resolving an undue burden on voting claim, a court must: (i) "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate"; (ii) "identify and evaluate the precise interests put forward by the [s]tate as justifications for the burden imposed by its rule"; (iii) "determine the legitimacy and strength of each of those interests"; and (iv) "consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). The analysis is not a "litmus-paper test" and instead requires a "'flexible'" approach. *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) (citation omitted). If a court finds that a plaintiff's voting rights "are subjected to severe restrictions, the [respective] regulation must be narrowly drawn to advance a state interest of compelling importance. But when [the law] imposes only reasonable, nondiscriminatory restrictions . . . , the [s]tate's important regulatory interests are generally sufficient to justify the restrictions." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (internal punctuation and citation omitted).

Here, the Amended Complaint contains detailed allegations of burdens that Plaintiffs assert the challenged provisions will impose on Georgia voters. Plaintiffs also maintain that there are no legitimate state interests that would support such burdens. *Anderson* and *Burdick* do not require more from Plaintiffs at the motion to dismiss stage. Because State and Intervenor Defendants' weighing of the alleged burden on voters relies on facts not asserted in the Amended Complaint, such analysis is not appropriate at this time.

The Court also declines, as Intervenor Defendants suggest, to forego the undue burden analysis the Supreme Court developed in *Anderson* and *Burdick* and summarily dispose of Plaintiffs' voting rights claims. The Court does not read *McDonald v. Board of Election Commissioners*, 394 U.S. 802, 807-08 (1969), which states that there is no right to an absentee ballot, to require such an outcome. As described above, the *Anderson-Burdick* framework requires the Court to evaluate the type of burden imposed by the challenged provisions and apply the corresponding level of review. "Only after weighing [the designated] factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional." *Anderson*, 460 U.S. at 789.

For all these reasons, the Court declines to dismiss Count I of the Amended Complaint.

2.     **Count II (intentional discrimination and discriminatory results under § 2 of the Voting Rights Act ("VRA"))**[14]

Plaintiffs allege that SB 202 violates § 2 of the VRA under either the intent or results tests.[15]

a.     **Intentional Discrimination**

According to the Amended Complaint, "[a]ll of the relevant indicia demonstrate that a discriminatory purpose was a motivating factor in the passage" of SB 202.  Am. Compl. ¶ 171, ECF No. 39.  Specifically, Plaintiffs assert that:

---

[14] Complaints seeking to invalidate a voting statute on the grounds that it is discriminatory typically allege claims under § 2 of the VRA and/or the Fourteenth and Fifteenth Amendments.  *See, e.g.*, *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1329 (11th Cir. 2021).  VRA § 2 claims generally constitute allegations of vote dilution (*e.g.*, challenges to election districting schemes) or vote denial (*e.g.*, challenges to time, place or manner restrictions on voting, such as absentee and in-person voting rules).  Either type of claim may be asserted as a discriminatory purpose/intent claim (*i.e.*, the statute was enacted with discriminatory intent and has a discriminatory effect) or a discriminatory results claim (*i.e.*, the statute results in the abridgement of the right to vote under the circumstances).  *See Chisom v. Roemer*, 501 U.S. 380, 394 n.21 (1991).  In this case, Plaintiffs make vote denial allegations, which are styled as § 2 discriminatory intent and results claims (Count II).

[15] Courts generally analyze discriminatory intent or purpose claims under the framework the Supreme Court established in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 267-68 (1977).  However, *Arlington Heights* did not involve a voting statute, so it does not track or refer to the language of § 2.  Discriminatory results claims, on the other hand, are usually analyzed under the framework the Supreme Court developed in *Thornburg v. Gingles*, 478 U.S. 30, 36-37 (1986).  *Gingles* involved a vote dilution claim, and the relevant analysis incorporates the text of § 2.

(i) SB 202 was enacted after "[n]early 30% of Black voters cast their ballot by mail in 2020, compared to only 24% of white voters";

(ii) "[t]he presidential candidate preferred by Black voters won Georgia's electoral votes for the first time since 1992";

(iii) "[f]ollowing [a] historic runoff, the paramount concern among leaders of the Republican Party was to prevent these results from repeating in future elections";

(iv) "over the course of just 36 days, [SB 202] was rushed through committee hearings and into final form, with limited opportunities for public input or testimony from interested parties";

(v) SB 202 "surgically removed accommodations" and options relied on and favored by Black and other minority voters; and

(vi) in the years leading up to the bill's passage, certain Republican lawmakers and other political operatives made racially tinged remarks in connection with political campaigns.

