**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.: 1:21-MI-55555-JPB |
| THE NEW GEORGIA PROJECT, *et al.*,<br><br>                              *Plaintiffs*,<br>      v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State, *et al.*,<br><br>                              *Defendants*,<br><br>REPUBLICAN NATIONAL COMMITTEE, *et al.*,<br><br>                              *Intervenor-Defendants*. | Civil Action No.: 1:21-cv-01229-JPB |

**NGP PLAINTIFFS' BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**Table of Contents**

INTRODUCTION.................................................................................1

BACKGROUND ................................................................................2

LEGAL STANDARD ........................................................................5

ARGUMENT .....................................................................................6

   I.   Plaintiffs are likely to succeed on the merits of their claim. ...........................6

      A.  The Line Relief Ban unconstitutionally criminalizes speech and expression. ...............................................................................6

      B.  NGP, BVMF, and Rise engage in political expression by offering food and water to voters waiting in line. ............................................7

      C.  A reasonable voter would recognize line relief as conveying a message. .8

      D.  The Line Relief Ban is a content-based restriction that is subject to strict scrutiny. ...............................................................................11

      E.  Alternatively, the Line Relief Ban requires exacting scrutiny because it burdens expression related to elections. ....................................12

      F.  The Line Relief Ban cannot survive any level of scrutiny......................13

   II.  Plaintiffs will suffer irreparable harm if the injunction is denied. ................16

   III.  The balance of equities favor granting a preliminary injunction, and such relief is in the public interest. ....................................................17

CONCLUSION.................................................................................20

# Table of Authorities

**Page(s)**

**Cases**

*Ams. for Prosperity Found. v. Bonta*,
  141 S. Ct. 2373 (2021) ......................................................................12

*Baumann v. City of Cumming*,
  No. 2:07-CV-0095-WCO, 2007 WL 9710767 (N.D. Ga. Nov. 2,
  2007) ...................................................................................................17

*Bd. of Educ. Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
  457 U.S. 853 (1982) (plurality opinion) ...............................................7

*Burk v. Augusta-Richmond Cnty.*,
  365 F.3d 1247 (11th Cir. 2004) ..........................................................11

*Burns v. Town of Palm Beach*,
  999 F.3d 1317 (11th Cir. 2021) ............................................................9

*Burson v. Freeman*,
  504 U.S. 191 (1992) (plurality opinion) .............................................11

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
  408 F.3d 1349 (11th Cir. 2005) ....................................................16, 17

*Coal. for Good Governance v. Kemp*,
  No. 1:21-CV-02070-JPB, 2021 WL 3710475 (N.D. Ga. Aug. 20,
  2021) ..............................................................................................16, 20

*Feldman v. Ariz. Sec'y of State's Off.*,
  843 F.3d 366 (9th Cir. 2016) ..............................................................19

*First Nat'l Bank of Bos. v. Bellotti*,
  435 U.S. 765 (1978)......................................................................9, 15

*Fish v. Kobach*,
  840 F.3d 710 (10th Cir. 2016) ............................................................20

*Fla. Businessmen for Free Enter. v. City of Hollywood*,
  648 F.2d 956 (5th Cir. 1981) ...............................................................18

*Fla. Fam. Pol'y Council v. Freeman*,
  561 F.3d 1246 (11th Cir. 2009) ............................................................7

*Ft. Lauderdale Food Not Bombs v City of Ft. Lauderdale*,
  901 F.3d 1235 (11th Cir. 2018) ...................................................10, 11

*Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale*,
  11 F.4th 1266 (11th Cir. 2021) ...........................................................11

*Gonzalez v. Governor of Ga.*,
  978 F.3d 1266 (11th Cir. 2020) .......................................................5, 6

*Harbourside Place, L.L.C. v. Town of Jupiter*,
  958 F.3d 1308 (11th Cir. 2020) ..........................................................12

*Joelner v. Vill. of Wash. Park*,
  378 F.3d 613 (7th Cir. 2004) ..............................................................18

*Jones v. Governor of Fla.*,
  950 F.3d 795 (11th Cir. 2020) ............................................................17

