**IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT
OF GEORGIA ATLANTA DIVISION**

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.: 1:21-MI-55555-JPB |
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, *et al.*,<br><br>    *Plaintiffs*,<br>  v.<br><br>BRIAN KEMP, Governor of the State of Georgia, in his official capacity, *et al.*,<br><br>    *Defendants*,<br><br>REPUBLICAN NATIONAL COMMITTEE, *et al.*,<br><br>    *Intervenor-Defendants.* | Civil Action No.: 1:21-cv-01284-JPB |
| GEORGIA STATE CONFERENCE OF THE NAACP, *et al.*,<br><br>    *Plaintiffs*,<br>  v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Secretary of State for the State of Georgia, *et al.*,<br><br>    *Defendants*,<br><br>REPUBLICAN NATIONAL COMMITTEE, *et al.*,<br><br>    *Intervenor-Defendants.* | Civil Action No.: 1:21-cv-01259-JPB |

**<u>HONEST ELECTIONS PROJECT'S AMICUS CURIAE BRIEF IN
SUPPORT OF DEFENDANTS AND INTERVENOR-DEFENDANTS</u>**

## **TABLE OF CONTENTS**

Table of Contents ................................................................ i

Table of Authorities ......................................................... ii

Statement of the Identity of the Amicus Curiae ................................. iv

Introduction & Background .......................................... 1

Argument ................................................................... 3

    I.      SB 202 Reduces Election Administration Burdens ........................ 3

    II.    SB 202 Prevents Last-Second Electioneering ................................. 6

    III.   SB 202 Prevents Voter-Intimidation ........................................... 9

Conclusion .................................................................. 12

Certificate of Compliance ............................................... 13

Certificate of Service ..................................................... 13

## TABLE OF AUTHORITIES

Cases

*Burson v. Freeman*,

504 U.S. 191 (1992)........................................................................... 3, 7

*Citizens for Police Accountability Political Committee v. Browning*,

572 F.3d 1213 (11th Cir. 2009) ...........................................1, 3-4, 9, 12

*Merrill v. Milligan*,

142 S. Ct. 879 (2022)............................................................................ 3

*Minnesota Voters Alliance v. Mansky*,

138 S. Ct. 1876 (2018)................................................................ 1, 6, 11

*New Georgia Project v. Raffensperger*,

976 F.3d 1278 (11th Cir. 2020) ............................................................ 3

Constitutional Provisions

U.S. Const. art. I, § 4 ............................................................................ 1

Statutes

O.C.G.A. § 21-2-414(a).......................................................................2, 7

O.C.G.A. § 21-2-414(d) ........................................................................ 7

O.C.G.A. § 21-2-570............................................................................. 4

Other Sources

C. Ryan Germany Declaration,

D.E. 151-2................................................................................. *passim*

Exhibit from *League of Women Voters of Florida v. Byrd*,

D.E. 651, 4:21-cv-00186 (N.D. Fla. Feb. 26, 2022)........................... 11

Lynn Bailey Declaration,

D.E. 151-4................................................................................. *passim*

Trial Transcript from *League of Women Voters of Florida v. Byrd*,

    4:21-cv-00186 (N.D. Fla. Feb. 4, 2022) ...................................... 5-6, 11

Twitter Post, Georgia Conference of the NAACP,

    @Georgia_NAACP, Twitter (June 24, 2022, 1:20 P.M.) ................ 8-9

Twitter Post, Black Voters Matter,

    @BlackVotersMtr, Twitter (June 23, 2022, 9:00 A.M.) ...................... 9

Twitter Posts, New Georgia Project,

    @NewGAProject, Twitter (June 24, 2022, 10:53 A.M.) .................... 8

## STATEMENT OF THE IDENTITY OF THE AMICUS CURIAE

The Honest Elections Project is a non-partisan organization that is devoted to supporting the right of every lawful voter to participate in free and honest elections. The Honest Elections Project will defend the fair, reasonable, and commonsense measures that voters want in place to protect the integrity of the voting process. SB 202 is such a fair, reasonable, and commonsense measure, and the Honest Elections Project has an interest in defending it.