*Id*. ¶¶ 41, 55, 57, 112, 139-46, 171.  The bottom-line allegation of the Amended Complaint is that SB 202 "erect[ed] new impediments that will disproportionately burden Black voters," *id*. ¶ 171, and will also "impose . . . unjustifiable burdens disproportionately on the [s]tate's minority, young, poor, and disabled citizens," *id*. ¶ 4.

Similar to their arguments for dismissal of Plaintiffs' undue burden claim, State Defendants focus on the merits of Plaintiffs' allegations as to their § 2 claims. They generally assert that Plaintiffs have not sufficiently alleged a disparate impact

claim because SB 202's provisions are not burdensome, given Georgia's alternate voting options.  *See generally* State Defs.' Br. 17-25, ECF No. 45-1.

Intervenor Defendants make similar arguments but also contend that the Court should focus on the legislative findings underlying SB 202, which they assert are "the only reliable evidence of *the legislature's* purposes."  Intervenor Defs.' Br. 14, ECF No. 73-1.  In their view, those findings prove that SB 202 was not enacted with discriminatory intent.  They argue that, at worst, the legislature was driven by the permissible purpose of securing partisan advantage.  *Id.* at 16.

In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, the Supreme Court of the United States identified a non-exhaustive list of factors that courts can use to evaluate whether government action was undertaken with discriminatory intent.[16]  429 U.S. 252, 267-68 (1977).  These include the "historical background of the decision"; the "specific sequence of events leading up to the challenged decision"; "[d]epartures from the normal procedural sequence" in taking the action; "[t]he legislative or administrative history," including "contemporary statements by members of the decisionmaking body";

---

[16] State and Intervenor Defendants do not dispute that *Arlington Heights* governs Plaintiffs' discriminatory purpose claim.

and whether the "impact of the official action . . . bears more heavily on one race than another." *Id*.

Because the aforementioned allegations in the Amended Complaint are consistent with the *Arlington Heights* factors and otherwise bear on the issue of intentional discrimination, the Court finds that Plaintiffs have stated a plausible discriminatory purpose claim.  At the motion to dismiss stage, Plaintiffs are not required to establish "a significant probability that the facts are true," *Burch*, 2014 WL 12543887, at *2, and only have to state facts sufficient to "nudge[] their claims across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570. They have done so here.

State and Intervenor Defendants' arguments, which attack the validity of Plaintiffs' allegations, are premature at this stage because they go to the merits of the claim and not to the question of whether Plaintiffs have asserted a plausible claim for relief.

Additionally, contrary to State and Intervenor Defendants' contentions that *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021), established certain requirements that Plaintiffs failed to meet here, the Supreme Court in that case specifically "decline[d] . . . to announce a test to govern all VRA § 2 claims" involving time, place or manner voting restrictions, *id*. at 2336.  The Supreme

Court explained that *Brnovich* was its "first foray" into deciding this type of claim

and therefore found it "sufficient for present purposes to identify certain

***guideposts***" that led to its decision rather than to mandate a test that must be

satisfied in all circumstances.  *Id*. (emphasis added).  Thus, while the language in

*Brnovich* could portend future requirements to state or prove a § 2 time, place or

manner claim, it should not be interpreted as currently setting forth pleading

requirements that Plaintiffs must fulfill in this case.[17]

Likewise, while the Court acknowledges that the *Brnovich* opinion discusses

the legislators' intent in passing the challenged statute, that analysis does not

support State and Intervenor Defendants' position that *Brnovich* now requires

plaintiffs in cases such as this one to allege that the legislature as a whole acted

with discriminatory intent.  The Supreme Court's discussion of intent in that case

occurred in the course of its review of whether the district court's interpretation of

the evidence of discrimination was "permissible" under the clearly erroneous

standard of review.  *Id*. at 2349.  The district court found no indication that the

---

[17] *Compare Guideline*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/guideline (last visited Dec. 6, 2021) ("an indication or outline of policy or conduct") *with Requirement*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/requirement (last visited Dec. 6, 2021) ("something essential to the existence or occurrence of something else"). "Guideline" and "Guidepost" are equivalent in the Merriam-Webster dictionary.

legislature "as a whole" was motivated by race, despite evidence in the record that a video reflecting a racial appeal played a role in the legislature's actions.  *Id*. at 2349-50.  The Supreme Court concluded that the district court's finding was not clearly erroneous.  *Id*.  When viewed in context, this finding does not establish a new test to state a VRA § 2 discrimination claim, especially in light of the Supreme Court's express disavowal of doing so.