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*,
  32 F.4th 1363, 1370 (11th Cir. 2022) .................................................10

*League of Women Voters of Fla. v. Lee*,
  No. 4:21CV186-MW/MAF, 2022 WL 969538 (N.D. Fla. Mar. 31,
  2022) ...............................................................................................9, 10

*Lichtenstein v. Hargett*,
  489 F. Supp. 3d 742 (M.D. Tenn. 2020) ......................................19, 20

*McCullen v. Coakley*,
  573 U.S. 464 (2014)............................................................................15

*Meyer v. Grant*,
  486 U.S. 414 (1988)............................................................................13

*Otto v. City of Boca Raton*,
   981 F.3d 854 (11th Cir. 2020) ....................................................16, 17

*Perdue v. Kemp*,
   No. 1:22-CV-0053-MHC, 2022 WL 710959 (N.D. Ga. Feb. 7,
   2022) ..............................................................................................18, 19

*Purcell v. Gonzalez*,
   549 U.S. 1 (2006)............................................................................18, 19

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
   487 U.S. 781 (1988)........................................................................14, 15

*Swain v. Junior*,
   958 F.3d 1081 (11th Cir. 2020) ..........................................................17

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
   425 U.S. 748 (1976)..............................................................................7

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)..................................................................................5

*Wooley v. Maynard*,
   430 U.S. 705 (1977)............................................................................14

**Statutes**

O.C.G.A. § 21-2-414(a) ..........................................................................14

**Other Authorities**

SB 202 § 2(13) ..................................................................................12, 13

## INTRODUCTION

Georgia's Senate Bill ("SB") 202 is a systematic assault on the right to vote—the pinnacle of political expression in our democracy. At every turn, SB 202 makes the process of requesting, receiving, and casting a ballot more difficult for Georgians and punishes its citizens for encouraging participation in the political process.

When citizens encounter barriers to voting, Plaintiffs New Georgia Project ("NGP"), Black Voters Matter Fund ("BVMF"), and Rise, Inc. ("Rise") (collectively, the "Organizations") respond with corollary forms of political expression, including, for example, educating voters, encouraging turnout, and honoring the dignity of voters waiting in hours-long polling place lines by offering messages of encouragement and solidarity. These forms of political expression—often conveyed by offering water to the thirsty, sharing food with the hungry, and providing other forms of comfort—are specifically targeted by SB 202's "Line Relief Ban," SB 202, § 33, which prohibits Plaintiffs from offering "food and drink" to voters within 150 feet of a polling place or within 25 feet of a voter standing in line, and subjects violators to criminal penalties for engaging in such activity. The Ban effectively silences non-partisan, non-disruptive expressions of support for voters, violating the First Amendment rights of Plaintiffs and the voters they serve.

NGP Plaintiffs filed suit against Keith Gammage, in his official capacity as the Solicitor General of Fulton County, and Gregory W. Edwards, in his official capacity as the District Attorney for Dougherty County (collectively, the "District Attorneys") to enjoin their enforcement of the Ban in areas where NGP Plaintiffs have historically conducted line relief programs. As explained in the AME Plaintiffs' Motion for Preliminary Injunction—which NGP Plaintiffs adopt and incorporate as noted below—the Line Relief Ban is particularly suitable for preliminary injunction. The governing law is clear. The stakes for Georgians are high. And the requested relief is administratively simple and equitable. The Court should enjoin the District Attorneys from enforcing the Line Relief Ban and its attempt to criminalize constitutionally protected political speech and expression.