It should be noted that a party's counsel has not authored the brief in whole or in part; a party or a party's counsel has not contributed money that was intended to fund preparing or submitting the brief; and a person—other the amicus curiae, its member, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

## INTRODUCTION & BACKGROUND

"Polling places are meant to be a sanctuary" from confusion, political influence, and intimidation. D.E. 151-2 ¶ 22 (C. Ryan Germany declaration) (Ex. B). "Casting a vote is a weighty civic act, akin to a jury's return of a verdict, or a representative's vote on a piece of legislation." *Min. Voters All. v. Mansky*, 138 S. Ct. 1876, 1887 (2018). "Members of the public are brought together at th[ose] place[s], at the end of what may have been a divisive election season, to reach considered decisions about their government and laws." *Id.* at 1887.

States "want[] peace and order around" their "polling places," "for it preserves the integrity and dignity of the voting process and encourages people to come and to vote." *Citizens for Police Accountability Political Comm. v. Browning*, 572 F.3d 1213, 1220 (11th Cir. 2009). And States "may reasonably take steps to ensure" that "discord not follow the voter up to the voting booth, and distract from a sense of shared civic obligation at the moment it counts the most." *Min. Voters All.*, 138 S. Ct. at 1888; *see also* U.S. Const. art. I, § 4 ("The Times, Places and Manner of holding Elections" "shall be prescribed in each State by the Legislature thereof.").

Georgia's election laws strive to meet those ends. According to one election official, Georgia has "some of the safest in-precinct voting in the country." D.E. 151-2 ¶ 21. Under Georgia law, "[n]o person shall solicit votes," "distribute or display any campaign material," or "solicit signatures for any petition" within a buffer zone,

which spans "150 feet of the outer edge of any building within which a polling place is established" and "25 feet of any voter standing in line to vote at any polling place." O.C.G.A. § 21-2-414(a). The buffer zone also applies within "any polling place." *Id.*

The buffer zone "allows voters in the final stages of the voting process to be free of confusion and external influences"; it "establish[es] a voting environment that allows voters to access the ballot with as few interruptions and distractions as possible." D.E. 151-4 ¶¶ 8-9 (Lynn Bailey declaration).

And yet, during the 2020 election, some confusion and external influences took place within the buffer zone. "[M]any third-party organizations sent representatives to approach voters in line with food, drinks, masks, literature, and other goods." D.E. 151-2 ¶ 27. In other words, third-party organizations were giving food, drinks, and gifts to voters who were about to vote. Tables, food stations, and food trucks—some of which were initially situated or parked within the buffer zone—offered voters coffee, water, crackers, and food boxes, among other things. *Id.* ¶¶ 29(c), 31(d). Some individuals were even "wearing clearly identifiable campaign clothing and colors" when doing so. *Id.* ¶ 29(a) (Ex. A).

Of course, this led to concerns about election administration, vote influencing, and even voter intimidation. SB 202 addressed these concerns. SB 202 contains the anti-solicitation provision, which prevents "any person" from "giv[ing], offer[ing]

2

to give, or participat[ing] in the giving of any money or gifts, including but not limited to, food and drink," to a voter within the buffer zone.[1] SB 202 § 33.

Plaintiffs ask this Court to enjoin SB 202's anti-solicitation provision. That would be improper. The provision is a commonsense solution to pertinent election issues—issues that just manifested themselves in the previous election cycle. The provision serves three compelling state interests: (1) it reduces election administration burdens, *see New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020); (2) it prevents last-second electioneering, *see Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality op.); and (3) it prevents voter intimidation, *id.* For these reasons, this Court should deny Plaintiffs' motions.

## **ARGUMENT**

### I.   **SB 202 Reduces Election Administration Burdens**

"Running elections" "is extraordinarily complicated and difficult." *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring in grant of applications for stay). Elections "pose significant logistical challenges," *id.*, and may require "split-second decisions" from election administrators, *Citizens*, 572 F.3d at 1220. This complicated and difficult task is not made any easier given Georgia's

---

[1] The bill also allows poll officers to "mak[e] available self-service water from an unattended receptacle to" a voter "waiting in line to vote."

"complex set of rules to protect voters and election officials and ensure a calm and orderly process of voting." D.E. 151-2 ¶ 17.