### b.    Discriminatory Results

In addition to the allegations identified above, the Amended Complaint asserts that SB 202 "abridges and, in some cases, entirely denies the rights of Black voters" when the totality of the circumstances is considered.  Am. Compl. ¶ 176, ECF No. 39.  Plaintiffs further allege that SB 202's provisions disproportionately affect Black voters and deny "Black voters an equal opportunity to participate in the political process and/or elect a candidate of their choice."  *Id*. ¶ 175.  Plaintiffs explain that this result is due in part to the "long history of voting-related discrimination against Black people in Georgia," the "highly polarized" nature of voting in Georgia and the "legacy" of racial discrimination reflected in Georgia's housing, economic and health disparities.  *Id*. ¶ 174.  Other paragraphs in the Amended Complaint specifically expound on these points.  *See, e.g.*, *id*. ¶ 131 (stating that Georgia has historically disenfranchised Black voters, including

through "literacy tests, strict residency requirements, onerous registration procedures, voter challenges and purges [and] the deliberate slowing down of voting by election officials").

State and Intervenor Defendants make similar arguments in seeking dismissal of Plaintiffs' voting claims.  Like State Defendants, Intervenor Defendants argue that the challenged provisions of SB 202 "impose nothing beyond the usual burdens of voting"; Plaintiffs improperly "focus on how each provision of SB 202 burdens a particular method of voting, without considering the State's entire [voting] system"; and "Plaintiffs misstate the strength of the state interests behind the challenged laws."  Intervenor Defs.' Br. 11-13, ECF No. 73-1. Intervenor Defendants also contend that Plaintiffs have failed to assert certain facts required by *Brnovich*, including "allegations comparing Georgia's laws with those of other States" and "'the size' of any racially disparate impacts."  *Id*. at 12.

A violation of § 2 of the VRA

> is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected] class . . . in that [they] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. § 10301(b).  To evaluate a results claim under § 2 of the VRA, courts have relied on the factors that the Supreme Court identified in *Thornburg v.*

*Gingles*, 478 U.S. 30, 36-37 (1986), such as the extent of any history of discrimination affecting the right to vote, the scope of racially polarized voting and the degree to which discrimination hinders the class' ability to participate in the voting process.[18]

However, the Supreme Court's opinion in *Brnovich* called into question the usefulness of some of the *Gingles* factors in evaluating a vote denial claim under § 2 of the VRA.[19] *Brnovich*, 141 S. Ct. at 2340. The Supreme Court identified other relevant factors, but, as discussed above, it was careful to define those factors as mere guideposts. *See id.* at 2336. These guideposts include the size and degree of the burden on voting, the size of the disparities between the protected class and other groups, the opportunities provided by a state's voting system, etc. *See id.* at 2336, 2338-39. Because this list is neither exhaustive nor prescriptive, *Brnovich* does not require Plaintiffs to plead any specific set of factors.

Here, Plaintiffs' allegations set forth above correspond with *Gingles* factors that may be relevant in this specific circumstance and ultimately weigh upon the

---

[18] Not all factors will be pertinent or essential to all claims. *See Nipper v. Smith*, 39 F.3d 1494, 1526-27 (11th Cir. 1994).

[19] *Gingles* was a vote *dilution* case, wherein the plaintiff claimed that legislative districting plans diluted the ability of particular voters to affect the outcome of elections. 478 U.S. at 47.

issue of whether the political process in Georgia is equally open to all voters. Therefore, Plaintiffs have stated a plausible claim under § 2 of the VRA.

While State and Intervenor Defendants' arguments regarding the burden on voters, Georgia's voting system as a whole and Georgia's underlying interests in enacting SB 202 will likely be relevant to the analysis of Plaintiffs' claims at a later stage of this case, those contentions investigate the merits of the claims, and their resolution requires an inquiry into facts not alleged in the Amended Complaint.  Therefore, they are not appropriate at the motion to dismiss stage.

Further, as the Court explained above, the *Brnovich* factors are not prescriptive.  Thus, contrary to Intervenor Defendants' position, Plaintiffs are not required to allege those factors or otherwise provide detailed facts regarding them. *See id.* at 2336; Fed. R. Civ. P. 8(a)(2) (requiring a plaintiff to provide only "a short and plain statement of the claim showing that the pleader is entitled to relief").