## BACKGROUND

One of the unfortunate hallmarks of voting in Georgia is that it is oftentimes plagued by long lines, and voters of color tend to vote in precincts where the wait time can stretch for hours. *See* AME Mot. in Supp. of Prelim. Inj., ("AME Br.") at 2–4, ECF No. 171-1; Ex. 1, Hector Decl. ¶ 17. AME Plaintiffs' Motion for Preliminary Injunction explains in detail the political acts and proactive messages expressed and facilitated by providing food and water to voters waiting in line. NGP

Plaintiffs join and incorporate AME Plaintiffs' background discussion in full. *See* AME Br. at 2–10.[1]

Like the individual voters and organizations identified in the AME Plaintiffs' Motion, NGP Plaintiffs have engaged in similar forms of political expression both as providers and recipients of line relief. Plaintiff Jauan Durbin, for instance, received line relief in Fulton County while waiting for hours to vote in the 2018 general election, which lifted his spirits—not merely by satiating his hunger and quenching his thirst, but by reinforcing the message that Mr. Durbin, who is Black, should not "let the delay diminish the voting rights that our forebearers had fought so hard for." Ex. 2, Durbin Decl. ¶ 4. The message so moved Mr. Durbin that after casting his ballot in 2020, he ordered pizza for voters and election workers at his polling place in Fulton County. *Id.* ¶ 5. His experience in 2018 motivated him to offer support and encouragement to other voters suffering similar burdens, and to express that "no matter which candidates [his] fellow voters favored, [he] wanted to support them for making the effort to have their voices heard." *Id.*

Billy Honor, NGP's Director of Organizing, committed to providing line relief after his own experience of standing in long polling place lines, and has since

---

[1] NGP Plaintiffs' pin cites to the AME Plaintiffs' Motion refer to page numbers of the brief itself, rather than the page numbers in the ECF header of the cited document.

recruited hundreds of volunteers on behalf of NGP to provide chairs for voters with weary legs, to give out umbrellas and ponchos for those standing in the rain, and to hand out food and water for voters who grew hungry or thirsty. Ex. 3, Honor Decl. ¶¶ 4, 7, 18–19. By doing so, Mr. Honor sought to express "that civic engagement through the voting process is an important part of being a member of the community, and every individual voter, no matter where they live or who they are, has a valuable voice and their vote should count." *Id.* ¶ 16.

Ebony Brown, the Deputy State Director at Rise for Georgia, similarly became motivated to support voters in polling place lines after her own experience of arriving at the precinct first thing in the morning, being forced to wait in line for hours without access to food and water, and observing voters who abandoned the line because of the interminable wait. Ex. 4, Brown Decl. ¶¶ 4–9. Through her actions, Ms. Brown sought to communicate, on behalf of Rise, that voters should "not lose hope in the democratic process," and to express solidarity with "Black voters in particular who might otherwise feel discouraged about the lack of inclusivity in the voting process." *Id.* ¶ 10.

And Reverend Christopher Johnson, a retired pastor and Chair and Executive Director of the Greater Augusta's Interfaith Coalition, which is in part funded by BVMF to provide support to voters in line, engaged in line relief with the intent of

sending a simple message to voters: stay in line, we are with you. Ex. 5, Johnson Decl. ¶¶ 2, 5, 6. Reverend Johnson also played music for voters waiting in long lines "just to put some pep in their step." *Id.* ¶ 5.

Affected voters and communities value these line relief activities and messages of support. *See, e.g.*, Hector ¶ 20. These voters understood Rise's message, as Rise's "presence made them feel as though they were 'a part of a community.'" *Id.*; *see also* Honor Decl. ¶ 19; Ex. 6, Galbreath Decl. ¶ 10; Johnson Decl. ¶ 7. But SB 202 banned these expressions of support and solidarity, criminalizing Mr. Honor's offer of umbrellas to rain-soaked voters, Mr. Durbin's offer of pizza, and Ms. Hector's offer of water to voters standing unsheltered in the Georgia sun, impeding their ability to convey these important messages. *See* SB 202, § 33.

## LEGAL STANDARD

A district court may grant a preliminary injunction if the moving party establishes that: (1) it has a substantial likelihood of success on the merits; (2) it will suffer an irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth factors "'merge' when, as here, the [g]overnment is the opposing party." *Gonzalez v. Governor of*

*Ga.*, 978 F.3d 1266, 1271 (11th Cir. 2020) (quoting *Swain v. Junior*, 961 F.3d 1276, 1285 n.3 (11th Cir. 2020)).