SB 202's anti-solicitation provision made things simple: no one—regardless of good intention—can give voters within the buffer zone food, drinks, or gifts. A line drawing problem is avoided: what constitutes a helpful gesture and what constitutes impermissible electioneering before casting a ballot? *See, e.g.*, *id.* ¶ 31(c) (election administrator complaining of "where to draw the line") (Ex. E).

Granted, "giving or receiving money or gifts for the purpose of" "voting[] or voting for a particular candidate" is illegal under Georgia law. O.C.G.A. § 21-2-570. But *what* the third-party organization provides to voters, and *who* the third-party organization is, puts election administrators in a complicated and difficult position.

For example, is it permissible for the League of Women Voters to hand out coffee and water to voters within the buffer zone? Would the answer change if the National Rifle Association did the same thing? What if the NRA gave voters coffee, water, and an NRA hat? Or let us say that Planned Parenthood procured a food truck and gave hot dogs, hamburgers, chips, slushies, and sunglasses to voters within the buffer zone? Can the American Baptist Association hand out cross-shaped cookies? And what if any of these organizations gave such food, drinks, and materials to some, but not all, voters waiting in line? Those "split-second decisions" from election administrators are tough calls. *Citizens*, 572 F.3d at 1220.

SB 202's anti-solicitation provision resolved another issue: if third-party organizations are going to interact with voters, who will supervise the interactions? As one election administrator stated, it is "impossible for the poll managers, workers[,] and watchers to monitor what is being said by these groups as they perform their 'line warming.'" D.E. 151-2 ¶ 28. On a busy election day with scores of third-party organizations and even more voters in and around a polling place, election administrators simply cannot supervise everything.

In another election case, *League of Women Voters of Florida v. Byrd,* Miami-Dade County Supervisor of Elections White described how difficult it is to monitor voters and third-party organizations at polling locations:

> I would represent to you that in Miami-Dade, anyway, it can be impossible to discern what is solicitation, what is not solicitation. People try to take advantage, right, and say, Oh, no, I'm just going to the bathroom, and then, you know, they start talking to voters. Or, another example is we have early voting sites in libraries and, you know, they pretend like they are just going to be a patron reading a book, you know, inside the early voting location, but then, you know, they leave campaign materials everywhere. And, you know, I have other examples where, you know, it is so impossible with the volume of sites and the volume of people that we are dealing with out there to discern who is engaging in activity to influence, who is not, you know, who is providing nonpartisan assistance, who is not.

Tr. 1376:15 – 1377:3, *League of Women Voters of Fla. v. Byrd*, 4:21-cv-00186 (N.D. Fla. Feb. 4, 2022). For Supervisor White, a robust anti-solicitation policy made election administration easier:

And so, you know, a good policy is one that is easy to understand, is easy to administer, and is easy to enforce. And so, you know, to put this type of interpretation on my essential poll workers who have, you know, been to training for less than a day I think is something that can be handled wildly inconsistent in those locations. So, again, to keep our voters safe, we ask everybody to conduct all activity outside of the 150 feet.

Tr. 1377:4-11, *League of Women Voters of Fla. v. Byrd*, 4:21-cv-00186 (N.D. Fla. Feb. 4, 2022).

SB 202's anti-solicitation provision does the same thing. "By restricting" individuals from the buffer zone, "elections officials may more easily monitor the voting process and ensure that voters are free of outside influences during the final stages" of casting a ballot. D.E. 151-4 ¶ 18. Voters can cast their ballots without harassment, and election administrators can focus their efforts on ensuring a safe and secure election.

## II.    SB 202 Prevents Last-Second Electioneering

"Casting a vote" "is a time for choosing, not campaigning." *Minn. Voters All.*, 138 S. Ct. at 1887. To be sure, outside the buffer zone, "anyone may campaign freely. Voters will often notice a collection of campaign signs just beyond the 150-foot limit when approaching their polling place or early voting site, as candidates try to reach voters one last time before they enter the protected zone around a polling place." D.E. 151-2 ¶ 23. But once voters are inside the buffer zone, they should be "free of confusion and external influences." D.E. 151-4 ¶ 9.