Based on the foregoing analysis, the Court finds that Plaintiffs have stated a VRA § 2 claim under both the intent and results tests.  For this reason, the Court declines to dismiss Count II of the Amended Complaint.

### 3.   Count III (viewpoint discrimination under the First Amendment)

Plaintiffs allege that SB 202 was enacted after approximately 30% of Black voters cast their ballot by mail and "immediately after Black voters, young voters, and Democratic voters saw their preferred candidates win" Georgia's presidential and senatorial elections.  Am. Compl. ¶¶ 41, 55, 57, 182, ECF No. 39.  Plaintiffs contend that SB 202 "surgically removed" voting mechanisms preferred by Black voters.  *Id*. ¶ 171.  They conclude that SB 202's purpose is to restrict "voters' ability to cast ballots for their preferred candidates in future elections on the basis of their viewpoint."  *Id*. ¶ 183.

State Defendants argue that Plaintiffs "do not say how, why, or which part of SB 202 violates . . . voters' free speech, expression, or association rights."  State Defs' Reply Br. 13, ECF No. 66.  Intervenor Defendants, on the other hand, acknowledge that retaliating against Georgians who elected Democrats would "normally" constitute viewpoint discrimination in violation of the First Amendment.  Intervenor Defs.' Br. 16, ECF No. 73-1.  However, they assert that Plaintiffs have not stated a claim here because they cannot challenge a "facially neutral" law on the grounds that it was passed for an impermissible purpose.  *Id*. at 16-17.

The First Amendment prohibits the enactment of laws that abridge the freedom of speech.  *See* U.S. Const. amend. I.  Therefore, governments generally "ha[ve] no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972)).

Regulation of speech based on the topic discussed or the idea or message expressed is presumptively unconstitutional and may be justified only if the government proves that the regulation is narrowly tailored to serve compelling state interests.  *See id.* at 165 (stating that "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech" (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993))).  In *Hand v. Scott*, the Eleventh Circuit recognized that a voting regulation that "was facially or intentionally designed to discriminate based on viewpoint— say, for example, by barring Democrats, Republicans, or socialists from [a voting opportunity] on account of their political affiliation—might violate the First Amendment."  888 F.3d 1206, 1211-12 (11th Cir. 2018).

Here, the Amended Complaint as a whole is centered on the idea that SB 202 was enacted in response to and intentionally to deter certain voters' exercise of

their franchise to elect Democratic candidates.  Thus, at a minimum, Plaintiffs have

stated facts that could plausibly support a claim of viewpoint discrimination as

acknowledged by *Hand*.  Whether SB 202 was indeed enacted with such a

retaliatory purpose is a question that cannot be resolved at this stage of the

litigation.  Rather, the Court must accept all factual allegations in the Amended

Complaint as true and allow the action to move forward where, as here, those facts

nudge the allegations of viewpoint discrimination across the line from conceivable

to plausible.  *See Twombly*, 550 U.S. at 570.

      *In re Hubbard*, 803 F.3d 1298 (11th Cir. 2015), does not require dismissal of

this count.  Although, as Intervenor Defendants state, that case confirms the well-

settled principle that "courts cannot 'strike down an ***otherwise constitutional***

statute on the basis of an alleged illicit legislative motive,'" *id*. at 1312 (quoting

*United States v. O'Brien*, 391 U.S. 367, 383 (1968) (emphasis added)), Intervenor

Defendants' reliance on that principle at this stage of the litigation is misplaced.

The Court would have to first deem the challenged provisions constitutional before

the *O'Brien* principle can govern.  But the constitutionality of the challenged

provisions is still an open question.

      Further, Intervenor Defendants appear to use "constitutional" and "facially

neutral" interchangeably, which conflates an important distinction.  A facially

36

neutral regulation is not presumptively constitutional and does not automatically escape scrutiny.  *See Reed*, 576 U.S. at 163-64.  As such, the *O'Brien* rule does not insulate SB 202 from scrutiny simply because Intervenor Defendants contend it is facially neutral.  The Court would still have to find that the challenged provisions are constitutional.  Since it has not, *O'Brien* is not an appropriate basis upon which to reject Plaintiffs' viewpoint discrimination claim at this time.

For these reasons, the Court declines to dismiss Count III of the Amended Complaint.