## ARGUMENT

### I.     Plaintiffs are likely to succeed on the merits of their claim.

Plaintiffs are likely to prevail on their claim that the Line Relief Ban violates Plaintiffs' constitutional rights. This standard "requires a showing of only *likely* or probable, rather than *certain,* success." *Id.* at 1271 n.12 (quoting *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005)) (emphasis in original). The AME Plaintiffs' Motion establishes that Plaintiffs engage in speech and political expression when providing line relief, that the Line Relief Ban unduly restricts those forms of expression and imposes a threat of criminal penalties on the speakers, and that the Ban cannot withstand First Amendment scrutiny. To avoid repetition and for the Court's convenience, this Motion joins and incorporates the AME Plaintiffs' arguments, and emphasizes several points specific to the NGP Plaintiffs' claims against the District Attorneys.

### A.     The Line Relief Ban unconstitutionally criminalizes speech and expression.

The Line Relief Ban infringes the First Amendment rights of both speakers and recipients. As explained in the AME Plaintiffs' Motion, First Amendment protection clearly extends to expressive conduct of the speaker. AME Br. at 11–14.

Just as the Organizations have a right to express themselves through line relief activities, voters like Mr. Durbin also enjoy a reciprocal First Amendment right to receive messages of support and encouragement. *Fla. Fam. Pol'y Council v. Freeman*, 561 F.3d 1246, 1254 (11th Cir. 2009). "An inherent corollary" to the right to free expression is the right to freely receive and engage with the expressive conduct of others. *Bd. of Educ. Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (plurality opinion). This right not only "follows ineluctably from the *sender's* First Amendment right to send them," but it is also "a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom." *Id.* (emphasis in original). Therefore, "the protection afforded [by the First Amendment] is to the communication, to its source and to its recipients both." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) (collecting cases). The Ban thus infringes the rights of both the Organizations offering line relief, and the voters who receive it.

### B.    NGP, BVMF, and Rise engage in political expression by offering food and water to voters waiting in line.

When the Organizations and their volunteers engage in line relief, they intend to convey a message of support for voting, voters, and the democratic process. NGP, for instance, provides "food, water, and other line-relief resources" to convey "a specific, nonpartisan message that civic engagement through the voting process is

an important part of being a member of the community, and every individual voter, no matter where they live or who they are, has a valuable voice and their vote should count." Honor Decl. ¶ 16. The Organizations' line relief activities encourage voters "to remain in line to vote despite the associated hardships," and express "gratitude and appreciation for voters' sacrificing many hours of their day in order to participate in the democratic process." Galbreath Decl. ¶ 9; *see also* Hector Decl. ¶¶ 14–16 (explaining that Rise engaged in line relief to "express to voters that every Georgian should be able to cast a vote without undue barriers"); Brown Decl. ¶ 10 (conveying through line relief that voters should "not lose hope in the democratic process").

### C.   A reasonable voter would recognize line relief as conveying a message.

Voters receiving line relief understand and appreciate the message of solidarity and encouragement. Plaintiff Jauan Durbin, who waited close to three hours to cast his ballot in 2018, expressed that he "was grateful for the encouragement and support of various campus organizations that were providing line relief, such as water and snacks. These groups urged us not to let the delay diminish the voting rights that our forebearers had fought so hard for. This message lifted my spirit and strengthened my resolve." Durbin Decl. ¶ 4.

The Organizations received similar feedback. *See, e.g.*, Honor Decl. ¶ 18 ("voters time and time again expressed their appreciation and gratitude for our

support"); Hector Decl. ¶ 20 ("Many voters expressed to us that our presence made them feel as though they were 'a part of a community.'"); Galbreath Decl. ¶ 10 (Voters were "uniformly thankful for NGP's efforts and informed us that the encouragement motivated them to persevere and remain in the long line so that they could make their voices heard."). These responses reflect a reasonable—indeed, obvious—interpretation of the NGP Plaintiffs' messages.