6

The whole purpose of the buffer zone is undermined when third-party organizations can approach voters within the buffer zone with food, drinks, and gifts, all of which could influence voters. That would be an ironic outcome, given that a pro-choice candidate cannot solicit votes within the buffer zone, O.C.G.A. § 21-2-414(a); O.C.G.A. § 21-2-414(d), but a pro-choice third-party organization can give meals, drinks, and gifts to voters within the buffer zone before the voters cast their ballots.

Appearances matter. What one person may consider a helpful gesture, another person may consider to be a means to influence voters. In 2020, Georgians complained that third-party organizations, food trucks, and food stations in or near the buffer zone may have been used to influence voters. D.E. 151-2 ¶¶ 29-31. That undermines confidence in the integrity of the electoral process, something that is hard to establish but easy to diminish.

Voter confidence is further undermined when, as in 2020, "people setting up tables and food stations within the 150-foot voter protection [b]ubble" were "wearing clearly identifiable campaign clothing and colors." *Id.* ¶ 29(a). This makes waiting in line to cast a ballot less like a "sanctuary free from political influence," D.E. 151-2 ¶ 36, and more like an "open auction place," *Burson*, 504 U.S. at 202 (plurality op.).

Indeed, third-party organizations have not been coy in their aims. Just last election cycle, one third-party organization stated that its food trucks at polling places were being used as its "last chance to reach Georgians before they vote." D.E. 151-2 ¶ 30(c). In fact, the organization stated that it wanted to reach voters before they voted because "the results have the potential to determine control of the U.S. Senate." *Id.*

"[D]epending on the organization that is distributing" food, drinks, or gifts, "there could arise allegations or perceptions of having a political agenda." *Id.* ¶ 30(b) (Ex. B). Frankly, that would be the concern if the Plaintiff organizations offer food, drinks, and gifts to voters within the buffer zone. While the New Georgia Project, the NAACP, and BVM, for example, are non-partisan, they are hardly silent on their political agenda. Take, for instance, some of their public statements on recent, politically charged issues:

- *Dobbs v. Jackson* "is a flagrant attempt to control the bodies, rights, and health of women and anyone who can become pregnant." @NewGAProject, Twitter (June 24, 2022, 10:53 A.M.), https://bit.ly/3OM5gEp.
- "Because of" GOP Governor "Brian Kemp's complete contempt of anyone with a uterus, abortion access in Georgia will likely be obliterated." @NewGAProject, Twitter (June 24, 2022, 10:53 A.M.) https://bit.ly/3QQ7NPo.
- "Those who claim to be 'pro-life' are actually killing people." @NewGAProject, Twitter (June 24, 2022, 10:53 A.M.), https://bit.ly/39RCLpX.
- "Over the last few months, we have watched a constant attempt to roll back rights. Voting rights, reproductive rights, and fundamental civil rights have been targeted." "All the elected officials in this state

need to do something to protect all women's reproductive rights, specially Black women, who will be impacted by this decision." @Georgia_NAACP, Twitter (June 24, 2022, 1:20 P.M.), https://bit.ly/3HPIQQl.

- "The 2020 Presidential Election, Georgia Senate Runoff, and confirmation of Judge Ketanji Brown Jackson would NOT have been possible without historic Black voter turnout. Now, the right to vote is being attacked. Join us in taking action." @BlackVotersMtr, Twitter (June 23, 2022, 9:00 A.M.), https://bit.ly/3A1Tf9F.

Given the organizations' public comments on political issues, a voter within a buffer zone may reasonably believe that volunteers from these organizations are attempting to advance their political agenda by handing food, drinks, and gifts to voters.

That said, the Plaintiff organizations are free to express their political beliefs and provide voters with food, drinks, gifts, and campaign material; SB 202 only prevents them from doing so within the buffer zone.

## III.   SB 202 Prevents Voter Intimidation

Voters should not be discouraged from waiting in line and casting a ballot. "Commotion," be that "bustle, stir," or "confusion," at a polling place can have that effect on voters. *Citizens*, 572 F.3d at 1215. Commotion is "capable of intimidating and confusing the electorate and impeding the voting process—even deterring potential voters from coming to the polls." *Id.* at 1219.