### 4.   Count IV (freedom of speech and expression under the First Amendment as to Gammage and Edwards)

Plaintiffs allege that distributing food and drink to voters waiting in line and encouraging them to stay in line constitute core political speech and expression protected by the First Amendment.  Am. Compl. ¶ 187, ECF No. 39.  Accordingly, they claim that "SB 202 unconstitutionally criminalizes protected speech and expression" by making it a misdemeanor to offer such accommodations to voters. *Id*. ¶ 188.

Gammage does not address the substance of this claim, and Edwards joins State Defendants' brief, which argues only that speech can be restricted near polling places and that the state's "important regulatory interests" justify the restrictions.  State Defs.' Br. 23, ECF No. 45-1.

Intervenor Defendants make a similar argument and additionally contend that the First Amendment is not implicated because line warming "is conduct, not speech." Intervenor Defs.' Br. 17, ECF No. 73-1. They therefore assert that while the challenged provision will impose an "incidental" burden on speech, the statute should not be analyzed as one regulating speech. *Id*.

Taking as true Plaintiffs' allegations that SB 202 establishes what type of conduct and communication is permissible while engaging with voters who are waiting in line and construing those allegations in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have plausibly alleged that SB 202's restrictions on line warming impinge on speech and/or expressive conduct in some way.

State Defendants do not provide support for their contention that such activities can be restricted simply because they occur near a polling place. Nor do Intervenor Defendants cite any authority for the proposition that line warming *per se* cannot be considered expressive conduct under the First Amendment. Indeed, they concede that line warming could impose some burden on speech.

The Eleventh Circuit's second opinion in *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, which Intervenor Defendants cite, did not disturb that court's prior conclusion in the case that the food sharing demonstrations at issue

constituted expressive conduct protected by the First Amendment.  11 F.4th 1266,

1291 (11th Cir. 2021).  Although the court's latest opinion noted that most food-

sharing events will not be considered expressive conduct, it acknowledged that its

prior holding was reached "after a close examination of the specific context

surrounding the events."  *Id*. at 1292.

At the motion to dismiss stage, the Court does not have the benefit of

sufficient facts to properly assess the specific context of Plaintiffs' allegations.  To

wit, answering the questions of whether line warming occurs in a nonpublic forum

subject to greater restrictions; whether the associated speech or conduct is of the

type protected by the First Amendment; what type of analysis should apply; and

whether the state has identified interests sufficient to meet the applicable standard

requires the type of substantive merits inquiry that is not appropriate on a motion

to dismiss.

For all these reasons, the Court declines to dismiss Count IV of the

Amended Complaint.

### 5.   Count V (immaterial voting requirement under 52 U.S.C. § 10101(a)(2)(B))

Plaintiffs allege that the provisions of SB 202 requiring voters to provide

their date of birth with their absentee ballot applications and their voted absentee

ballots violate 52 U.S.C. § 10101(a)(2)(B) because they "require[] election

officials to reject absentee applications and ballots solely on the basis of a missing or incorrect year of birth."  Am. Compl. ¶ 197, ECF No. 39.

State Defendants respond that the date of birth requirement does not violate § 10101(a)(2)(B) because the provision requires notice to the voter of an error and an opportunity to cure the defect before the absentee ballot can be rejected.  *See* State Defs.' Br. 25, ECF No. 45-1.  Intervenor Defendants do not address this count of the Amended Complaint.

Under § 10101(a)(2)(B),

[n]o person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under [s]tate law to vote in such election.

Plaintiffs have alleged that date of birth information is not necessary to determine whether a person is qualified to vote, yet SB 202 requires county officials to reject absentee ballot applications and voted ballots of voters who make errors in providing such information.  As such, the Court finds that Plaintiffs have stated a plausible claim for relief under § 10101(a)(2)(B).

State Defendants have not provided any support for their argument that the opportunity to cure an error rehabilitates any potential violation of § 10101(a)(2)(B), and the statute is silent on this point.  This argument would also

require the Court to incorrectly address the merits of Plaintiffs' allegations at the motion to dismiss stage.

For these reasons, the Court declines to dismiss Count V of the Amended Complaint.

## III.    CONCLUSION

Based on the foregoing analysis, the Court **DENIES** Defendants' motions to dismiss (ECF Nos. 45, 53, 55, 57, 61, 73, 74).

**SO ORDERED** this 9th day of December, 2021.

_____
**J. P. BOULEE**
United States District Judge