The contextual clues for ascertaining the communicative elements of expressive conduct, as outlined by the Eleventh Circuit and in the AME Plaintiffs' Motion, are also present here. *See Burns v. Town of Palm Beach*, 999 F.3d 1317, 1343–44 (11th Cir. 2021). *First*, the Organizations' line relief efforts are frequently accompanied by traditional expressive activity, including performance art and religious support, Honor Decl. ¶¶ 9–10; Galbreath Decl. ¶ 4, and conversations about the importance of voting and removing burdens to the franchise, Johnson Decl. ¶¶ 7–8. *Second*, the Organizations provide line relief to all voters indiscriminately, without regard for their political beliefs or candidate choices. Honor Decl. ¶¶ 14–15; Galbreath Decl. ¶ 6. *Third*, they conduct their activities "outside of polling places—an area the U.S. Supreme Court and Eleventh Circuit have both considered to be a traditional public forum." *League of Women Voters of Fla. v. Lee*, No. 4:21CV186-MW/MAF, 2022 WL 969538, at *64 (N.D. Fla. Mar. 31, 2022) (citing *Burson v.*

*Freeman*, 504 U.S. 191, 196–97 (1992) (plurality opinion), and *Citizens for Police Accountability Pol. Comm. v. Browning*, 572 F.3d 1213, 1217 n.9, 1218 (11th Cir. 2009)), *stayed pending appeal*, *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1370 (11th Cir. 2022); *see also* AME Br. at 17–18, 20–21. *Fourth*, line relief "addresses an issue of public concern—voting and democracy." *Lee*, 2022 WL 969538, at *64.

Finally, the Eleventh Circuit has already recognized that "the significance of sharing meals with others dates back millennia," holding a key place in numerous religious and patriotic traditions. *Ft. Lauderdale Food Not Bombs v City of Ft. Lauderdale* ("*FNB I*"), 901 F.3d 1235, 1243 (11th Cir. 2018); *Lee*, 2022 WL 969538, at *63 (citing *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1344–45 (11th Cir. 2021)). Applying these factors, a Florida district court recently determined that line relief "activities are expressive activities that a reasonable person would understand to convey a specific message of support, solidarity, and celebration in exercising" their voting rights. *Lee*, 2022 WL 969538, at *65. The same is true here. "Food shared with company differs greatly from a meal eaten alone," and the Organizations provide more than mere sustenance when they give food and water to voters waiting in long lines. *FNB I*, 901 F.3d at 1243. They are engaged in "an act of political

solidarity meant to convey the organization's message," and are entitled to constitutional protection. *Id.* at 1238.

**D.   The Line Relief Ban is a content-based restriction that is subject to strict scrutiny.**

The Line Relief Ban's plain terms and the General Assembly's justification for the law reveal that its restrictions are content-based and thus subject to strict scrutiny. *Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale* ("*FNB II*"), 11 F.4th 1266, 1291–92 (11th Cir. 2021); *see also* AME Br. at 14–17. For one, the law's plain terms "do[] not reach other categories of speech, such as commercial solicitation, distribution, and display." *Burson v. Freeman*, 504 U.S. 191, 197 (1992) (plurality op.); *see Burk v. Augusta-Richmond Cnty.*, 365 F.3d 1247, 1251 (11th Cir. 2004). Plaintiffs remain free to hand out food and water to a person standing only inches from a voter in line so long as the recipient was queuing to enter a bank or a supermarket—or doing anything other than voting. By targeting interactions with voters, the Ban singles out expressive conduct directed at political and civic engagement. *See Burson*, 504 U.S. at 197 (finding restriction on distributing campaign materials within 100 feet of polling place entrances was content-based).

Furthermore, State Defendants themselves all but conceded that the Ban is content-based. They suggest that enjoining the Ban may lead to an "increase[] [in the] risk of improper electioneering/campaigning at polling locations"—a tacit

admission that line relief activities can be expressive and convey a substantive message. State Defs.' Resp. Pls.' First Interrog. ("State Defs.' Interrog.") No. 2 at 6 (May 16, 2022). In fact, the General Assembly's justification for the Line Relief Ban openly acknowledges just that: it states that providing line relief may subject voters to "political pressure" and "intimidation." SB 202 § 2(13). An act that expresses nothing could neither pressure nor intimidate. In this case, the General Assembly's supposed fears are unfounded because Plaintiffs' messages convey solidarity and support. But because the Ban on its face targets line relief specifically to restrict the message it conveys, it is presumptively unconstitutional and thus subject to strict scrutiny. *Harbourside Place, L.L.C. v. Town of Jupiter,* 958 F.3d 1308, 1316 (11th Cir. 2020).