Without SB 202's anti-solicitation provision, "it takes little foresight to envision polling places awash" with third-party organizations, "some competing

9

(albeit peacefully) for the attention of the same voters at the same time." *Id.* at 1220. It "is probable that some—maybe many—voters faced with *running the gauntlet* will refrain from participating in the election process merely to avoid the resulting commotion when leaving the polls." *Id.* (emphasis in the original).

Third-party organizations were "aggressive" and "sophisticated" in their efforts during the last election cycle. D.E. 151-2 ¶ 29(a). Given the success of these efforts, these organizations—as well as other, new organizations—will likely be even more aggressive and sophisticated in elections to come. It is not hyperbole to believe that that some polling places may be awash with volunteers and food trucks that are competing for voters' attention.

The sheer number of third-party organizations and volunteers is not the only thing that could intimidate voters. The third-party organizations themselves could intimidate voters. If SB 202 is enjoined, *any* third-party organization could offer food, drinks, and gifts to voters who are about to vote. Even odious third-party organizations like the Proud Boys. The presence of certain organizations at polling places and within the buffer zone would deter voters from casting their ballots in person.

But intimidation can take other forms as well. One polling place, for example, could be awash in non-partisan, yet solely left-leaning, third-party organizations. A voter may not feel comfortable going to the polling place and casting a ballot. And

even if the voter stays in line, there may be a sticky situation if the voter rejects an offering of food, drinks, or gift from the third-party organization. As noted above, such third-party organizations, like the New Georgia Project, the NAACP, and BVM, publicly take stances on hot-button issues. If the voter rejects an offering from these organizations in a public setting during a divisive political climate, the voter may fear that he or she will be perceived as having "contempt of anyone with a uterus," as opposing "fundamental civil rights," and as endorsing "killing people." *See supra*.

Voter intimidation is not an abstract concern. During the last election cycle, "older voters felt intimidated by the presence of" the "Black Voters Matter Group," as group members were handing out food and drinks. D.E. 151-2 ¶ 30(a) (cleaned up). Miami-Dade County Supervisor of Elections White also recounted the "aggressive and/or intrusive" tactics used by parties before the county adopted its anti-solicitation provision: bullhorns and loud music were being played at polling places, individuals were engaging voters within 100 feet of a polling place, and people were getting "in fights with each other," which required police intervention. Tr. 1388:9-14, *League of Women Voters*, 4:21-cv-00186 (N.D. Fla. Feb. 4, 2022); D.E. 651 at 5, *League of Women Voters*, 4:21-cv-00186 (N.D. Fla. Feb. 26, 2022).

This commotion, as scene during the 2020 elections in Georgia and in other jurisdictions, is "capable of intimidating and confusing the electorate, "impeding the

voting process," and "deterring potential voters from coming to the polls." *Citizens*, 572 F.3d at 1219. SB 202's anti-solicitation provision prevents that from happening.

## CONCLUSION

SB 202's anti-solicitation provision is a commonsense election law: it prevents administrative confusion, prevents last-second electioneering, and prevents voter intimidation. It should be upheld, and Plaintiffs' motions should be denied.

Dated:  June 30, 2022                     /s/ *Gary K. Hunter, Jr.*

Gary K. Hunter, Jr.
Georgia Bar No. 378878
Counsel for Honest Elections Project
*Amicus Curiae*
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe Street
Suite 500
Tallahassee, Florida 32327
Telephone: (850) 391-0509
Email: ghunter@holtzmanvogel.com

## **CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing document has been prepared in Times New Roman 14, a font and type selection approved by the Court in L.R. 5.1(C).

Dated:  June 30, 2022                 /s/ *Gary K. Hunter, Jr.*

                                        Gary K. Hunter, Jr.
                                        *Counsel for Honest Elections Project*
                                        *Amicus Curiae*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 30, 2022, I electronically filed this document with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record.

Dated:  June 30, 2022                 /s/ *Gary K. Hunter, Jr.*

                                        Gary K. Hunter, Jr.
                                        *Counsel for Honest Elections Project*
                                        *Amicus Curiae*