### E.  Alternatively, the Line Relief Ban requires exacting scrutiny because it burdens expression related to elections.

As the AME Plaintiffs' Motion explains, even if the Line Relief Ban was content neutral, which it is not, it would still be subject to "exacting scrutiny" because it burdens election-related expression. Under that standard, there must be "a substantial relation between the disclosure requirement and a sufficiently important governmental interest," and thus, in order "[t]o withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383

(2021) (quotations omitted). The Supreme Court has repeatedly found that even content-neutral limits on "interactive communication concerning political change," called "core political speech," are subject to exacting scrutiny where they have "the inevitable effect of reducing the total quantum of speech on a public issue." *Meyer v. Grant*, 486 U.S. 414, 420, 423 (1988); *see also* Hector Decl. ¶ 22 (describing how "Rise has had to cease all efforts to support Georgians waiting in line to cast their votes" because of the Line Relief Ban); Honor Decl. ¶ 21 (describing how NGP is now unable to provide support and comfort to voters in line); Johnson Decl. ¶ 11 (describing how BVMF had "completely ceased . . . early voting and election day voter support efforts"); AME Br. at 18–20.

## F. The Line Relief Ban cannot survive any level of scrutiny.

For the reasons stated in the AME Plaintiffs' Motion, the Line Relief Ban fails under strict, exacting, or even less demanding scrutiny. NGP Plaintiffs adopt and incorporate those arguments here, *see* AME Br. at 21–26, which apply equally to the District Attorneys for several reasons.

First, the law serves no compelling or legitimate interest. Neither the Defendants nor the legislature have advanced a coherent theory to explain how a slice of pizza, water bottle, or poncho given to any queuing voter has resulted in "improper interference, political pressure, or intimidation," SB 202 § 2(13). But

even if they did, the Line Relief Ban is not sufficiently tailored to that interest because it is "prophylactic, imprecise, and unduly burdensome." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 800 (1988). Long before SB 202's enactment, Georgia's election laws prohibited any person near a polling place from "solicit[ing] votes in any manner or by any means or method." O.C.G.A. § 21-2-414(a). The use of food and water to bribe or pressure a person to vote a certain way was thus already illegal. The Line Relief Ban expanded this narrower restriction to a blanket prohibition on providing food and water to voters in line on the theory that doing so would mitigate "improper electioneering/campaigning at polling locations." State Defs.' Interrog. No. 2 at 6. Because Georgia law already provides an enforcement mechanism against improper electioneering and intimidation at the polls, the Line Relief Ban is precisely the type of "[b]road prophylactic rule[]" that is generally "suspect" and not permitted "in the area of free expression." *Riley*, 487 U.S. at 801 (citation omitted).

The Supreme Court has been clear that a restriction on speech is not properly tailored if it prohibits a broad range of expression in order to prevent the *possibility* of improper conduct—particularly when the State can achieve the same goal simply by enforcing its existing prohibitions more vigorously. *Id.* at 800; *Wooley v. Maynard*, 430 U.S. 705, 716 (1977) ("The breadth of legislative abridgment must be

viewed in the light of less drastic means for achieving the same basic purpose.")
(quoting *Shelton v. Tucker*, 364 U.S. 479, 488, (1960)). For example, in *McCullen
v. Coakley*, 573 U.S. 464 (2014), the Court held that a law creating a "buffer zone"
around abortion clinics to prevent illegal harassment was not sufficiently tailored
even under *intermediate* scrutiny where "a separate provision . . . prohibit[ed] much
of th[e] conduct" the state's asserted interests sought to address, as did other "generic
criminal statutes." *Id.* at 490–92.

The Line Relief Ban suffers from the same flaws: it adds little to the interests
already served by existing laws, and yet prohibits a wide range of political
expression "[w]ithin 25 feet of any voter standing in line to vote at any polling
place," and "[w]ithin 150 feet of the outer edge of any building within which a
polling place is established," SB 202, § 33, primarily to impede Plaintiffs' ability to
engage in expressive conduct directed at voters. *See Riley*, 487 U.S. at 801; *First
Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 794 (1978) (holding that a regulation
that is overinclusive is not narrowly tailored to its goal). In sum, the Line Relief Ban
is an overinclusive, prophylactic rule that cannot satisfy the tailoring requirements
applicable to regulations of expressive conduct. It therefore violates the First
Amendment, and the District Attorneys should be enjoined from enforcing it.

**II.      Plaintiffs will suffer irreparable harm if the injunction is denied.**

Enforcement of the Line Relief Ban will irreparably harm Plaintiffs' rights under the First Amendment. As the Eleventh Circuit held, threats to "associational and franchise-related rights" represent "significant, irreparable harm." *Charles H. Wesley Educ. Found.*, *Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005). And "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Coal. for Good Governance v. Kemp*, No. 1:21-CV-02070-JPB, 2021 WL 3710475, at *14 (N.D. Ga. Aug. 20, 2021) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Relatedly, as demonstrated above, SB 202's ban on distributing or coordinating the distribution of food and drink to voters waiting in line is an unconstitutional "direct penalization" of protected speech, and any remedy provided at the conclusion of this case cannot restore the expressive opportunities Plaintiffs will miss in the interim. *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020) (enforcement of speech and associational restrictions, "for even minimal periods of time, constitutes 'a *per se* irreparable injury'"). Thus, without an injunction against the Line Relief Ban, Plaintiffs' and voters' constitutional rights will be irreparably injured.

16

III.   **The balance of equities favor granting a preliminary injunction, and such relief is in the public interest.**

Where the government opposes a preliminary injunction, the equities merge with the public interest. *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020). "It is clear that neither the government nor the public has any legitimate interest in enforcing an unconstitutional ordinance." *Otto*, 981 F.3d at 870. Meanwhile, "cautious protection of the Plaintiffs' franchise-related rights is without question in the public interest." *Cox*, 408 F.3d at 1355. A preliminary injunction in this case, would "no more than safeguard that interest." *Jones v. Governor of Fla.*, 950 F.3d 795, 831 (11th Cir. 2020).

While the State may have a general "interest in enforcing its statutes," that argument "would prove too much" by itself, as it would mean that "hardly any preliminary injunction could ever issue" against a state law. *Id.* at 829. Instead, courts must weigh the specific harm that would result from enjoining the statute against the law's threatened irreparable harm. *See id.*

Here, the balance of the equities weighs heavily in favor of an injunction because it would pose virtually no hardship to the District Attorneys whatsoever. First, the Line Relief Ban violates the First Amendment, and the District Attorneys have "no legitimate interest in enforcing an unconstitutional" statute and thus no harm from the injunction. *Baumann v. City of Cumming*, No. 2:07-CV-0095-WCO,

17

2007 WL 9710767, at *7 (N.D. Ga. Nov. 2, 2007); *accord Fla. Businessmen for Free Enter. v. City of Hollywood*, 648 F.2d 956, 959 (5th Cir. 1981); *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004) ("[T]here can be no irreparable harm to a municipality when it is prevented from enforcing an unconstitutional statute because it is always in the public interest to protect First Amendment liberties.") (quotation omitted).

Second, enjoining the District Attorneys' enforcement of the Line Relief Ban does not raise the type of concerns regarding election administration or voter confusion that courts may consider when evaluating whether to order a change in election laws prior to an election. For instance, in *Perdue v. Kemp*, another court in this district specifically rejected the argument that the application of *Purcell v. Gonzalez* counseled against granting injunctive relief against a Georgia statute regulating contributions for elective office. *Perdue v. Kemp*, No. 1:22-CV-0053-MHC, 2022 WL 710959, at *14 n.12 (N.D. Ga. Feb. 7, 2022). The court found that "[t]he so-called 'Purcell rule' is grounded in the idea that '[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws near, that risk will increase.'" *Id.* (citing *Purcell v. Gonzalez*, 549 U.S. 1, 5 (2006)). But because "[t]he injunction entered by th[e] Court has no impact on the casting of

votes, the counting of ballots, or anything to do with the election process . . . the *Purcell* principle [did] not preclude the injunction . . . ." *Id.*

Here, Defendants Gammage and Edwards are not election officials. They are county prosecutors. Prohibiting their enforcement of any criminal penalty associated with the Line Relief Ban would have little, if any, impact on the election process itself. *Id.* Importantly, Georgia's elections will "continue unaltered" if an injunction issues, with "[t]he only effect" being "on third party" line-relief providers "whose efforts to [support voters waiting in line] will not be criminalized." *Feldman v. Ariz. Sec'y of State's Off.*, 843 F.3d 366, 368 (9th Cir. 2016).

When weighing the equities of enjoining analogous criminal prohibitions on third-party election-related activity, courts have concluded that an injunction does "not confuse election officials or deter people from going to the polls." *Id.*; *see also Lichtenstein v. Hargett*, 489 F. Supp. 3d 742, 756 n.16 (M.D. Tenn. 2020) ("[E]njoining enforcement of the Law would merely put a stop to particular criminal prosecutions . . . it would not strain administration of election procedures or risk voter confusion.").

Finally, to the extent the burdens of implementing relief are properly considered, those burdens are negligible. Rather than requiring "Defendants, or anyone else, to scramble to revamp election procedures or do anything else," an

injunction "would require only that Defendants *not* do something, *i.e.*," prosecute violations of the Line Relief Ban. *Lichtenstein,* 489 F. Supp. 3d at 756 (emphasis in original). If the Ban is enjoined, law enforcement officials will simply revert to not interfering with the efforts of non-poll workers to distribute food or water. *See* Spalding Cnty. Resp. Pls.' First Interrog. No. 2(viii) at 5 (May 13, 2022). Enjoining the District Attorneys from enforcing the Line Relief Ban would thus impose, at most, "modest administrative burdens" that are not "unduly time consuming or costly." *Fish v. Kobach*, 840 F.3d 710, 754–55 (10th Cir. 2016); *cf. Coal. for Good Governance,* 2021 WL 3710475, at *15 (enjoining election laws even closer to election than present case).

Because the threatened injury to Plaintiffs outweighs any potential harm an injunction may cause to the District Attorney defendants, the balance of the equities and public interest weigh decisively in favor of injunctive relief.

## CONCLUSION

For these reasons, NGP Plaintiffs' Motion for Preliminary Injunction should be granted.

Respectfully submitted this 3rd day of June, 2022,

Halsey G. Knapp, Jr.                          */s/ Uzoma N. Nkwonta*
Georgia Bar No. 425320                        Uzoma N. Nkwonta*
Joyce Gist Lewis                              Jyoti Jasrasaria*
Georgia Bar No. 296261                        Spencer McCandless*
Adam M. Sparks                                Tina Meng*
Georgia Bar No. 341578                        Marcos Mocine-McQueen*
KREVOLIN & HORST, LLC                         Jacob D. Shelly*
1201 W. Peachtree St., NW                     ELIAS LAW GROUP LLP
One Atlantic Center, Suite 3250               10 G St. NE, Suite 600
Atlanta, GA 30309                             Washington, D.C. 20002
Telephone: (404) 888-9700                     Telephone: (202) 968-4490
Facsimile: (404) 888-9577                     unkwonta@elias.law
hknapp@khlawfirm.com                          jjasrasaria@elias.law
jlewis@khlwafirm.com                          smccandless@elias.law
sparks@khlawfirm.com                          tmeng@elias.law
                                              mmcqueen@elias.law
                                              jshelly@elias.law

                                              *Admitted *pro hac vice*
                                              *Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of L.R. 5.1, using font type of Times New Roman and a point size of 14.

Dated: June 3, 2022                                  */s/ Uzoma N. Nkwonta*
                                                     *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2022, I electronically filed this document with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record.

Dated: June 3, 2022                                  */s/ Uzoma N. Nkwonta*
                                                     *Counsel for Plaintiffs*